UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| ERIC MATILTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> HUMBOLDT COUNTY, et al., <br><br> Defendants. | Case No. 25-cv-01168-RMI <br><br> **ORDER ON MOTION TO DISMISS** <br> Re: Dkt. No. 13 |

Now pending before the court is the motion (dkt. 13) of Defendant Christian Agricola, M.D. ("Dr. Agricola") to dismiss Plaintiffs' complaint (dkt. 1). Oral argument was heard in this matter on June 3, 2025. After consideration of the parties' arguments and the relevant law, the court has determined that Dr. Agricola's motion will be GRANTED IN PART AND DENIED IN PART.

**I.    Background**

"In assessing whether a plaintiff has stated a claim, we accept as true all well-pleaded factual allegations, and construe all factual inferences in the light most favorable to the plaintiff." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Plaintiffs have alleged the following relevant facts in this matter:

Plaintiffs are the children of Eric Matilton, Sr. (hereinafter "Mr. Matilton"). (Dkt. 1, p. 3). Mr. Matilton had "a long, well-documented history of severe and debilitating mental illness." *Id.* at 6. In early November of 2023, Mr. Matilton's family discovered that Mr. Matilton was experiencing a mental health crisis. *Id.* at 7. However, his family was unable to get him the mental health care he needed. *Id.*

1   On the evening of November 3, 2023,[1] Mr. Matilton entered another man's home while
2   speaking nonsensically and swinging a baseball bat.  (Dkt. 1, p. 7).  As a result, Mr. Matilton was
3   arrested on misdemeanor charges.  *Id.* at 8.  During his arrest, Mr. Matilton spoke nonsensically
4   about God and demons.  *Id.*  Mr. Matilton was then booked in the Humboldt County Correctional
5   Facility ("HCCF").  *Id.*  Despite the circumstances of his arrest and the fact that Mr. Matilton had
6   a prescription for the antipsychotic medication Seroquel, Mr. Matilton received no antipsychotic
7   medication for several days while at HCCF.  *Id.* at 10.

8   On November 6, 2023, Mr. Matilton reported that he felt hopeless, wanted to die, and was
9   experiencing suicidal thoughts.  (Dkt. 1, p. 10).  Based on this report, HCCF staff placed Mr.
10  Matilton in a "safety cell."  *Id.*

11  The next day, November 7, Mr. Matilton was evaluated by Dr. Agricola, a psychiatrist.
12  (Dkt. 1, p. 10).  Dr. Agricola noted that Mr. Matilton was experiencing suicidal thoughts and
13  auditory hallucinations commanding him to harm himself.  *Id.*  Dr. Agricola also knew that Mr.
14  Matilton had a history of self-harm, including a prior suicide attempt.  Further, Dr. Agricola was
15  aware of Mr. Matilton's ongoing mental health issues.  Dr. Agricola noted that Mr. Matilton's
16  impulse control was poor.  He also found Mr. Matilton's judgment and ability to participate in
17  treatment decisions to be poor.  *Id.*  Despite these findings, Dr. Agricola removed Mr. Matilton
18  from the safety cell in exchange for Mr. Matilton's agreement to take Seroquel.  *Id.* at 11.

19  Between November 7 and November 17, 2023, Mr. Matilton failed to take roughly half of
20  his doses of Seroquel.  (Dkt. 1, p. 11).  On several occasions, Mr. Matilton simply refused the
21  Seroquel; on at least one occasion, he was caught flushing it down the toilet.  *Id.*  While these
22  missed doses were documented, Plaintiffs allege that nursing staff failed to alert anyone that Mr.
23  Matilton was not fulfilling his part of the agreement.  *Id.* at 12.  Plaintiffs further allege that Dr.

---

[1] The complaint gives this date as "December 3, 2023[.]"  (Dkt. 1, p. 7).  The complaint describes other events as taking place in December as well.  *See id.* at 12–13.  However, from the context of the complaint and the content of the adjoining paragraphs, it appears that the references to December dates are typographical errors.  *See id.* at 6 ("On or about *November 3, 2023*, [Mr. Matilton] was arrested and thereafter became a pre-trial detainee at the HCCF.  *Only 14 days later, on November 17, 2023*, [Mr. Matilton] attempted suicide via asphyxiation" and later succumbed to those injuries.) (emphasis added).

1  Agricola had "actual or constructive knowledge" that Mr. Matilton was not taking Seroquel
2  regularly, but took no further action to protect him. *Id.* at 16.

