UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

|  |  |
|---|---|
| ERIC MATILTON, et al., | Case No.  25-cv-01168-RMI |
| Plaintiffs, |  |
| v. | **ORDER ON MOTIONS TO DISMISS** |
| HUMBOLDT COUNTY, et al., | Re: Dkts. No. 28, 29 |
| Defendants. |  |

Before the court is the motion of Defendants Humboldt County and Kelsey Hawk (collectively, "County Defendants") (dkt. 29) to dismiss Plaintiffs' first amended complaint (dkt. 27). Plaintiffs have responded in opposition (dkt. 31) and County Defendants have replied (dkt. 33). Before the court is also the motion of Defendant Dr. Christian Agricola's (dkt. 28) to dismiss Plaintiffs' Sixth Cause of Action against him on the grounds that the first amended complaint fails to allege facts supporting this cause of action. Plaintiffs have responded in opposition (dkt. 30) and Dr. Agricola has replied (dkt. 32).

For the reasons stated below, County Defendants' motion will be GRANTED IN PART AND DENIED IN PART and Dr. Agricola's motion will be GRANTED.

## I.    Factual Allegations

Plaintiffs are the children of Eric Matilton, Sr. (hereinafter "Decedent"). (Dkt. 27, at 2–3.) Decedent passed away following a suicide attempt while detained at the Humboldt County Correctional Facility ("HCCF"). *Id.* at 2. Plaintiffs are suing Humboldt County ("the County"), Dr. Christian Agricola, Associate Marriage and Family Therapist ("AMFT") Kelsey Hawk, and several Doe defendants, alleging that Decedent's suicide was the result of inadequate mental health care during his detention. *See id.* at 2–5.

Plaintiffs allege that Decedent had a long and well-documented history of serious mental illness, much of which was known to the County.  (Dkt. 27, at 7.)  Indeed, County-affiliated medical providers had previously "diagnosed Decedent with post-traumatic stress disorder, major depressive disorder with psychotic features, unspecified schizophrenia spectrum and other psychotic disorder, and episodic mood disorder." *Id.* at 7–8.  Previous evaluations of Decedent by County employees or affiliates noted both suicidal ideation and auditory hallucinations.  *Id.* at 8.  These evaluations also reflected that Decedent had previously attempted suicide.  *Id.*  All of these medical records were in the County's possession and accessible to the County's employees and affiliates at the time of Decedent's detention.  *Id.*

On November 3, 2023, Decedent was experiencing an acute mental health crisis.  (Dkt. 27, at 8.)  Decedent's family tried to help but was unable to get him mental health care.  *Id.*  At 7:30 p.m. that evening, Decedent entered a neighbor's home, swinging a baseball bat and speaking nonsensically.  Decedent was ultimately arrested on misdemeanor charges.  During his arrest, Decedent spoke nonsensically about God and demons.  *Id.*

After his arrest, Decedent was brought to HCCF.  (Dkt. 27, at 9.)  Once there, Decedent was given an incomplete mental health screening.  *Id.*  Questions on the screening form about suicidality and Decedent's mental health status and history were left blank, filled out inconsistently with other answers, or completed inaccurately.  Further, Decedent's previous mental health records were not meaningfully consulted as part of the intake process.  As a result, Decedent was placed in HCCF's general population.  *Id.*

On the morning of November 6, 2023, HCCF staff received calls from two of Decedent's healthcare providers.  (Dkt. 27, at 9–10.)  One of these providers called to request that Decedent be seen by mental health personnel while in custody.  *Id.* at 9.  The other called to inform HCCF of Decedent's history of mental illness, including psychotic episodes, and Decedent's prescription for Seroquel.  *Id.* at 10.  However, Decedent was only given a mental health referral of "unspecified urgency" and was given no medication, including Seroquel, between November 3 and November 6.

On the evening of November 6, 2023, Decedent reported suicidal thoughts and

hopelessness. (Dkt. 27, at 11.) It was determined that Decedent was unable to keep himself safe, so he was placed in a "safety cell." *Id.* The next day, Decedent was evaluated by Dr. Agricola. Dr. Agricola's notes reflect that Decedent expressed suicidal ideations and reported auditory hallucinations commanding that he self-harm. *Id.* Dr. Agricola noted Decedent's mood as anxious and depressed, his affect as restricted, his impulse control as poor, and his judgment as poor in the context of treatment decisions. *Id.* at 12. Dr. Agricola ultimately removed Plaintiff from the safety cell on the condition that Plaintiff would take Seroquel. *Id.*

On November 8, criminal proceedings against Decedent were suspended when a judge determined there was a doubt as to Decedent's competence to assist in his own defense. (Dkt. 27, at 13.)

Between November 7 and November 17, Decedent failed to take roughly half of his scheduled doses of Seroquel. (Dkt. 27, at 13.) While HCCF employees documented these missed doses, including one incident where Decedent flushed his Seroquel down the toilet, they took no action to ensure Decedent's compliance with his medication regimen or return Decedent to a safety cell. *Id.* at 13–14.

On November 15, Decedent requested mental health services from Ms. Hawk, complaining that he was delusional and hearing voices. (Dkt. 27, at 14.) These voices were particularly significant given Decedent's recent history of auditory hallucinations commanding self-harm. *Id.* at 15. Besides requesting health services, Decedent sought additional medication and for his status to be communicated to his outside mental health provider. *Id.* Plaintiffs allege that Ms. Hawk was aware of Plaintiff's previous suicidality and auditory hallucinations, his previous suicide attempt, and the fact that an outside psychiatrist had prescribed him medication. *Id.* at 22. However, despite this information and the actual or constructive knowledge that Decedent was not taking the Seroquel regularly, Ms. Hawk determined that no immediate intervention was needed. *Id.* at 15.

Plaintiffs allege that Ms. Hawk should never have been in a position to make this decision. Specifically, they allege that AMFTs are required to work under the direct supervision of licensed therapists, who are responsible for approving AMFTs' treatment decisions. (Dkt. 27, at 16.)