3  On November 15, 2023, Mr. Matilton requested health services from on-site therapist
4  Kelsey Hawk, stating he was delusional and hearing voices. (Dkt. 1, p. 12). He requested
5  additional medication and for his outside treatment providers to be informed of his condition. *Id.*
6  Ms. Hawk, who is also a defendant in this matter, did not "take any steps to ensure health services
7  were provided[]" after receiving the request and instead noted that "no immediate intervention was
8  needed." *Id.* at 13. The complaint alleges that Ms. Hawk "controlled [Mr. Matilton's] access to
9  mental health services[]" and that her decisions were not reviewed by another healthcare provider.
10 *Id.*

11 On November 17, 2023, Mr. Matilton ripped and knotted multiple strips of his clothing
12 together, tied them to items in his cell, and attempted suicide by asphyxiation. (Dkt. 1, p. 13). He
13 was found unconscious by HCCF staff and later died of his injuries. *Id.*

14 Plaintiffs allege six causes of action in their complaint. Three of those causes of action are
15 alleged against Dr. Agricola: the first cause of action, for violation of Mr. Matilton's right to
16 medical care under the Fourteenth Amendment to the United States Constitution; the fourth cause
17 of action, for failure to furnish medical care in violation of California Government Code § 845.6;
18 and the sixth cause of action, for dependent adult neglect under California Welfare and Institutions
19 Code § 15610.57. Dr. Agricola argues that Plaintiffs have failed to state a claim against him under
20 either the Fourteenth Amendment or Cal. Welf. Inst. Code § 15610.57. The court will consider
21 these arguments in turn.

22 **II.     Legal Standard**

23 Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the
24 claim showing that the pleader is entitled to relief." Although a plaintiff need not include detailed
25 factual allegations in a complaint, the complaint must do more than recite elements of a cause of
26 action and state conclusions; rather, a plaintiff must state factual allegations sufficient to raise the
27 entitlement to relief "above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,
28 555 (2007). A complaint must proffer "enough facts to state a claim to relief that is plausible on

3

1  its face." *Id*. at 570.

2  **III.   Analysis**

3      *a. Fourteenth Amendment Claim*

The court finds that Plaintiffs have stated a claim against Dr. Agricola for violating Mr. Matilton's Fourteenth Amendment due process right to receive mental health care during his detention.

In the Ninth Circuit,

> the elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018). The Ninth Circuit also applies these factors when the pretrial detainee is the plaintiff's decedent. *See Sandoval v. County of San Diego*, 985 F.3d 657, 670 (9th Cir. 2021).

Here, taking Plaintiffs' allegations as true, Dr. Agricola's conduct meets this standard. First, Dr. Agricola made the intentional decision to remove Mr. Matilton from the safety cell based on Mr. Matilton's agreement to take Seroquel. Second, because Mr. Matilton was experiencing a mental breakdown with suicidal ideation and lacked the judgment to make appropriate decisions about his health, releasing Mr. Matilton from the safety cell put him at a substantial risk of causing harm to himself. Third, Dr. Agricola took no action to ensure that Mr. Matilton took his Seroquel, even after learning that Mr. Matilton was missing nearly half of his Seroquel doses, and did not transfer him back to the safety cell on learning of his noncompliance. A reasonable official in these circumstances would have taken immediate steps to ensure that Mr. Matilton either took the Seroquel or was not able to harm himself. Fourth, drawing all reasonable inferences in Plaintiffs' favor, Mr. Matilton's failure to take stabilizing medication and presence in a non-safety cell caused his suicide.

4

Dr. Agricola objects to this conclusion on several grounds. First, he argues that prescribing Mr. Matilton Seroquel and releasing him from the safety cell did not rise to the level of "reckless disregard" required to state a claim for a pretrial detainee's denial of medical care. *See Gordon*, 888 F.3d at 1125. However, the reasonableness of a medical decision "will necessarily turn on the facts and circumstances of each particular case." *Id.* (cleaned up). Here, for the moment, the only facts and circumstances before the court are those alleged by Plaintiffs: that Mr. Matilton was delusional, suicidal, and unable to exercise judgment regarding his own medical care, and that Dr. Agricola knew all of this. To the court's untrained eye, trusting such a person to comply with a treatment regimen (let alone taking no action after learning of noncompliance) represents a "reckless disregard" of the "substantial risk" that the regimen will not be followed, resulting in an act of self-harm by the patient.[2]

Dr. Agricola further argues that Plaintiffs' assertion that Dr. Agricola "knew or should have known" that Mr. Matilton was not taking his Seroquel is undercut by Plaintiffs' allegation that other staff failed to inform anyone of Mr. Matilton's noncompliance. However, these two allegations are not contradictory. Plaintiffs allege that other staff documented Mr. Matilton's refusals even though they did not tell others about the missed doses. Dr. Agricola could have learned that Mr. Matilton was not consistently taking Seroquel by reading these records or by any number of other means. Accordingly, Plaintiff's allegation that Dr. Agricola "knew" about Mr. Matilton's noncompliance is adequate.[3]