1    However, Plaintiffs allege that the County permitted Ms. Hawk to work unsupervised at all

2    relevant times, that Ms. Hawk was given the "ongoing responsibility to provide care to

3    Decedent[,]" and that Ms. Hawk "was responsible for . . . providing mental health support related

4    to Decedent throughout Decedent's detention." *Id.*  None of the decisions Ms. Hawk made about

5    Decedent's care were approved by a licensed therapist. *Id.*

6         Plaintiffs allege that no mental health services were provided to Decedent between his

7    November 15 request and the evening of November 17.  (Dkt. 27, at 15.)  That evening, Decedent

8    was found unconscious after attempting suicide. *Id.* at 17.  Decedent had been able to tie ligatures

9    to multiple points in his cell and hang himself without being noticed. *Id.*  Decedent later died of

10   his injuries. *Id.*

11        Plaintiffs allege that Decedent's death did not occur in a vacuum.  A 2017-2018 report

12   from a Humboldt County Grand Jury noted that HCCF lacked the staff to meet the mental health

13   needs of its detainees.  (Dkt. 27, at 17.)  The same report noted that the existing staff were not

14   available for sufficient amounts of time, that clinical staff often overrode the orders of physicians,

15   and that clinicians sometimes practiced beyond the scope of their authority. *Id.*  Finally, the report

16   noted a lack of policies and procedures in place for mental health care as well as insufficient

17   administrative involvement in mental health treatment. *Id.* at 17–18.  Subsequent Grand Jury

18   reports continued to note insufficient mental health staffing and inappropriate mental health

19   services. *Id.* at 18.  The County has refused to create a plan to remedy these deficiencies. *Id.*

20   Plaintiffs allege that a lack of proper staffing motivated Dr. Agricola and Ms. Hawk's deficient

21   treatment decisions. *Id.* at 26.

22   **II.    Legal Standard**

23        Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be

24   dismissed for failure to state a claim for which relief may be granted.  Rule 12(b)(6) requires

25   dismissal when a complaint lacks either a "cognizable legal theory" or "sufficient facts alleged"

26   under such a theory. *Godecke v. Kinetic Concepts, Inc.,* 937 F.3d 1201, 1208 (9th Cir. 2019)

27   (citation omitted). A complaint contains sufficient factual allegations if it pleads enough facts to

28   "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

United States District Court
Northern District of California

1  (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In turn, a claim is plausible

2  "when the plaintiff pleads factual content that allows the court to draw the reasonable inference

3  that the defendant is liable for the misconduct alleged." *Id.* at 678.

4      When evaluating a motion to dismiss, courts "accept factual allegations in the complaint as

5  true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v.*

6  *St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  However, "allegations in a

7  complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient

8  allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

9  effectively." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (citations omitted).

10          *a.  14th Amendment Right to Mental Health Care (Claims 1–3)*

11              i.  Deliberate Indifference

12      The County Defendants argue that Plaintiffs' allegations do not show that Ms. Hawk was

13  deliberately indifferent to Decedent's needs in violation of the Fourteenth Amendment.  The court

14  disagrees.

15      In the Ninth Circuit,

16          the elements of a pretrial detainee's medical care claim against an
            individual defendant under the due process clause of the Fourteenth
17          Amendment are: (i) the defendant made an intentional decision with
            respect to the conditions under which the plaintiff was confined; (ii)
18          those conditions put the plaintiff at substantial risk of suffering
            serious harm; (iii) the defendant did not take reasonable available
19          measures to abate that risk, even though a reasonable official in the
            circumstances would have appreciated the high degree of risk
20          involved—making the consequences of the defendant's conduct
            obvious; and (iv) by not taking such measures, the defendant caused
21          the plaintiff's injuries.

22  *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).  The Ninth Circuit also uses

23  this test when the pretrial detainee is the plaintiff's decedent.  *See Sandoval v. County of San*

24  *Diego*, 985 F.3d 657, 670 (9th Cir. 2021).

25      While the County Defendants quote the *Gordon* test in full, they make no argument as to

26  which prongs of the test the complaint fails.  Instead, they point the court to three out-of-district

27  cases with similar facts which were ultimately dismissed.  The court finds these cases to be

28  inapposite.

United States District Court
Northern District of California

1    The first case County Defendants cite is *Moreno v. County of San Bernardino*, 2022 WL

2    3012224 (C.D. Cal. June 2, 2022).  In that case, the plaintiff presented a set of barebones

3    allegations about her decedent: that law enforcement knew of the decedent's mental health

4    struggles, that the decedent was suicidal at the time of his arrest, that the decedent requested help

5    with his mental health from several employees, that no appropriate care was provided, and that the

6    decedent then committed suicide.  *Id.* at *1.  The court dismissed the plaintiff's original complaint,

7    noting no indication that anyone at the jail knew or should have known that the decedent was

8    suicidal.  *Id.* at *3.

9    The complaint in the present case, by contrast, alleges many more relevant details.  For

10   example, Plaintiffs here allege that Decedent had a history of suicidal ideations and attempted

11   suicide at least once and that this was reflected in the County's records, to which all Defendants

12   had access.  Plaintiffs further allege that while in County custody, Decedent actually reported

13   suicidal ideation and was placed in a safety cell.  They then allege that Decedent was removed

14   from the safety cell on the condition that he take Seroquel, but that the County Defendants knew

15   or should have known that Decedent did not consistently take Seroquel.  Finally, Plaintiffs allege

16   that Decedent requested medical help for auditory hallucinations before his death—significant

17   because Decedent's previous suicidal ideation had been spurred by auditory hallucinations telling

18   Decedent to kill himself.  All of these are circumstances from which the County Defendants, and

19   Ms. Hawk in particular, could have determined that there was a "high degree of risk involved" in

20   failing to take further action.