For these reasons, Plaintiffs' Fourteenth Amendment claims against Dr. Agricola may proceed.

   b. *Neglect of Dependent Adult Claim*

---

[2] While Dr. Agricola's counsel argued at the hearing that the supervised, regimented nature of drug dispensation at HCCF was a measure to ensure compliance, the exact means by which medication was dispensed to detainees is not detailed in Plaintiffs' complaint. Further, this does not address Plaintiffs' allegation that Dr. Agricola knew that Mr. Matilton was not complying despite whatever procedures HCCF had put in place.

[3] The court need not address Plaintiffs' alternative allegation that Dr. Agricola "had constructive knowledge" or "should have known" of Mr. Matilton's noncompliance. "If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2).

By contrast, Plaintiffs have failed to allege an adequate claim against Dr. Agricola for neglect of a dependent adult under California law.

California Welfare and Institutions Code Section 15610.57 defines neglect of a dependent adult in relevant part as "[t]he negligent failure of any person having the care or custody of . . . a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." Cal. Welf. & Inst. Code § 15610.57(a)(1). The California Supreme Court has held that the determination of whether a person has "care or custody of . . . a dependent adult" centers "on the nature and substance of the relationship between an individual and . . . a dependent adult. This focus supports the conclusion that the distinctive relationship contemplated by the Act entails more than casual or limited interactions." *Winn v. Pioneer Med. Grp.*, 370 P.3d 1011, 1017 (Cal. 2016). In short, "care or custody" refers to "the existence of a robust caretaking or custodial relationship—that is, a relationship where a certain party has assumed a significant measure of responsibility for attending to one or more…basic needs" of a dependent adult. *Id.* This responsibility must be "ongoing", and "a party with only circumscribed, intermittent, or episodic engagement" with the dependent adult does not meet the criteria. *Id.*, *id.* at 1013.

The court cannot conclude from Plaintiffs' allegations that Dr. Agricola had "care or custody of" Mr. Matilton under California law. The complaint does not detail Dr. Agricola's precise role in Mr. Matilton's treatment, and the court is unable to infer from the facts that Dr. Agricola "assumed a significant measure of responsibility" for one or more of Mr. Matilton's basic needs on more than a "circumscribed, intermittent, or episodic" basis. The complaint alleges only one interaction between Dr. Agricola and Mr. Matilton. After that interaction, the complaint does not allege any further involvement by Dr. Agricola in Mr. Matilton's treatment besides an awareness that Mr. Matilton was not taking the Seroquel regularly. (Indeed, the complaint states that *Ms. Hawk* had control of, and final say over, Mr. Matilton's mental health care.) One evaluation followed by medication monitoring is not the kind of "robust caretaking or custodial relationship" required to state a cause of action for dependent adult neglect under California law.

To be sure, it appears Dr. Agricola had the authority to place Mr. Matilton in, or remove Mr. Matilton from, a safety cell. However, the ability of a jail official to make choices about a

detainee's conditions of confinement does not in itself establish a "robust caretaking or custodial relationship." It is entirely possible for an official to have such authority and yet have only limited contact with, and responsibility for, a detainee, especially if other officials have the same authority. Here, for instance, any number of HCCF officials could have had similar authority and been able to exercise it independently of Dr. Agricola if they felt it was necessary. (Indeed, HCCF officials placed Mr. Matilton in a safety cell before Dr. Agricola ever became involved.) Because Plaintiffs do not plead facts establishing that Dr. Agricola had substantial and ongoing responsibility for (as opposed to just the ability to alter) Mr. Matilton's conditions of confinement for Mr. Matilton's safety, they have not stated a claim for neglect of a dependent adult.

Accordingly, Plaintiffs' sixth cause of action will be dismissed against Dr. Agricola. However, because this claim could "possibly be cured by the allegation of other facts" concerning Dr. Agricola's involvement in Mr. Matilton's care, the court will grant Plaintiffs leave to amend their complaint. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

### IV. Conclusion

For the reasons stated above, Dr. Agricola's motion is GRANTED IN PART AND DENIED IN PART. Plaintiffs' California-law dependent-adult-neglect claim is dismissed as against Dr. Agricola. Plaintiffs have 21 days from the issuance of this order in which to amend that claim. Plaintiffs' Fourteenth Amendment claim against Dr. Agricola may proceed.

**IT IS SO ORDERED.**

Dated: June 12, 2025

ROBERT M. ILLMAN
United States Magistrate Judge