21   Further, as Plaintiffs point out in their response, the plaintiff in *Moreno* successfully

22   amended her complaint to survive a second motion to dismiss.  2022 WL 17078659 (C.D. Cal.

23   Aug. 26, 2022).  In the amended complaint, she alleged that her decedent made it plain at the time

24   of his arrest that he was suicidal, that staff at the jail knew he had a history of suicide attempts,

25   that he told staff he had auditory hallucinations commanding him to self-harm, and that he

26   continued to report and exhibit serious mental health symptoms for a prolonged period of time.

27   *Id.* at *1.  During this time, the decedent was housed in a safety cell.  *Id.*  Eventually, the decedent

28   punched a wall kiosk and was hospitalized.  After being released from the hospital, the decedent

United States District Court
Northern District of California

was transferred to a regular cell, where he hanged himself shortly afterward.  *Id.*  The court in that matter found that the plaintiff had stated a claim for deliberate indifference.  *Id.* at *3.  It concluded that the combination of circumstances—the decedent's history of suicide attempts, his previous suicidality, his prolonged presence in a secure cell, and the fact that he had injured himself shortly before he was moved out of the safety cell—showed a high degree of risk to the decedent.  *Id.*  Notably, the decedent does not appear to have expressly stated that he was actively suicidal after his initial booking in jail.  *See id.* at *1.  The facts of the amended *Moreno* complaint are quite similar to the case at bar.

Next, the County Defendants cite *Damitz v. City of Los Angeles*, 2018 WL 6177953 (C.D. Cal. Sept. 24, 2018).  In that case, the plaintiff alleged that her decedent (who suffered from multiple mental illnesses and had attempted suicide at least once in his life) did not comply with his medication regimen and was considered "a risk to himself and others" by his probation officer. *Id.* at *1.  The decedent was institutionalized with the recommendation that he be placed in a "secure environment," but no precautions were taken against suicide, and he ultimately killed himself.  *Id.*  The *Damitz* court dismissed the complaint, noting that "Decedent's prior suicide attempt could have occurred anytime between 1969 and 2017[]" and that "Decedent's mental illness and [the] recommendation [that he be placed] in a 'secure environment' also do not give rise to the reasonable inference that Decedent was 'on the brink of killing himself.'"  *Id.* at *3 (quoting *Simmons v. Navajo Cty.*, 609 F.3d 1011, 1018 (9th Cir. 2010)).

In this case, however, the facts alleged *could* give rise to such an inference.  Rather than one suicide attempt within the past 50 years, Decedent had complained of suicidal ideation on several occasions in the past, including during the same stint in jail.  This most recent episode of suicidal ideation, accompanied by auditory hallucinations commanding Decedent to self-harm, was serious enough to warrant Decedent's confinement in a safety cell.  Decedent was then released from the safety cell (with no apparent improvement in his condition) based on his promise to take Seroquel, a promise he frequently broke with the County Defendants' actual or constructive knowledge.  Decedent's mental health appeared to have been deteriorating, as his auditory hallucinations had resumed.  Further, Decedent's past auditory hallucinations had

commanded him to self-harm.  Taken together, these facts would have informed a reasonable person that Decedent was at a "high degree of risk" for an "impending suicidal crisis."  *Gordon*, 888 F.3d at 1125; *Simmons*, 609 F.3d at 1018.

The final case cited by the County Defendants is *Estate of Posard v. Los Angeles County Sheriff's Department*, 2024 WL 4403865 (C.D. Cal. Sept. 12, 2024).  In that case, the decedent only reported suicidal ideation during a *prior* incarceration several months before his death, denied suicidal ideation during his final incarceration, and showed no indications of risk other than depression and the refusal to undergo certain medical testing.  *Id.* at *1–2.  Here, the facts which would have put the County Defendants on notice of Decedent's "impending suicidal crisis" included suicidal ideation during the same two-week period of detention, frequent refusal to take the medicine prescribed to combat that ideation, and the return of auditory hallucinations where Decedent had a very recent history of such hallucinations commanding him to self-harm.  *Estate of Posard* is therefore inapposite.  Indeed, that case cited another Central District case which allowed a claim where the "decedent was removed from suicide watch without justification, experienced worsening psychotic episodes and symptoms, and made numerous attempts to obtain treatment in the time leading up to his suicide[.]"  *Id.* at *5 (citing *Mendoza v. County of San Bernardino*, 2020 WL 2066142, at *5–*6 (C.D. Cal. Feb. 21, 2020).  The present case is factually more similar to *Mendoza* than it is to *Posard*.

Accordingly, the County Defendants have not shown that Plaintiffs have failed to plead deliberate indifference.

ii.  Qualified Immunity

The County Defendants further argue that Ms. Hawk is entitled to qualified immunity. Qualified immunity shields government officials from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A case "clearly establishes" a constitutional right for qualified immunity purposes if it is controlling precedent from the Ninth Circuit or the Supreme Court and was decided before the alleged violation took place.  *Russell v. Lumitap*, 31 F.4th 729, 737 (9th Cir. 2022).  "While there need not exist 'a case directly on point

8

for a right to be clearly established, existing precedent must have placed the . . . constitutional question beyond debate.'" *Id.* (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)).

The County Defendants assert that "[t]here is no binding precedent that a mental health worker in a jail violates the Constitution by not requesting immediate intervention when an inmate with prior mental health history makes a request for health services after experiencing delusions and hearing voices but did not describe anything to indicate he had suicidal thoughts."  (Dkt. 29, at 19–20.)  The court suspects this is true, at least in the sense that no Ninth Circuit case it has encountered presents this very particular set of facts.  There is, however, binding precedent stating that "deliberate indifference to a detainee's mental health needs that results in the detainee's suicide[]" may violate a detainee's constitutional rights.  *Clouthier v. Contra Costa County*, 591 F.3d 1232, 1245 (9th Cir. 2010), *overruled in part on other grounds by, Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016).

The facts of *Clothier* are similar to the case at bar.  In that case, the decedent was arrested after assaulting his father-in-law during a mental breakdown.  591 F.3d at 1237.  Upon arriving at jail, he reported intense suicidal ideation, a recent past suicide attempt, and that he had discontinued his medication some time earlier.  *Id.*  Based on this, the decedent was placed in a safety cell and other precautions were taken for his safety, and the nurse who originally evaluated him told her colleagues that the decedent was truly suicidal.  Later that day, the decedent reported that he was feeling less suicidal, but the original nurse refused to remove him from his cell because she did not believe he had actually improved so quickly.  The decedent was then prescribed medication and placed in a designated area for mentally unstable inmates.  *Id.* at 1237–38.  The nurse told the guard in this area that the decedent was very suicidal and needed to be monitored.  *Id.* at 1238.  She also gave her notes to the incoming nurse and warned her of the same thing.  *Id.*  However, shortly after the original nurse left, the incoming nurse determined based on a five-minute conversation with the decedent that the decedent was no longer suicidal and could be moved to a different type of cell if some precautions were kept in place.  *Id.*  Several days later, the decedent committed suicide.  *Id.* at 1240.  The Ninth Circuit held that the incoming nurse was not entitled to qualified immunity because she could have inferred from the information known to

1    her that the decedent faced a "substantial risk of serious harm" absent the safety cell and other

2    precautions.  *Id.* at 1244.  In the words of a later Ninth Circuit case, *Clothier* condemns

3    "unilaterally halt[ing protective] measures despite a belief that [a suicidal patient] [i]s not yet 'out

4    of the woods[.]'" [1]  *Simmons*, 609 F.3d at 1018–1019.

5         The facts of the present case, while not perfectly analogous, are close enough to have put

6    Ms. Hawk on notice for qualified immunity purposes.  Here, rather than unilaterally halting a

7    protective measure, Ms. Hawk allegedly took no action upon learning that the only protective

8    measure in place (the Seroquel) was not being followed and that Decedent's mental health was

9    deteriorating as a result.  The fact that the conduct in *Clouthier* was active and the conduct in the

10    present case is passive makes no difference here; liability under the *Gordon* test does not require

11    that an action be taken, only that a decision be made.  The relevant decision—that the recently-

12    suicidal decedent did not need certain protective measures despite no reliable indications that the

13    decedent's mental condition had improved since the protective measures were put in place—is the

14    same in both cases.

15         Accordingly, the County Defendants' motion for qualified immunity must be denied at this

16    time.

17         *b.  14th Amendment Right to Familial Association (Claims 9–11)*

18         The County Defendants argue that Plaintiffs' familial association claims should be

19    dismissed because they have failed to plead an underlying constitutional claim.  As Plaintiffs' 14th

20    Amendment claim for denial of medical treatment will be allowed to proceed, Plaintiffs' familial

21    association claim will be allowed to proceed as well.

22         c.  *Monell* Liability

23         The County Defendants assert that the County itself is not liable for violating the

24    constitutional rights at issue in this case.  However, the court finds that Plaintiffs have adequately

25    stated a claim for municipal liability.

26

27    _____

[1] At the time, the Ninth Circuit used a subjective actual-knowledge standard for Fourteenth
28    Amendment denial-of-care claims.  As of 2016, this has been replaced by an objective "should
      have inferred" standard.  *Russell*, 31 F.4th at 739.

United States District Court
Northern District of California

1    A local government can be held liable under 42 U.S.C. § 1983 if its "policy or custom"

2  causes a plaintiff's rights to be violated.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436

3  U.S. 658, 694 (1978).  Liability only attaches if the policy "inflicts the injury" of which the

4  plaintiff complains.  *Id.*; *see Dougherty v. City of Covina*, 654 F.3d 892, 900–01 (dismissing

5  complaint which lacked "any facts demonstrating that [the plaintiff's] constitutional deprivation

6  was the result of a custom or practice of the City . . . or that the custom or practice was the

7  'moving force' behind his constitutional deprivation.").  Besides formal policies, *Monell* liability

8  can arise from "practices of sufficient duration, frequency and consistency that the conduct has

9  become a traditional method of carrying out policy[.]"  *Trevino v. Gates*, 99 F.3d 911, 918 (9th

10  Cir. 1996).

11    In this case, Plaintiffs allege four specific "policies, practices and customs pertaining to

12  mental health care at the HCCF[.]"  (Dkt. 27, at 24.)  These policies are the following:

- "permitting inadequate staffing leading to care decisions being made by staff not qualified to make care decisions;"

- "permitting inadequate staffing leading to substandard care decisions and the deprivation of needed care;"

- "permitting inadequate supervision of staff not individually qualified to provide care;" and

- "permitting staff who are unlicensed or un/underqualified to provide mental health care or gatekeep access to such care."

21  *Id.*

22    The County Defendants argue that Plaintiffs have alleged insufficient facts to demonstrate

23  a policy or custom of sufficient duration, frequency, or consistency for *Monell* liability.

24  However, Plaintiffs allege that these problems were reflected in grand jury reports dating back as

25  far as 2017 and that the County took no action based on a recent report with similar findings.

26  Other district courts in California have found that grand jury reports can demonstrate a policy or

27  custom sufficient to give rise to *Monell* liability.  *S.B. v. County of San Bernardino*, 2020 WL

28  3051360, at *11 (C.D. Cal. Mar. 24, 2020) (alleged failure of county to remedy deficiencies

United States District Court
Northern District of California

11

reported by grand jury adequate to sustain *Monell* claim); *Shibley v. County of San Bernardino*, 2019 WL 6331398, at *3 (C.D. Cal. Sept, 6, 2019) (similar conduct noted in grand jury reports showed requisite duration, frequency, and consistency for *Monell* liability).  Accordingly, Plaintiffs' *Monell* claim may proceed.

### III.    State Claims

#### a.    Failure to Summon Medical Care

The County Defendants argue that Plaintiffs' California-law claim for failure to summon medical care should be dismissed for failure to state a claim.  A claim for failure to summon medical care under California Government Code § 845.6 has three elements: "(1) the public employee knew or had reason to know of the need (2) for immediate medical care, and (3) failed to reasonably summon such care." *Jett v. Penner*, 439 F.3d 1091, 1099 (9th Cir. 2006).  The County Defendants argue that the first two elements are not met because Decedent did not inform Ms. Hawk of any suicidal thoughts, only that he was hearing voices, and that Decedent was not exhibiting suicidal risk factors at the time.  However, as described above, Ms. Hawk "had reason to know" that Decedent's symptoms indicated a suicide risk in the context of his previous suicidal crisis.  Further, the phrase "immediate medical care" is a legal term of art: "'immediate' does not signify urgency; rather, the obligation to summon immediate medical care requires that the public employee act in a 'timely' manner, so as to prevent further injury." *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 608 (9th Cir. 2019).  Here, Plaintiffs allege that Decedent received no medical care for his delusions and auditory hallucinations in the 50 hours between when his request was made and when he hanged himself, despite Decedent's previous suicidal crisis and failure to adhere to his medication regimen.  Even if medical care was not required at the instant Decedent requested it, a failure to address these serious psychological symptoms for over two days after they were reported could certainly be considered "untimely."  For these reasons, Plaintiffs have stated a claim against Ms. Hawk for failure to summon medical care.

The County further argues that it should not be vicariously liable for Ms. Hawk's actions.  However, it bases this argument on the premise that Ms. Hawk herself is not liable.  As Plaintiffs have adequately alleged Ms. Hawk's liability, their claim against the County for vicarious liability

1  may proceed.

2       *b. Dependent Adult Abuse*

3       The County Defendants argue that Plaintiffs have forfeited their claim for dependent adult

4  abuse because they failed to adequately present this claim in the Notice of Claims previously

5  presented to the County. The County Defendants further argue that Plaintiffs' dependent adult

6  abuse claim fails on the merits. The court will address these arguments in turn.

7             i. <u>Waiver by Omission in Claim</u>

8       California law requires that, prior to suing public entities, would-be plaintiffs present such

9  entities with written claims and give the entities an opportunity to act on those claims. Cal. Gov't

10 Code § 945.4. Such claims must, among other things, state the "date, place, and other

11 circumstances of the occurrence or transaction which gave rise to the claim asserted" and provide

12 a "general description of the ... injury, damage or loss incurred so far as it may be known at the

13 time of presentation of the claim." Cal. Gov't Code §§ 910(c), 910(d). However, a claim does not

14 need to be a carbon copy of a subsequent complaint:

> A complaint's fuller exposition of the factual basis beyond that given
> in the claim is not fatal, so long as the complaint is not based on an
> entirely different set of facts. Only where there has been a complete
> shift in allegations, usually involving an effort to premise civil
> liability on acts or omissions committed at different times or by
> different persons than those described in the claim, have courts
> generally found the complaint barred. Where the complaint merely
> elaborates or adds further detail to a claim, but is predicated on the
> same fundamental actions or failures to act by the defendants, courts
> have generally found the claim fairly reflects the facts pled in the
> complaint.

*Stockett v. Ass'n of Cal. Water Agencies Joint Powers Ins. Authority*, 99 P.3d 500, 503 (Cal. 2004)

(collecting cases) (internal citations and quotations omitted).

     To illustrate the difference between a permissible "fuller exposition" of facts in a claim and

an impermissible "complete shift in allegations," the *Stockett* court recounted several California

cases. In one case, the plaintiff was struck in the head by a steel door at a school. *Stockett*, 99

P.3d at 504 (citing *Fall River v. Superior Court*, 253 Cal. Rptr. 587 (Cal. 1988). The plaintiff

submitted a claim to the school asserting that his injury had been caused by negligent maintenance

13

1    of the door. *Id.* However, the plaintiff's complaint also alleged that his injury had been caused by

2    the school failing to supervise rowdy children. The California Supreme Court held that the

3    failure-to-supervise allegations presented an "entirely different factual basis" for the plaintiff's

4    alleged injury than the negligent maintenance alleged in the original claim. Accordingly, the

5    plaintiff's lawsuit was not allowed to proceed on the failure-to-supervise theory. *Id.*

6        In another case, a car crashed on an iced-over public highway when the driver lost control

7    of the vehicle. *Stockett*, 99 P.3d at 504 (citing *Blair v. Superior Court,* 267 Cal. Rptr. 13). An

8    injured passenger submitted a claim against the state, alleging that the highway surface had been

9    negligently constructed and maintained, particularly due to the failure to place sand on it to

10   prevent slipping. *Id.* However, the passenger's complaint alleged that the state should have

11   provided warning signs and a guardrail at that location. The court allowed the passenger's

12   complaint to proceed, reasoning that "negligent construction" could fairly be read to encompass

13   the failure to put up warning signs or guardrails. It noted that the claim and complaint shared the

14   same foundation: that the negligent construction or maintenance of the highway created a

15   dangerous condition. *Id.*

16       Turning to the case at bar, the County Defendants allege that "there is nothing in the

17   plaintiffs' claims alleging decedent had physical or mental limitations restricting his ability to

18   carry out normal activities or to protect his rights" such that the County Defendants would have

19   been on notice of a dependent adult neglect claim. (Dkt. 29, at 16–17.) To the contrary, however,

20   Plaintiffs' claims asserted that Decedent's symptoms included "refusing to eat, refusing to go to

21   court and refusing to take prescribed psychotropic medication." (Dkt. 29-1, at 8.) One could

22   conclude from this that the mental limitations caused by Decedent's psychological condition

23   restricted his ability to carry out normal activities. More broadly, from the combination of these

24   allegations and the assertions of medical neglect, the "circumstances . . . which gave rise to" the

25   neglect charge were adequately reflected. Accordingly, the court concludes that Plaintiffs' claim

26   fairly reflects the facts pled in their complaint.

27           ii.   <u>Merits</u>

28       The County Defendants challenge Plaintiffs' dependent adult neglect claim on several

14

1    bases.  First, they argue that Plaintiffs have not adequately alleged that Decedent's mental

2    limitations restricted his ability to carry out normal activities or protect his rights.  However,

3    Plaintiffs have adequately alleged a variety of Decedent's specific symptoms, such as auditory

4    hallucinations and suicidal thoughts, as well as specific related behaviors, such as poor medical

5    judgment and a failure to take his medication.  Further, a court declared doubt as to Decedent's

6    capacity to assist in his own defense.  These facts can be fairly said to indicate a restricted ability

7    to carry out normal activities or protect one's own rights under California law.  *See People v.*

8    *Matye*, 70 Cal. Rptr. 3d 342, 343 (Cal. Ct. App. 2008) ("The word 'restrict' is not synonymous

9    with 'preclude.'  Therefore, it is not necessary to prove the person is incapable of carrying out

10    normal activities or of protecting the person's rights; it is sufficient that the person's ability to do

11    so is limited in some significant way.")

12    Second, the County Defendants assert that Plaintiffs have failed to plead that Ms. Hawk

13    had a "substantial caretaking or custodial relationship" with Decedent.  While the complaint

14    specifically alleges that "Ms. HAWK had ongoing responsibility to provide care to Decedent[]"

15    and "was responsible for participating in crisis interventions and providing mental health support

16    related to Decedent throughout Decedent's detention" (dkt. 27, at 16), the County Defendants

17    argue this is not enough to establish that Ms. Hawk "assumed a significant measure of

18    responsibility for attending to one or more of [Decedent's] basic needs that an able-bodied and

19    fully competent adult would ordinarily be capable of managing without assistance."  (Dkt. 29, at

20    28 (quoting *Winn v. Pioneer Med. Grp., Inc.*, 370 P.3d 1011, 1017 (Cal. 2016).)

21    However, *Winn* itself notes that "protect[ion] from health and safety hazards" is one such

22    basic need, and notes "failure to provide medical care" is one form of neglect under the applicable

23    statute, presupposing "a determination made by one with control over the [dependent adult]

24    whether to *initiate* medical care at all."  *Winn*, 370 P.3d at 1017.  Here, construing the allegations

25    in Plaintiffs' favor, Decedent's suicidal impulses posed a health and safety hazard.  Further, again

26    construing the allegations in Plaintiffs' favor, the court can infer that Ms. Hawk "assumed a

27    significant measure of responsibility" for managing this hazard.  Besides being responsible for

28    Decedent's mental health support throughout Decedent's detention, Ms. Hawk allegedly had the

1    final say in what support was provided, as none of her decisions on the need for treatment were

2    reviewed by a supervisor with medical training.  Because Ms. Hawk was allegedly in a consistent

3    position to decide whether to initiate medical care for Decedent, and because Decedent's mental

4    health issues have been plausibly alleged to be a health and safety hazard to Decedent, Plaintiffs

5    have adequately alleged the requisite custodial relationship between Decedent and Ms. Hawk.

6        Third, the County Defendants argue that Ms. Hawk is not alleged to have engaged in any

7    neglect within the meaning of the dependent adult abuse statute.  As *Winn* described, however, one

8    form of neglect enumerated in the statute is "[f]ailure to provide medical care for physical and

9    mental health needs[.]"  370 P.3d at 1017 (quoting Cal. Welf. & Inst. Code §15610.57(b)(2)).

10        Finally, the County Defendants argue that they are not subject to an enhanced damages

11    award under California Welfare and Institutions Code §15657 because Plaintiffs have not pled that

12    the alleged conduct was undertaken with recklessness, oppression, fraud, or malice.  However,

13    Plaintiffs have alleged facts from which a reckless disregard for Decedent's health may be

14    inferred: namely, that the County Defendants were actually aware that Decedent was going

15    through a mental health crisis and was a danger to himself but failed to provide needed mental

16    health treatment.

          *c.  Medical Negligence*

18        The County Defendants argue that Plaintiffs' medical negligence claims must fail because

19    Plaintiffs do not allege that Ms. Hawk did not use the same skill, prudence, and diligence as other

20    members of Ms. Hawk's profession would have used.  However, Plaintiffs have in fact made such

21    an allegation: "Defendants HAWK and DOES 1-20 took no further action to care for Decedent

22    despite Decedent directly reporting auditory hallucinations and requesting medical aid, even

23    though a reasonable mental health provider under the same or similar circumstances would have

24    understood that failing to provide further treatment was below the standard of care."  (Dkt. 27, at

25    35.)  Accordingly, Plaintiffs' medical negligence claim may proceed.

          *d.  Immunities*

27        The County Defendants assert that, regardless of the foregoing, they are immune under

28    several provisions of the California Government Code.  The court will address these claims in

United States District Court
Northern District of California

turn.

First, the County Defendants claim immunity under California Government Code § 844.6, which provides that "a public entity is not liable for . . . [a]n injury to any prisoner."  However, § 844.6 enumerates several specific exceptions, one of which is set forth in California Government Code § 845.6: "a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care."  As described above, Plaintiffs have stated a claim under § 845.6.  Accordingly, the County Defendants are not entitled to immunity under § 844.6 or § 845.6.

Next, the County Defendants claim immunity under California Government Code § 855.8. That law provides that "[n]either a public entity nor a public employee acting within the scope of his employment is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental illness or addiction or from failing to prescribe for mental illness or addiction."  *Id.* § 855.8(a).  However, that law also provides that "[n]othing in this section exonerates a public employee who has undertaken to prescribe for mental illness or addiction from liability for injury proximately caused by his negligence or by his wrongful act in so prescribing" or "exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission in administering any treatment prescribed for mental illness or addiction."  *Id.* §§ 855.8(c), (d).  Here, Plaintiffs allege that the treatment of Decedent was inadequate and his medication was not administered as prescribed, not that Decedent should have been given a prescription he did not already have or diagnosed with another mental illness. Accordingly, the County Defendants cannot claim immunity under this provision.

The County Defendants also claim immunity under California Government Code § 856, which provides immunity "for any injury resulting from determining in accordance with any applicable enactment" whether and how to confine a person for mental illness or addiction. However, the County Defendants do not specify, and the complaint does not indicate, which (if any) "applicable enactment" governed the decisions relating to Decedent's conditions of confinement.  Accordingly, the court cannot determine whether Decedent's confinement or

United States District Court
Northern District of California

treatment was "in accordance" with such an enactment, and thus cannot determine whether immunity applies. Even assuming that § 856 does apply, it contains carveouts for injuries proximately caused by the negligent or wrongful acts or omissions of public employees in determining whether and under what conditions to confine someone for mental illness. Accordingly, the court cannot grant the County Defendants immunity under this section at this stage.

The County Defendants also point to California Welfare and Institutions Code § 5278, which provides that "[i]ndividuals authorized . . . to detain a person for 72-hour treatment and evaluation pursuant to Article 1 . . . shall not be held either criminally or civilly liable for exercising this authority in accordance with the law." The County Defendants argues that because Ms. Hawk is an Associate Marriage and Family Therapist, she has the authority to detain a person for 72-hour treatment or evaluation under Article 1 of the relevant law and is therefore immune for her actions during Decedent's detention. However, the complaint does not establish that Decedent was detained for 72-hour treatment and evaluation in accordance with the relevant statute, so there is no indication that Ms. Hawk was "exercising *this* authority" at the time of her alleged omissions. Accordingly, the County Defendants are not immune under this provision, either.

Finally, the County Defendants assert that they are immune under California Government Code §§ 815.2 and 820.2. However, § 815.2 does not apply here: it provides that public entities are not responsible for injuries caused by the acts or omissions of their employees "[e]xcept as otherwise provided by statute[.]" Cal. Gov't Code § 815.2(b). California Government Code § 845.6 is a statute which creates liability for public entities and their employees for failure to provide medical care when immediately needed, and Plaintiffs have stated a claim under this section. Accordingly, the County Defendants are not immune under § 815.2.

Section 820.2 immunizes public employees from claims resulting from acts or omissions "where the act or omission was the result of the exercise of the discretion vested in" the employee. However, "discretion" under this section refers to the "planning . . . functions of government" as opposed to the "operational" ones. *Caldwell v. Montoya*, 897 P.2d 1320, 1325–26 (Cal. 1995). The California Supreme Court has held that "to be entitled to immunity the state must make a

showing that . . . a policy decision, consciously balancing risks and advantages, took place." *Johnson v. State*, 447 P.2d 352, 361 n.8 (Cal. 1968). The County Defendants have made no such showing here as regards Ms. Hawk's decision process. Accordingly, they are not entitled to immunity under § 820.2.

## IV.    Injunctive and Declaratory Relief

The County Defendants argue that Plaintiffs' requests for injunctive and declaratory relief should be denied because Plaintiffs lack standing to obtain such relief. The court agrees.

"In the particular context of injunctive and declaratory relief, a plaintiff must show that he has suffered or is threatened with a 'concrete and particularized' legal harm, coupled with 'a sufficient likelihood that he will again be wronged in a similar way.'" *Canatella v. State of California*, 304 F.3d 843, 852 (9th Cir. 2002) (first quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); then quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)) (internal citations omitted). However, Plaintiffs here have not pled any facts to show that *they* will be wronged in a similar way going forward. They do not allege that they have any other family members who are likely to find themselves in a similar situation, nor that they themselves are likely to be arrested and then denied mental health care despite an evident risk of suicide.

To be sure, Plaintiffs allege that other inmates will find themselves in Decedent's situation. However, those other inmates are not before this court. Plaintiffs must demonstrate their own entitlement to injunctive or declaratory relief, and they have not done so here. Therefore, Plaintiffs' claim for injunctive and declaratory relief must be dismissed.

## V.    Punitive Damages

The County Defendants argue that Plaintiffs' claim for punitive damages should be dismissed because the complaint does not demonstrate that the County Defendants acted with the requisite state of mind.

Punitive damages are not available against municipalities in federal civil rights actions brought under 42 U.S.C. § 1983. *City of Newport v. Fact Concerns, Inc.*, 453 U.S. 247, 271 (1981). Counties are "municipalities" for § 1983 purposes. *Christie v. Iopa*, 176 F.3d 1231, 1234 (9th Cir. 1999). Accordingly, Plaintiffs are not entitled to an award of punitive damages against

1    the County itself.

2        Punitive damages are, however, available against individual defendants in § 1983 cases

3    "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it

4    involves reckless or callous indifference to the federally protected rights of others." *Bacon v.*

5    *Woodward*, 104 F.4th 744, 750 (9th Cir. 2024) (internal quotations omitted).  Here, construing the

6    allegations in the light most favorable to Plaintiffs, a reasonable jury could conclude that Ms.

7    Hawk was recklessly indifferent to Decedent's federally protected right to medical care.

8    Accordingly, Plaintiffs' § 1983 claim for punitive damages against Ms. Hawk may proceed.

9        As for the state claims, California law prohibits the award of "exemplary" (that is,

10   punitive) damages against a public entity.  *Watts v. Gateway Pub. Schs.*, 2025 WL 1827897, at *1

11   (N.D. Cal. July 2, 2025) (citing Cal. Gov't Code § 818) (collecting cases).  Counties are among

12   the entities immune from punitive damages under California law.  *See Loggervale v. Holland*, 677

13   F. Supp. 3d 1026, 1068–69 (N.D. Cal. 2013).  Accordingly, Plaintiffs cannot recover punitive

14   damages from Humboldt County under California law.

15       Employees of public entities may be liable for punitive damages under California Civil

16   Code § 3294(a) if guilty of "oppression, fraud, or malice."  *See Loggervale*, 677 F. Supp. 3d at

17   1069.  "Malice," as defined in that statute, includes "despicable conduct which is carried on by the

18   defendant with a willful or conscious disregard of the rights or safety of others."  Cal. Civ. Code §

19   3294(c)(1).  Similarly, "'[o]ppression' means despicable conduct that subjects a person to cruel

20   and unjust hardship in conscious disregard of that person's rights."  *Id.* § 3294(c)(2).  Here,

21   besides pleading facts from which the disregard of Decedent's rights may be inferred, Plaintiffs

22   explicitly allege that "Ms. HAWK acted despicably with a willful and conscious disregard for the

23   rights and safety of Decedent and exposed Decedent to cruel and unjust hardship in conscious

24   disregard of Decedent's rights."  (Dkt. 27, at 16.)  Accordingly, Plaintiffs have adequately alleged

25   a claim for state-law punitive damages against Ms. Hawk.

26   **VI.    Nature of Dismissal**

27       When dismissing a claim, a court "should grant leave to amend even if no request to

28   amend the pleading was made, unless it determines that the pleading could not possibly be cured

20

by other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). The court has determined that Plaintiffs' claims for punitive or exemplary damages against the County are barred as a matter of law and cannot be cured by the pleading of any facts. Accordingly, those claims are dismissed with prejudice. Plaintiffs' claims for declaratory injunctive relief, however, will be dismissed without prejudice because Plaintiffs could, however unlikely, conceivably plead a risk of future harm by alleging additional facts. Plaintiffs' remaining claims may proceed.

## VII.    Dr. Agricola's Motion to Dismiss

The court previously granted Dr. Agricola's motion to dismiss the Sixth Cause of Action for neglect of a dependent adult because this court could not conclude from Plaintiffs' allegations that Dr. Agricola had "care or custody of" Decedent under California law. (Dkt. 26, at 6.) This court noted that the complaint alleged "only one interaction between Dr. Agricola and Mr. Matilton" and nothing further "besides an awareness that Mr. Matilton was not taking the Seroquel regularly." *Id.* The court concluded that "one evaluation followed by medication monitoring is not the kind of 'robust caretaking or custodial relationship' required to state a cause of action for dependent adult neglect under California law" and noted the possibility of curing by alleging other facts concerning Dr. Agricola's involvement in Decedent's care—specifically by pleading facts establishing that Dr. Agricola had substantial and ongoing responsibility for (as opposed to just the ability to alter) Decedent's conditions of confinement for his safety. *Id.*

Here are the additional allegations made in the first amended complaint regarding Dr. Agricola:

- "Furthermore, by virtue of his status as the prescribing physician, and because he was the sole psychiatrist responsible for Decedent's care while Decedent was detained at the HCCF, Dr. AGRICOLA had an ongoing duty and responsibility to monitor Decedent. . .

- This duty and responsibility included the responsibility to continually and meaningfully monitor Decedent's compliance with the medication he had prescribed, monitor the effectiveness of the medication as to the treatment goal i.e., ensuring Decedent was not a danger to himself, and monitor Decedent's mental health. . .

- Furthermore, Dr. AGRICOLA'S ongoing responsibility to monitor Decedent to ensure

he was not a danger to himself was enhanced by the fact that Dr. Agricola knew

Decedent's mental state was poor and his ability to participate in his own treatment

was limited. . .

- Stated plainly, Dr. AGRICOLA's responsibility to care for Decedent and ensure

    Decedent was not a danger to himself was ongoing, and did not end when he wrote the

    prescription for Seroquel and directed Decedent be removed from the safety cell. . .

- Defendants COUNTY OF HUMBOLDT HAWK, AGRICOLA and DOES 1- 40 were

    responsible for proving daily care to Decedent, which included monitoring Decedent's

    compliance with medication and ordered treatment, monitoring whether prescribed

    treatment was effective and monitoring whether Decedent was a harm to himself."

(Dkt. 27 ¶¶ 80–83, 202).

Based on these additional allegations, the court still cannot conclude that Dr. Agricola had

"care or custody of" Decedent under California law that would extend beyond the typical "patient

– health care provider" relationship. As before, the first amended complaint alleges only one

interaction between Dr. Agricola and Decedent, in which Dr. Agricola allegedly removed Plaintiff

from the safety cell on the condition that Plaintiff would take Seroquel. Furthermore, the court

notes that it is not clear that the limited care that Decedent received—Seroquel—is indeed a "basic

need" of the type that an able-bodied and fully competent adult would ordinarily be capable of

managing on his or her own. *See, e.g., Kruthanooch v. Glendale Adventist Med. Ctr.*, 83 Cal. App.

5th 1109, 1123, 299 Cal. Rptr. 3d 908, 916 (2022) (finding no substantial evidence that the

caretaking relationship between the hospital and decedent was robust and ongoing and where

hospital's attention to decedent's basic needs—providing IV hydration and mobility assistance—

was incidental to the circumscribed medical care it provided). Conclusory statements about an

"ongoing responsibility" or pointing out Dr. Agricola's role as the "sole" psychiatrist in this

context, with many other players involved, do not bolster the argument that a robust caretaking

relationship existed between Dr. Agricola and Decedent. As before, "one evaluation followed by

medication monitoring is not the kind of 'robust caretaking or custodial relationship' required to

state a cause of action for dependent adult neglect under California law." (Dkt. 26, at 6.) Thus, Dr.

Agricola's motion to dismiss this cause of action is GRANTED.

1      **IT IS SO ORDERED.**

2     Dated: October 22, 2025

3

4     _____

5     ROBERT M. ILLMAN
      United States Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28