Nicholas R. Kloeppel, CSB #186165
Karen J. Roebuck, CSB #160915
THE MITCHELL LAW FIRM, LLP
Attorneys at Law
426 First Street
P. O. Drawer 1008
Eureka, CA  95502
Tel: (707) 443-5643
Fax: (707) 444-9586
Email:  nkloeppel@mitchelllawfirm.com

Attorneys for Defendants
COUNTY OF HUMBOLDT and KELSEY HAWK

UNITED STATES DISTRICT COURT

NOTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC MATILTON, JR., individually and as successor in interest to ERIC MATILTON, SR. deceased; C.M. a minor by and through his guardian ad litem Carrie Ames; and K.M., a minor, by and through his guardian ad litem, Carrie Ames<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF HUMBOLDT, CHRISTIAN AGRICOLA, KELSEY HAWK; and DOES 1 through 40 inclusive,<br><br>Defendants. | Case No.: 1:25-cv-01168-RMI<br><br>**STIPULATION FOR LEAVE FOR DEFENDANTS COUNTY OF HUMBOLDT AND KELSEY HAWK TO FILE A THIRD-PARTY COMPLAINT AND [~~PROPOSED~~] ORDER THEREON** |

## STIPULATION TO MODIFY SCHEDULING ORDER

Defendants COUNTY OF HUMBOLDT and KELSEY HAWK ("County"),

Defendant CHRISTIAN AGRICOLA, and Plaintiffs ERIC MATILTON, JR., C.M. and

K.M. (collectively "the parties"), through counsel, hereby submit this stipulation for

leave for defendants COUNTY OF HUMBOLDT and KELSEY HAWK to file the

Third-Party Complaint, a true and correct copy of which is attached hereto as ***Exhibit 1.***

1

**STIPULATION FOR LEAVE FOR DEFENDANTS COUNTY OF HUMBOLDT AND KELSEY HAWK TO FILE A THIRD-PARTY COMPLAINT AND [~~PROPOSED~~] ORDER THEREON— 1:25-cv-01168-RMI**

# RECITALS

1.    Through their investigation and discovery, the County identified Third-party Defendants COTY SCHNEIDER ("Schneider") and DANIEL GONGORA ("Gongora") who they contend may be persons responsible for injuries sustained by plaintiffs and plaintiffs' decedent, if any, due to the involvement of Schneider and Gongora in providing psychiatric nursing services to plaintiffs' decedent leading up to his attempted suicide in the Humboldt County Correctional Facility ("HCCF") which is the subject matter of this lawsuit.

2.    It was also learned by the County that, during the relevant time period, Schneider and Gongora were employed by Third-party Defendant NIGHTINGALE NURSES, LLC ("Nightingale").

3.    There is a written agreement between the County and Nightingale to provide qualified Psychiatric Registered Nurses for the HCCF, such as Schneider and Gongora (hereinafter "Agreement").

4.    The County contends that, pursuant to this Agreement, Nightingale is contractually obligated to hold harmless, defend and indemnify the County from any and all liability arising out or in connection with, Third-party defendants' negligent performance of, or failure to comply with, any of the duties and/or obligations under the Professional Services Agreement. A true and correct copy of the Agreement is attached to *Exhibit 1* as Exhibit A.

5.    The County contends it has acted diligently by seeking to tender the defense of this case to Nightingale and its insurance provider on or about December 5, 2025, and then again on January 2, 2026. The tender was rejected by the insurance provider near the end March 2026. The County has not received a response from Nightingale as to whether it will accept the tender of defense which the County contends it is obligated to do regardless of whether there is insurance.

THE MITCHELL
LAW FIRM, LLP
426 First Street
P.O. Drawer 1008
Eureka, CA 95502

2

**STIPULATION FOR LEAVE FOR DEFENDANTS COUNTY OF HUMBOLDT AND KELSEY HAWK TO FILE A THIRD-PARTY COMPLAINT AND [PROPOSED] ORDER THEREON— 1:25-cv-01168-RMI**

6. The County submits that Nightingale, Schneider and Gongora are not unduly prejudiced because the Third-party Complaint is being filed in advance of the new trial setting and prior to any depositions being taken in the case.

WHEREAS, the parties stipulate and agree as follows:

## STIPULATION

**IT IS STIPULATED**, by counsel for the Defendants COUNTY OF HUMBOLDT and KELSEY HAWK, Defendant CHRISTIAN AGRICOLA, and Plaintiffs ERIC MATILTON, JR., C.M. and K.M. that Defendants COUNTY OF HUMBOLDT and KELSEY HAWK have leave to file the Third-Party Complaint attached hereto as *Exhibit 1*.

**IT IS SO STIPULATED AND AGREED.**

Dated: April 24, 2026         THE MITCHELL LAW FIRM, LLP

By:  */s/ Nicholas R. Kloeppel*
_____
NICHOLAS R. KLOEPPEL
Attorneys for Defendants
COUNTY OF HUMBOLDT and
KELSEY HAWK

Dated: April 24, 2026         LAW OFFICE OF BENJAMIN MAINZER, A.P.C.

By:  */s/ Benjamin Mainzer*
_____
BENJAMIN MAINZER
Attorneys for Plaintiffs ERIC MATILTON,
JR., C.M., a minor by and through his guardian
ad litem Carrie Ames; and K.M., a minor, by
and through his guardian ad litem, Carrie
Ames

THE MITCHELL
LAW FIRM, LLP
426 First Street
P.O. Drawer 1008
Eureka, CA 95502

3
STIPULATION FOR LEAVE FOR DEFENDANTS COUNTY OF HUMBOLDT
AND KELSEY HAWK TO FILE A THIRD-PARTY COMPLAINT AND
[~~PROPOSED~~] ORDER THEREON— 1:25-cv-01168-RMI

Dated: April 24, 2026                    J SUPPLE LAW, A Professional Corporation


By:    /s/ Aaron T. Schultz
        AARON T. SCHULTZ
        Attorneys for Defendant
        CHRISTIAN AGRICOLA


**SIGNATURE ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that I have obtained the concurrence in the filing of this document from all of the signatories for whom a signature is indicated by a "/s/" signature within this e-filed document and I have on file confirmation of this concurrence for subjection production for the court if so ordered.

Dated: April 24, 2026                    THE MITCHELL LAW FIRM, LLP


By:    /s/ Nicholas R. Kloeppel
        NICHOLAS R. KLOEPPEL
        Attorneys for Defendants
        COUNTY OF HUMBOLDT and
        KELSEY HAWK


**ORDER**

PURSUANT TO STIPULATION, IT IS SO ORDERED.

DATED: April 27, 2026

HONORABLE ROBERT ILLMAN
United States Magistrate Judge

**STIPULATION FOR LEAVE FOR DEFENDANTS COUNTY OF HUMBOLDT AND KELSEY HAWK TO FILE A THIRD-PARTY COMPLAINT AND [~~PROPOSED~~] ORDER THEREON— 1:25-cv-01168-RMI**

THE MITCHELL LAW FIRM, LLP
426 First Street
P.O. Drawer 1008
Eureka, CA 95502

# Exhibit 1

Nicholas R. Kloeppel, CSB #186165
THE MITCHELL LAW FIRM, LLP
Attorneys at Law
426 First Street
P. O. Drawer 1008
Eureka, CA  95502
Tel: (707) 443-5643
Fax: (707) 444-9586
Email:  nkloeppel@mitchelllawfirm.com

Attorneys for Defendants and Third-Party Plaintiffs
COUNTY OF HUMBOLDT and KELSEY HAWK

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC MATILTON, JR., individually and as successor in interest to ERIC MATILTON, SR. deceased; C.M. a minor by and through his guardian ad litem Carrie Ames; and K.M., a minor, by and through his guardian ad litem, Carrie Ames<br><br>        Plaintiffs,<br><br>  vs.<br><br>COUNTY OF HUMBOLDT, CHRISTIAN AGRICOLA, KELSEY HAWK; and DOES 1 through 40 inclusive,<br><br>        Defendants.<br>_____<br>COUNTY OF HUMBOLDT, KELSEY HAWK<br><br>        Third-party Plaintiffs<br><br>  vs.<br><br>COTY SCHNIEDER, DANIEL GONGORA and NIGHTINGALE NURSES, LLC, AND ROES 1 through 50 inclusive,<br><br>        Third-party Defendants | Case No.: 1:25-cv-01168-RMI<br><br>**THIRD-PARTY COMPLAINT BY COUNTY OF HUMBOLDT AND KELSEY HAWK FOR EQUITABLE INDEMNITY, APPORTIONMENT OF FAULT, DECLARATORY RELIEF AND EXPRESS INDEMNITY**<br><br>**Fed. Rules of Civ. Pro., Rule 14**<br><br>**DEMAND FOR JURY TRIAL** |

0

**THIRD-PARTY COMPLAINT BY COUNTY OF HUMBOLDT AND KELSEY HAWK FOR EQUITABLE INDEMNITY, CONTRIBUTION, DECLARATORY RELIEF AND EXPRESS INDEMNITY and DEMAND FOR JURY TRIAL**
**1:25-cv-01168-RMI**

Third-party plaintiffs COUNTY OF HUMBOLDT and KELSEY HAWK (collectively referred to as "Third-party plaintiffs"), allege as follows:

**GENERAL ALLEGATIONS**

*A.    Parties*

1.    Third-party plaintiff, COUNTY OF HUMBOLDT, ("County") is a California public entity and is a defendant in the above-entitled action brought by Plaintiffs ERIC MATILTON, JR., individually and as successor in interest to ERIC MATILTON, SR. deceased; C.M. a minor by and through his guardian ad litem Carrie Ames; and K.M., a minor, by and through his guardian ad litem, Carrie Ames (hereinafter "Plaintiffs.").

2.    Third-party plaintiff KELSEY HAWK was at all times a public employee of the COUNTY OF HUMBOLDT and is a defendant in the above-entitled action brought by Plaintiffs.

3.    Third-party plaintiffs are informed and believes, and upon such information and belief allege that Third-party defendants COTY SCHNIEDER, DANIEL GONGORA and NIGHTINGALE NURSES, LLC (collectively "Third-party Defendants"), at all times herein alleged were individuals residing in the state of California, County of Humboldt and were employees of NIGHTINGALE NURSES, LLC, or were authorized and doing business in California, by and under the laws of the State of California, where applicable were authorized and doing business in the County of Humboldt, California, and was the employer of COTY SCHNIEDER and DANIEL GONGORA at all times relevant.

4.    The true names and capacities, whether individual, corporate, associate, representative, or otherwise of Third-party defendants Roes 1 through 50, inclusive, are presently unknown to Third-party plaintiffs, who therefore sues said Third-party defendants by such fictitious names. Third-party plaintiffs will seek leave of Court to amend this Cross-Complaint to insert the true names and capacities when they are ascertained. Third-party plaintiffs are informed and believe and thereon alleges that each of the Third-party defendants

1

**THIRD-PARTY COMPLAINT BY COUNTY OF HUMBOLDT AND KELSEY HAWK FOR EQUITABLE INDEMNITY, CONTRIBUTION, DECLARATORY RELIEF AND EXPRESS INDEMNITY and DEMAND FOR JURY TRIAL
1:25-cv-01168-RMI**

designated as a Roe, is legally responsible in some manner for the events and happenings herein referenced to and caused damage proximately thereby to Third-party plaintiffs as alleged herein.

5. At all times mentioned herein, each of the Third-party defendants was the agent and/or employee of the remaining Third-party defendants and was at all times within the course and scope of said agency and employment.

B. *The Underlying Incident and Complaint*

6. Third-party plaintiffs incorporate by reference Plaintiffs' First Amended Complaint, Dkt. No. 27, a true and correct copy of which is attached hereto as ***Exhibit A*** (herein collectively referred to as the "Complaint") and the underlying causes of actions, as if the same were set forth in full herein, for the limited purpose of setting forth the claims and allegations by plaintiff and intervenor.

7. It is asserted in the Complaint that, beginning on or about November 17, 2023, plaintiffs' decedent ERIC MATILTON, SR., attempted suicide and ultimately succumbed to his injuries.

8. By way of the Complaint, plaintiffs claim that Third-party plaintiffs and defendant Christian Agricola are legally responsible for decedent's and plaintiffs' injuries.

9. Third-party plaintiffs and Third-party defendant NIGHTINGALE NURSES, LLC, entered into a Professional Services Agreement, dated May 16, 2023, (hereinafter "Professional Services Agreement") a true and correct copy of which is attached hereto as ***Exhibit B*** and incorporated by this reference. The Professional Services Agreement with Third-party plaintiffs is applicable to the claims asserted by plaintiffs, including, but not limited to an obligation to defend, indemnify and hold harmless Third-party plaintiffs from any and all liability arising out of the subject lawsuit during which plaintiffs claim they and their decedent were injured.

///

///

THE MITCHELL
LAW FIRM, LLP
426 First Street
P.O. Drawer 1008
Eureka, CA 95502

2

**THIRD-PARTY COMPLAINT BY COUNTY OF HUMBOLDT AND KELSEY HAWK FOR EQUITABLE INDEMNITY, CONTRIBUTION, DECLARATORY RELIEF AND EXPRESS INDEMNITY and DEMAND FOR JURY TRIAL**
**1:25-cv-01168-RMI**

**FIRST CAUSE OF ACTION**
**EQUITABLE INDEMNITY**
**(Against each of the Third-party defendants)**

10. Third-party plaintiffs incorporate by this reference all of the above allegations as if set forth in full herein.

11. Third-party plaintiffs incorporate by reference the Complaint as if the same were set forth in full herein, for the limited purpose of setting forth plaintiffs' claims and allegations.

12. Third-party plaintiffs are informed and believe, and thereon allege, that each of the Third-party defendants and Roes 1-10, were either a corporation, partnership or some other form of business entity authorized to do and doing business under the laws of the State of California or an individual employees of such a business entity.

13. The Third-party plaintiffs do not presently know the true names, identities or capacities of those Third-party defendants named herein as Roes 1-50, inclusive, and therefore names said parties by such fictitious names. Third-party plaintiffs shall amend this pleading to set forth the true names, capacities, and identities of such parties when the same are ascertained.

14. Third-party plaintiffs are informed and believe that Third-party defendants were the agents, employees, co-ventures, partners or in some manner agents or principals, or both, for each other and were acting within the course and scope of their agency or employment at all times mentioned herein.

15. The plaintiffs' underlying cause of action alleges that plaintiffs are entitled to compensatory or other damages against the Third-party plaintiffs.

16. If Third-party plaintiffs are found in some manner responsible to the plaintiffs, or to any third party, as a result of the incidents and occurrences described in plaintiffs' underlying complaint, the liability of Third-party plaintiffs would be based solely upon a derivative form of liability not resulting from conduct of the Third-party plaintiffs, but only from an obligation imposed upon Third-party plaintiffs by law; therefore, Third-party plaintiffs would be entitled to partial or complete indemnity from Third-party defendants.

3

THE MITCHELL
LAW FIRM, LLP
426 First Street
P.O. Drawer 1008
Eureka, CA 95502

**THIRD-PARTY COMPLAINT BY COUNTY OF HUMBOLDT AND KELSEY HAWK FOR EQUITABLE INDEMNITY, CONTRIBUTION, DECLARATORY RELIEF AND EXPRESS INDEMNITY and DEMAND FOR JURY TRIAL**
**1:25-cv-01168-RMI**

17. Specifically, as a result of the performance or failure to perform services which Third-party defendants COTY SCHNIEDER and DANIEL GONGORA were obligated to perform on behalf of their employer NIGHTINGALE NURSES, LLC, pursuant to the Professional Services Agreement caused or contributed to plaintiffs' and their decedents' injuries.

**SECOND CAUSE OF ACTION**
**APPORTIONMENT OF FAULT**
**(Against each of the Third-party defendants.)**

18. Third-party plaintiffs incorporate by this reference all of the above allegations as if set forth in full herein.

19. Third-party plaintiffs allege, on information and belief, that Third-party defendants were responsible, in whole or in part, for the injuries and damages, if any, sustained by the plaintiff in the underlying cause of action as a result of the performance or failure to perform services which Third-party defendants COTY SCHNIEDER and DANIEL GONGORA were obligated to perform on behalf of their employer NIGHTINGALE NURSES, LLC, pursuant to the Professional Services Agreement caused or contributed to plaintiffs' and their decedents' injuries.

20. If Third-party plaintiffs are found liable for plaintiff's injuries and damages in the underlying state cause of actions, Third-party defendants should be required to pay a share of the judgment which is in proportion to the comparative fault of those Third-party defendants and to reimburse Third-party plaintiffs for any payments Third-party plaintiffs may make in excess of Third-party plaintiffs' proportional share of fault.

**THIRD CAUSE OF ACTION**
**DECLARATORY RELIEF**
**(Against each of the Third-party defendants)**

21. Third-party plaintiffs incorporate by this reference all of the above allegations as if set forth in full herein.

4

THE MITCHELL
LAW FIRM, LLP
426 First Street
P.O. Drawer 1008
Eureka, CA 95502

**THIRD-PARTY COMPLAINT BY COUNTY OF HUMBOLDT AND KELSEY HAWK FOR EQUITABLE INDEMNITY, CONTRIBUTION, DECLARATORY RELIEF AND EXPRESS INDEMNITY and DEMAND FOR JURY TRIAL**
**1:25-cv-01168-RMI**

22.    An actual controversy exists between the Third-party plaintiffs and the Third-party defendants concerning their respective rights, duties, and obligations because the Third-party plaintiffs contends, and the Third-party defendants dispute, that if the Third-party plaintiffs is in any way liable, said liability will be the responsibility, in whole or in part, of the Third-party defendants, and the Third-party plaintiffs request a declaration by the court of the respective rights, duties and obligations of the Third-party plaintiffs and the Third-party defendants concerning the liability, if any.

## FOURTH CAUSE OF ACTION
### EXPRESS INDEMNITY

**(Against Third-party defendant NIGHTINGALE NURSING, LLC)**

21.    Third-party plaintiffs incorporate by this reference all of the above allegations as if set forth in full herein.

22.    Under the express terms Professional Services Agreement, which was in full force and effect at all material times, NIGHTINGALE NURSING, LLC was obligated, among other things, to defend, indemnify and hold harmless Third-party plaintiffs from any and all liability arising out or in connection with, Third-party defendants' negligent performance of, or failure to comply with, any of the duties and/or obligations under the Professional Services Agreement as set forth more specifically in *Exhibit A*.

23.    The Professional Services Agreement was and is in full force and effect at all material times, and Third-party plaintiffs have fully performed their obligations to NIGHTINGALE NURSING, LLC with respect to the Professional Services Agreement.

24.    Counsel has been retained to defend Third-party plaintiffs in this action, thereby incurring costs, consultants' fees, attorney's fees and other litigation fees in the defense of this action.

25.    Because the underlying action is rooted in a claim arising out of the performance of or failure to perform the obligations of the Professional Services Agreement by the Third-

5

THE MITCHELL
LAW FIRM, LLP
426 First Street
P.O. Drawer 1008
Eureka, CA 95502

**THIRD-PARTY COMPLAINT BY COUNTY OF HUMBOLDT AND KELSEY HAWK FOR EQUITABLE INDEMNITY, CONTRIBUTION, DECLARATORY RELIEF AND EXPRESS INDEMNITY and DEMAND FOR JURY TRIAL
1:25-cv-01168-RMI**

party defendants, the Third-party plaintiffs are entitled to the benefits of the terms of the contract including the obligation to indemnity, defend and hold Third-party plaintiffs harmless.

WHEREFORE, Third-party plaintiffs requests total and complete indemnity for any judgments rendered against Third-party plaintiffs; judgment in a proportionate share from each Third-party defendant; a judicial determination that Third-party defendants caused or contributed to the injuries and damages sustained by plaintiff; and that Third-party defendants indemnify Third-party plaintiffs, either completely or partially, for any judgment which the plaintiffs may recover in the underlying cause of action; for costs of suit incurred, including attorney's fees; and for such other relief as the court may deem fair, just and equitable.

DATED:  April __ , 2026                THE MITCHELL LAW FIRM, LLP


By:    _/ s /  Nicholas R. Kloeppel_____
           NICHOLAS R. KLOEPPEL
           Attorneys for Defendants
           COUNTY OF HUMBOLDT and
           KELSEY HAWK

**DEMAND FOR JURY TRIAL**

These Third-party plaintiffs demand a trial by jury on all issues triable to a jury.

DATED: April __, 2026                THE MITCHELL LAW FIRM, LLP


By:    _/ s /  Nicholas R. Kloeppel_____
           NICHOLAS R. KLOEPPEL
           Attorneys for Defendants
           COUNTY OF HUMBOLDT and
           KELSEY HAWK

**THIRD-PARTY COMPLAINT BY COUNTY OF HUMBOLDT AND KELSEY HAWK FOR EQUITABLE INDEMNITY, CONTRIBUTION, DECLARATORY RELIEF AND EXPRESS INDEMNITY and DEMAND FOR JURY TRIAL**
**1:25-cv-01168-RMI**

Exhibit A

**LAW OFFICE OF
BENJAMIN MAINZER, A.P.C**.
Benjamin Mainzer (CSB 257748)
305 K Street
Eureka, CA 95501
(707) 234-5171
bmainzer@mainzerlaw.com

Attorney for PLAINTIFFS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

ERIC MATILTON, JR., individually
and as successor in interest to ERIC
MATILTON, SR. deceased; C.M. a
minor by and through his guardian
ad litem Carrie Ames; and K.M., a
minor, by and through his guardian
ad litem, Carrie Ames

        Plaintiff,

v.

COUNTY OF HUMBOLDT,
CHRISTIAN AGRICOLA,
KELSEY HAWK; and DOES 1
through 40 inclusive,

        Defendants.
_____ /

CASE NO.  **1:25-cv-1168-RMI**

**FIRST AMENDED COMPLAINT FOR
DAMAGES AND DECLARATORY AND
INJUNCTIVE RELIEF**

(1) **Violation of Pretrial Detainee's
Fourteenth Amendment Right to
Mental Health Care (42 U.S.C. § 1983)**
(2) **Violation of Pretrial Detainee's
Fourteenth Amendment Right to
Mental Health Care (42 U.S.C. § 1983)**
(3) **Violation of Pretrial Detainee's
Fourteenth Amendment Right to
Mental Health Care (42 U.S.C. § 1983)**
(4) **Failure to Furnish Medical Care (Cal.
Gov. Code § 845.6)**
(5) **Vicarious Liability for the Act or
Omission of a Public Employee (Cal.
Gov. Code §§ 815.2(a), 820(a))**
(6) **Dependent Adult Neglect (Cal. Welf.
Inst. Code § 15610.57)**
(7) **Medical Negligence**
(8) **Medical Negligence**
(9) **Violation of Fourteenth Amendment
Right to Familial Association (42 U.S.C.
§ 1983)**
(10)   **Violation of Fourteenth Amendment
Right to Familial Association (42 U.S.C.
§ 1983)**

**FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 1**

**(11) Violation of Fourteenth Amendment Right to Familial Association (42 U.S.C. § 1983)**

**(12) Declaratory and Injunctive Relief**

<u>**DEMAND FOR JURY TRIAL**</u>

COMES NOW, Plaintiffs for their complaint against Defendants COUNTY OF HUMBOLDT, CHRISTIAN AGRICOLA, KELSEY HAWK, and DOES 1-40, inclusive, alleges as follows:

<u>**INTRODUCTION**</u>

1. This action seeks compensatory damages, punitive damages and declaratory and injunctive relief, from Defendants for violating various rights under the United States Constitution and state law in connection with the preventable in-custody death of Eric Matilton Sr., hereinafter, "Decedent."

2. On or about November 3, 2023, Decedent was arrested and thereafter became a pre-trial detainee at the Humboldt County Correctional Facility (HCCF).

3. Only 14 days later, on or about November 17, 2023, at or around 8:00 pm, Decedent was found in his cell by a correctional deputy after he attempted suicide via asphyxiation. Decedent later succumbed to the injuries he sustained in the attempt.

4. As detailed herein, while incarcerated at the HCCF, Decedent was systemically deprived of necessary supervision, monitoring and mental health care.

5. These systemic deprivations led Decedent, whom Defendants knew suffered from serious and debilitating mental illness, to decompensate and attempt suicide on November 17, 2023. Decedent's attempt was tragically successful.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF    PAGE 2

6.      Defendants' failure to provide mental health care to persons like Decedent at the HCCF is neither a new problem nor aberrant.  For years, mental health services provided to persons incarcerated at the Humboldt County Correctional Facility have failed to meet minimum Constitutional standards.

7.      Repeatedly, the Humboldt County Civil Grand Jury has sounded the alarm that mental health care for people incarcerated at the HCCF are inadequate, yet inadequate care persists.

8.      As will be detained herein, Defendants' conduct was tortious, violative of Decedent's rights under the Constitutions of the United States and caused injury to Plaintiffs.

## PARTIES

9.      Plaintiff ERIC MATILTON, JR. is the biological child of Decedent.  Plaintiff is the successor in interest to Decedent as defined in Section 377.11 of the California Code of Civil Procedure.  Attached to this Complaint as Exhibit 1 and incorporated herein by reference is the Declaration of ERIC MATILTON JR. per section 377.32 of the California Code of Civil Procedure.  No personal representative exists.

10.      Plaintiff C.M., a minor, is the biological child of Decedent and Carrie Ames.

11.      Plaintiff K.M., a minor, is the biological child of Decedent and Carrie Ames.

12.      Plaintiffs ERIC MATILTON, JR., C.M., and K.M., are collectively referred to herein as "Plaintiffs."

13.      At all relevant times, Plaintiffs were individuals residing in the County of Humboldt, California.

14.      At all relevant times, the Humboldt County Sheriff's Office was responsible for running the HCCF.

**FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF     PAGE 3**

15.     The Humboldt County Sheriff's Office is a department or agency of Defendant COUNTY OF HUMBOLDT, California.

16.     At all relevant times, the Humboldt County Department of Health and Human Services was responsible for providing behavioral health services to persons incarcerated at the HCCF.

17.     The Humboldt County Department of Health and Human Services is a department or agency of Defendant COUNTY OF HUMBOLDT, California.

18.     COUNTY OF HUMBOLDT is a public entity as defined by California Government Code section 811.2.

19.     At all relevant times, COUNTY OF HUMBOLDT contracted with the Tennessee company Wellpath, Inc. (Wellpath) to provide some health care staffing and heath care services at the HCCF.

20.     While the COUNTY OF HUMBOLDT contracted with Wellpath to provide some health care services at the HCCF, at all relevant times, COUNTY OF HUMBOLDT bore ultimate responsibility for health care provided at the HCCF. At all relevant times, the COUNTY OF HUMBOLDT had final authority over the administration of all aspects of health care at the HCCF.

21.     Defendants CHRISTIAN AGRICOLA, hereinafter "AGRICOLA," and KELSEY HAWK, hereinafter "HAWK," at all times herein mentioned were either public employees of COUNTY OF HUMBOLDT, as defined by California Government Code section 811.4, or agents of the COUNTY OF HUMBOLDT.

22.     In doing the things alleged herein, Defendants HAWK and AGRICOLA were acting within the course and scope of their employment and/or agency and were at all

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF     PAGE 4

relevant times acting with the consent, permission and authorization of COUNTY OF HUMBOLDT.

23. Plaintiffs are ignorant of the true names or capacities of the Defendants sued herein under the fictitious names Doe 1 through Doe 40, inclusive. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.

24. Plaintiffs are informed and believe that each of the Doe Defendants was responsible in some manner for the occurrences and injuries alleged in this complaint. At all times herein mentioned, Doe Defendants 1 through 40 were California residents.

25. At all relevant times, DOES 1-20 were the employees or agents of COUNTY OF HUMBOLDT and at all relevant times were acting within the course and scope of their employment.

26. DOES 1-20 participated in the acts and omissions herein alleged and had knowledge of the acts, conduct and operative information available to all Defendants.

27. At all relevant times, DOES 21-40 were the employees or agents of COUNTY OF HUMBOLDT and at all relevant times were acting within the course and scope of their employment.

28. DOES 21-40 had at all relevant times the authority to create, change or modify the training, instruction, policies, departmental practices, standard operating procedures and customs of COUNTY OF HUMBOLDT and the ability to approve or ratify the conduct of each defendant.

29. Defendants COUNTY OF HUMBOLDT, AGRICOLA, HAWK and DOES 1-40 are collectively described herein as "Defendants."

**FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF     PAGE 5**

## JURISDICTION & VENUE

30. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 based on questions of federal Constitutional law and 42 U.S.C. § 1983.

31. This Court has jurisdiction to issue declaratory or injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

32. This Court has jurisdiction over claims arising under the laws of the State of California pursuant to the supplemental jurisdiction provided by 28 U.S.C. § 1367(a).

33. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 because all of the events giving rise to the claims herein occurred in the Northern District of California.

34. As a condition precedent to filing state causes of action, on March 26, 2024, Plaintiffs served their claims for damages with COUNTY OF HUMBOLDT pursuant to applicable sections of the California Government Code.

35. On May 16, 2024, COUNTY OF HUMBOLDT rejected Plaintiffs' claims.

36. As a condition precedent to filing claims of medical negligence, on November 4, 2024, Plaintiffs mailed notices to Defendants AGRICOLA and HAWK pursuant to California Code of Civil Procedure section 364. These notices were sent via certified mail to the addresses listed for Defendants AGRICOLA and HAWK on the State of California Department of Consumer Affairs website.

**FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF  PAGE 6**

37. State claims and claims of medical negligence are timely filed. *Wurts v. County of Fresno*, 44 Cal.App.4th 380 (1996).

## DIVISION

38. Division assignment is proper for Eureka, as all of the conduct alleged herein occurred within the COUNTY OF HUMBOLDT.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

39. On or about November 3, 2023, Decedent was arrested and thereafter became a pre-trial detainee at the HCCF. Only 14 days later, on or about November 17, 2023, at or around 8:00 pm, Decedent was found in his cell by a correctional deputy after he attempted suicide via asphyxiation. Decedent later succumbed to the injuries he sustained in the attempt.

40. Prior to his arrest on November 3, 2023, Decedent had a long, well-documented history of severe and debilitating mental illness.

41. Defendant COUNTY OF HUMBOLDT had actual or constructive knowledge of Decedent's medical history, including Decedent's history of mental illness.

42. Prior to November 3, 2023, Decedent had previously been diagnosed by medical providers employed by or affiliated with Defendant COUNTY OF HUMBOLDT with a litany of mental health disorders.

43. Prior to his arrest on November, 3, 2023, medical providers employed by or affiliated with Defendant COUNTY OF HUMBOLDT diagnosed Decedent with post-

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF    PAGE 7

traumatic stress disorder, major depressive disorder with psychotic features, unspecified schizophrenia spectrum and other psychotic disorder, and episodic mood disorder.

44. Evaluations of Decedent—conducted prior to his November 3, 2023, arrest—by medical providers employed by or affiliated with Defendant COUNTY OF HUMBOLDT noted that Decedent experienced both suicidal ideations and auditory hallucinations and that Decedent had previously actually attempted suicide.

45. Prior to his arrest on November 3, 2023, the above-described medical records of Decedent containing the aforementioned diagnoses and information were in actual possession of the COUNTY OF HUMBOLDT and were, at all relevant times, accessible to agents and employees of Defendants.

46. On or about November 3, 2023, Decedent's family members noticed that Decedent was experiencing an acute mental health crisis. They attempted to get Decedent mental health care, but were unsuccessful.

47. Later on November 3, 2023, at or around 7:30 pm, Decedent entered the home of Richard Hostler. Decedent was speaking nonsensically. He was swinging a baseball bat, but did not hit anything, nor from the perspective of Mr. Hostler was Decedent trying to hit anyone. Mr. Hostler told the responding deputy that while he was not afraid, he was concerned that Decedent would hit him or his grandmother who was also in the house.

48. Decedent was thereafter arrested on misdemeanor charges.

49. Upon arrest, Decedent was speaking nonsensically. The arresting deputy noted Decedent was making nonsensical statements about god and demons.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF     PAGE 8

50. Once brought to the HCCF, on or about November 3, 2023, Maria Mehegan, RN, was tasked to complete the receiving screening for Decedent. This screening was not properly completed.

51. Notably, numerous questions related to suicidality screening and Decedent's mental health status and history were left blank, filled in inconsistently or filled in incorrectly.

52. Resulting from the inaccurate and incomplete receiving screening, Decedent was not appropriately triaged for a mental health referral and needed mental health care.

53. In fact, per the improperly completed intake screening, no mental health referral (emergent, urgent or routine) was scheduled for Decedent and the recommendation was for Decedent to be placed in general population.

54. The screening also did not meaningfully make use of past records in the possession of Defendant COUNTY OF HUMBOLDT that noted past serious mental health diagnoses and suicidality.

55. Decedent was thereafter placed into general population at the HCCF.

56. On or about November 6, 2023, at or around 8:30 am, Christina Frye, RN, received a call from Dr. Eva Smith at K'ima:w Medical Center. Dr. Smith reported to Ms. Frye that Decedent had been under her care and had been scheduled for mental health counseling prior to his November 3, 2023, arrest.

57. The documented purpose of Dr. Smith calling was to ensure Decedent was seen by mental health while in custody.

58. Later on November 6, 2023, at or around 10:37 am, Nicholas Entsminger, PA, reviewed the receiving screening completed by Maria Mehegan. Despite the fact that the

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF    PAGE 9

screening was obviously incomplete, Mr. Entsminger approved it. On information and belief, Mr. Entsminger however ordered a mental health referral of unspecified urgency.

59.    Based on the symptoms Decedent reported at intake, the observations of the arresting deputy, Decedent's history that was known or reasonably should have been known to Defendants, and the information provided to Defendants by Dr. Smith, an urgent or emergent screening should have been ordered.

60.    Based on the symptoms Decedent reported at intake and Decedent's history that was known or reasonably should have been known to Defendants, and the information provided to Defendants by Dr. Smith, Decedent should have been provided with mental health care.

61.    Later on November 6, 2023, at or around 10:30 am, Kelsey HAWK, AMFT, documented that she received a call from a Dr. John Israel.

62.    Ms. HAWK documented that Dr. John Israel informed her that Decedent had a history of receiving psychiatric services and has been medically treated for mania, psychosis and bipolar disorder.

63.    Ms. HAWK was informed by Dr. Israel that Decedent had a history of psychotic episodes where he experiences paranoia, delusions and auditory hallucinations.

64.    Later on November 6, 2023, at or around 12:00 pm, Daniel Gongora documented that he received a call from Decedent's psychologist, Dr. John Israel, informing him that Decedent was being seen by Dr. Bassiri and had been prescribed Seroquel.

65.    From November 3, 2023, through November 6, 2023, Decedent was given no antipsychotic mediation including, but not limited to, Seroquel.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 10

66.     From November 3, 2023, through November 6, 2023, Decedent was not evaluated by any doctor or psychiatrist for purposes of determining if Decedent required Seroquel or any other antipsychotic mediation.

67.     On November 6, 2023, at or around 4:55, Decedent disclosed he was experiencing suicidal thoughts and that he wanted to die.  He stated he felt hopeless.

68.     The determination was made that Decedent was unable to keep himself safe.

69.     Based on observed suicidal ideation, Decedent was placed in a safety cell.

70.     On or about November 7, 2023, a psychiatrist, Dr. Christian AGRICOLA, evaluated Decedent while Decedent was still in the safety cell.

71.     At all relevant times, Dr. AGRICOLA was the sole psychiatrist responsible for Decedent's care and treatment.  On information and belief, throughout his detention at the HCCF, no other medical doctor was responsible in any way for Decedent's psychological treatment and care.  Indeed, on information and belief, throughout his detention at the HCCF, Decedent saw no other psychiatrist other than Dr. AGRICOLA.

72.     The November 7, 2023, evaluation by AGRICOLA, which took place four days after being arrested, was Decedent's first and only interaction with a psychiatrist while at the HCCF.

73.     Dr. AGRICOLA noted in his report that Decedent expressed suicidal ideations.

74.      Per Dr. AGRICOLA'S report, Dr. AGRICOLA knew that Decedent had command auditory hallucinations ordering he self-harm.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 11

75.     At the time of his evaluation of Decedent, Dr. AGRICOLA knew Decedent had a confirmed history of self-harm, including a documented prior suicide attempt, and that Decedent was under the care of outside medical providers for his mental health issues.

76.     At the time of the November 7, 2023, evaluation, Dr. AGRICOLA noted that Decedent's mood was anxious and depressed, that his affect was restricted, his impulse control poor, and that his judgement was poor in his ability to participate in treatment decisions.

77.     Despite these findings, Dr. AGRICOLA directed Decedent be removed from the safety cell.

78.     The plan for Decedent's safety was minimal: despite recognizing that Decedent's judgement was poor in his ability to participate in treatment decisions, Dr. AGRICOLA made the explicit decision to allow Decedent's release to be predicated on Decedent entering into a "contract for safety" and take medication, namely Seroquel.

79.     Meaningfully, this meant the decision to release Decedent from the safety cell was exclusively based on Decedent's adherence to taking Seroquel.

80.     Furthermore, by virtue of his status as the prescribing physician, and because he was the sole psychiatrist responsible for Decedent's care while Decedent was detained at the HCCF, Dr. AGRICOLA had an ongoing duty and responsibility to monitor Decedent.

81.      This duty and responsibility included the responsibility to continually and meaningfully monitor Decedent's compliance with the medication he had prescribed, monitor the effectiveness of the medication as to the treatment goal i.e., ensuring Decedent was not a danger to himself, and monitor Decedent's mental health.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 12

82.     Furthermore, Dr. AGRICOLA'S ongoing responsibility to monitor Decedent to ensure he was not a danger to himself was enhanced by the fact that Dr. Agricola knew Decedent's mental state was poor and his ability to participate in his own treatment was limited.

83.     Stated plainly, Dr. AGRICOLA's responsibility to care for Decedent and ensure Decedent was not a danger to himself was ongoing, and did not end when he wrote the prescription for Seroquel and directed Decedent be removed from the safety cell.

84.     The following day, on or about November, 8, 2023, a doubt as to Decedent's competence to participate in his own defense was declared by a judge of the Humboldt County Superior Court, and criminal proceedings against Decedent were suspended.

85.     On information and belief, from November 7 through November 17, Decedent was scheduled to take 18 separate doses of Seroquel.  Despite Seroquel being the only meaningful component of Decedent's care related to preventing suicidal ideation, from November 7, 2023, until he was found on November 17, 2023, medication logs document 8 separate instances Decedent did not take Seroquel following Decedent's removal from the safety cell.

86.     While on about November 14, 2023, Daniel Gongora documented that Decedent refused his Seroquel and while on November 16, 2023, Coty Schneider documented that Decedent flushed his medications down the toilet, there is no indication in Decedent's medical records that anyone took any meaningful action based thereupon.

87.     Moreover, on information and belief, other than documenting the refusals by Decedent in their medication logs, neither Maria Mehegan, RN Ashley Mersman, LVN, Roberta Conn, LVN, Baylee Crosby, RN, Stevie Garza, RN nor Leigha Campbell, LVN, ever

**FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 13**

meaningfully informed anyone that Decedent was not consuming prescribed antipsychotic medication, despite that medication being the only meaningful measure employed to combat his suicidal ideation.

88. Despite two separate progress notes records being made that Decedent was not consuming his prescribed Seroquel, and eight notations in Decedent's medication log that Decedent had not consumed prescribed Seroquel, Dr. AGRICOLA never revaluated Decedent, nor took any action whatsoever. In so failing to act, Dr. AGRICOLA intentionally abrogated his ongoing responsibly to monitor Decedent and ensure both that Decedent was compliant with the medication he prescribed and that the treatment he prescribed was furthering his treatment goals.

89. In acting as herein described, Dr. AGRICOLA acted despicably with a willful and conscious disregard for the rights and safety of Decedent and exposed Decedent to cruel and unjust hardship in conscious disregard of Decedent's rights.

90. On or about November 15, 2023, at or around 6:00 pm, Decedent made a request for health services, noting he was experiencing delusions and hearing voices.

91. This disclosure was made to AMFT Kelsey HAWK.

92. Decedent's disclosure to HAWK was not a vague request for help. In light of Decedent's known history documented in his treatment records and the nature of the symptoms Decedent reported, Decedent's request should have triggered awareness that Decedent was in serious medical need and in need of immediate medical care.

93. Specifically, Decedent's disclosures that he was experiencing delusions and hearing voices should have been especially concerning given Decedent's prior documented suicide attempts, the recent evaluation of Dr. AGRICOLA which noted Decedent had a

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 14

history of command auditory hallucinations directing self-harm, Decedent's prior safety cell placement due to suicidality, and the fact that Decedent was not consuming prescribed Seroquel indented to address his suicidality.

94.     Decedent's request for health services made by Decedent on November 15, 2023, additionally sought out additional medication (Zoloft and antipsychotic medication) and that his status be communicated to his medical providers at K'ima:w Medical Center.

95.     Despite his well-documented history of mental illness, the fact that his removal from safety cell placement was almost entirely predicated on Decedent taking Seroquel, the fact that Decedent has not been taking Seroquel as prescribed, and Decedent's reporting symptoms consistent with his known past history of command auditory hallucinations directing self-harm, when Decedent requested health services, Kelsey HAWK, AMFT, made the intentional decision to not take any steps to ensure health services were provided.

96.     Ms. HAWK indicated on the health services request that no immediate intervention was needed.

97.     On information and belief, no mental health services addressing the delusions or auditory hallucinations Decedent expressed he was experiencing were provided to Decedent from at or around 6:00 pm on November 15, 2023, to at or around 8:00pm on November 17, 2023, when Decedent was found unconscious after attempting suicide.

98.     Additionally, on November 15, 2023, at or around the time Decedent made a request for health services, because Ms. HAWK was the person who was physically handed the request and made the decision to take no steps, at this specific time it was Ms. HAWK

**FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 15**

who had the ability to control Decedent's access to mental health services, even though Ms. HAWK was not an individually licensed qualified health provider.

99. In acting as herein described, Ms. HAWK acted despicably with a willful and conscious disregard for the rights and safety of Decedent and exposed Decedent to cruel and unjust hardship in conscious disregard of Decedent's rights.

100.

101. As at all relevant times Ms. HAWK was not an individually licensed qualified health provider, she was not vested with any authority to act with discretion. Rather, each and every decision of Ms. HAWK had to be approved by a licensed therapist supervisor.

102. At all relevant times, Defendants permitted Ms. HAWK to work unsupervised even though as an Associate Marriage and Family Therapist (AMFT), Ms. HAWK was required to work under the direct supervision of a licensed therapist.

103. Ms. HAWK'S responsibility to provide care to Decedent was not episodic or limited. Rather Ms. HAWK had ongoing responsibility to provide care to Decedent. Indeed, records of Decedent show she was responsible for participating in crisis interventions and providing mental health support related to Decedent throughout Decedent's detention.

104. However, records of Decedent fail to show any qualified healthcare provider reviewed any of Ms. HAWK care decisions related to Decedent, including, but not limited to, the decisions Ms. HAWK made following Decedent's submission of the above-described health services request on or about November 15, 2023.

105. In doing the aforementioned, Defendants AGRICOLA, HAWK and DOES 1-20 each undertook responsibility to provide care for Decedent's mental illness, but as described herein, each failed to properly provide needed and vital care and treatment.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 16

106.    On November 17, 2023, Decedent was found in his cell unconscious after attempting suicide by asphyxiation.  He later succumbed to his injuries.

107.    Decedent had crafted ligatures out of multiple strips of clothing he had ripped and knotted.

108.    Decedent tied ligatures to multiple points in his cell.

109.    Supervision of Decedent was inadequate such that Decedent was able to rip clothing into multiple ligatures, tie these ligatures in various locations in his cell, and hang himself using these ligatures without being noticed.

110.    The COUNTY OF HUMBOLDT has long been aware that mental health services for people incarcerated at the HCCF have been inadequate.

111.    Indeed, the HCCF has been understaffed and incarcerated persons underserved for years.

112.    The 2017-18 Grand Jury report found mental health staffing levels at the HCCF inadequate.

113.    Resulting from understaffing, the 2017-18 Grand Jury noted it had been common for some mental health supervising clinicians to override a physician's order and that at times, clinicians practice beyond their scope of authority.

114.    The 2017-18 Grand Jury further noted that the amount of time mental health clinicians were available in the HCCF was insufficient.

115.    The 2017-18 Grand Jury further noted the lack of written policies and procedures concerning the care of mentally ill inmates at the HCCF inhibited the ability for staff to provide quality mental health care.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 17

116.     In addition to insufficient staffing at the HCCF, the 2017-18 Grand Jury noted there was a lack of sufficient administrative involvement in the treatment and care of mentally ill inmates in Humboldt County Correctional Facility.

117.     The 2019-20 Humboldt County Grand Jury noted that the COUNTY OF HUMBOLDT failed to provide round-the-clock, qualified mental health staffing at the HCCF.

118.     The 2019-20 Grand Jury additionally raised concern over the COUNTY OF HUMBOLDT'S intent to contract with a for-profit private health services provider, specifically, Wellpath.  The Grand Jury specifically cautioned that Wellpath had been cited in a wide array of public articles accusing it of providing substandard care.  The Grand Jury further noted that Wellpath had been sued in over 100 lawsuits.

119.     The 2021-22 Humboldt County Grand Jury found that "The [HCCF] continues to incarcerate individuals experiencing serious mental health issues who should be housed in a mental health facility."

120.     The 2021-22 Grand Jury recommended that the COUNTY OF HUMBOLDT create a plan by January 31, 2023, to among other things, provide appropriate services for users experiencing mental health issues.

121.     In its November 29, 2022 response, the COUNTY OF HUMBOLDT refused to implement this recommendation.

122.     The aforementioned findings of the Humboldt County Grand Jury, made over six years, evidence a pattern of systemic and continual failures by the COUNTY OF HUMBOLDT to provide minimally adequate medical care to persons incarcerated at the HCCF.

**FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 18**

123.     The aforementioned findings of the Humboldt County Grand Jury, made over six years, evidence a widespread practice of the COUNTY OF HUMBOLDT that was the moving force of the Constitutional violations described herein.

124.     Furthermore, the decision of the COUNTY OF HUMBOLDT to reject the Grand Jury's recommendation that the COUNTY OF HUMBOLDT create a plan to provide appropriate mental health services to persons incarcerated in the HCCF evidences ratification and acceptance of the substandard mental health care provided to persons incarcerated in the HCCF, and that the COUNTY OF HUMBOLDT was, at all relevant times, deliberately indifferent to its obligation to provide to persons incarcerated in the HCCF Constitutionally adequate mental health care.

**FIRST CAUSE OF ACTION**
**Violation of Pretrial Detainee's Fourteenth Amendment Right to Mental Health Care**
**(42 U.S.C. § 1983)**
**(By Plaintiff ERIC MATILTON JR. as successor in interest against Defendants AGRICOLA and DOES 1-20)**

125.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if stated fully herein.

126.     The Fourteenth Amendment of the U.S. Constitution and the parallel provision in Article 1, Section 7 of the California Constitution prohibit officials from employing policies and practices that are subjectively unreasonable because they expose pretrial detainees to a substantial risk of serious harm.

127.     Defendants AGRICOLA and DOES 1-20 knew of Decedent's medical history, including that Decedent had been previously diagnosed with post-traumatic stress disorder, major depressive disorder with psychotic features, unspecified schizophrenia spectrum and other psychotic disorder, and episodic mood disorder.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 19

128.    Defendants AGRICOLA and DOES 1-20 knew Decedent experienced both suicidal ideations and auditory hallucinations and that Decedent had previously actually attempted suicide.

129.    Defendants AGRICOLA and DOES 1-20 knew Decedent had been under the care of a psychiatrist and that Decedent had been prescribed medication by that psychiatrist.

130.    With knowledge of Decedent's profound mental illness, Defendants AGRICOLA and DOES 1-20 limited his treatment of Decedent to entering into a "contract for safety" with Decedent and prescribing medication, namely Seroquel.

131.    This course of treatment was medically unacceptable under the circumstances.

132.    Moreover, even after embarking upon a medically unacceptable course of treatment, and despite actual or constructive knowledge that Decedent was not regularly taking Seroquel, Defendants AGRICOLA and DOES 1-20 intentionally took no further action and provided Decedent with no further care even when it became obvious the course of treatment was not working.

133.    Defendants AGRICOLA and DOES 1-20 took no further action to care for Decedent despite Decedent reporting auditory hallucinations and requesting medical aid, even though a reasonable person under the same or similar circumstances would have understood the high degree of risk involved.

134.    In so doing, Defendants AGRICOLA and DOES 1-20 denied Decedent, who was suffering from a serious and acute medical condition, with needed treatment.

135.    In ignoring the information available to him regarding Decedent's serious and acute medical condition, Defendants AGRICOLA and DOES 1-20 stood idly by and failed to

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 20

respond with reasonable diligence.  Indeed, in so doing, Defendants AGRICOLA and DOES 1-20 acted with deliberate indifference.

136.    In acting as described herein, Defendants AGRICOLA and DOES 1-20 violated Decedent's Fourteenth Amendment Right to be provided adequate mental health care.

137.    In acting as described herein, Defendants AGRICOLA and DOES 1-20 put Decedent at a substantial risk of serious harm.

138.    In acting as described herein, Defendants AGRICOLA and DOES 1-20 acted recklessly and were deliberately indifferent to the substantial risk of harm to Decedent, who was known to be mentally ill and suicidal.

139.    In acting as described herein, Defendants AGRICOLA and DOES 1-20 were acting in their official duties as employees or agents of the COUNTY OF HUMBOLDT.

140.    In acting as described herein, Defendants AGRICOLA and DOES 1-20's conduct was a substantial factor in causing harm to Decedent.

## SECOND CAUSE OF ACTION
**Violation of Pretrial Detainee's Fourteenth Amendment Right to Mental Health Care**
**(42 U.S.C. § 1983)**
**(By Plaintiff ERIC MATILTON JR. as successor in interest against Defendants HAWK and DOES 1-20)**

141.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if stated fully herein.

142.    The Fourteenth Amendment of the U.S. Constitution and the parallel provision in Article 1, Section 7 of the California Constitution prohibit officials from employing policies and practices that are subjectively unreasonable because they expose pretrial detainees to a substantial risk of serious harm.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 21

143.    Defendants HAWK and DOES 1-20 knew of Decedent's medical history, including that Decedent had been previously diagnosed with post-traumatic stress disorder, major depressive disorder with psychotic features, unspecified schizophrenia spectrum and other psychotic disorder, and episodic mood disorder.

144.    HAWK and DOES 1-20 knew Decedent experienced both suicidal ideations and auditory hallucinations and that Decedent had previously actually attempted suicide.

145.    HAWK and DOES 1-20 knew Decedent had been under the care of a psychiatrist and had been prescribed medication by that psychiatrist.

146.    Despite actual or constructive knowledge that Decedent was not regularly taking Seroquel, HAWK and DOES 1-20 intentionally took no further action and provided Decedent with no further care even when it became obvious the course of treatment was not working.

147.    HAWK and DOES 1-20 took no further action to care for Decedent despite Decedent reporting to her that he was experiencing auditory hallucinations and was requesting medical aid, even though a reasonable person under the same or similar circumstances would have understood the high degree of risk involved associated with denying care.

148.    In so doing, HAWK and DOES 1-20 denied Decedent, who was suffering from a serious and acute medical condition, with needed treatment.

149.    In ignoring the information available to her regarding Decedent's serious and acute medical condition, HAWK and DOES 1-20 stood idly by and failed to respond with reasonable diligence.  Indeed, in so doing, Defendants HAWK and DOES 1-20 acted with deliberate indifference.

150.    In acting as described herein, HAWK and DOES 1-20 violated Decedent's Fourteenth Amendment Right to be provided adequate mental health care.

151.    In acting as described herein, HAWK and DOES 1-20 put Decedent at a substantial risk of serious harm.

152.    In acting as described herein, Defendants HAWK and DOES 1-20 acted recklessly and were deliberately indifferent to the substantial risk of harm to Decedent, who was known to be mentally ill and suicidal.

153.    In acting as described herein, HAWK and DOES 1-20 were acting in their official duties as employees or agents of the COUNTY OF HUMBOLDT.

154.    In acting as described herein, HAWK and DOES 1-20's conduct was a substantial factor in causing harm to Decedent.

**THIRD CAUSE OF ACTION**
**Violation of Pretrial Detainee's Fourteenth Amendment Right to Mental Health Care**
**(42 U.S.C. § 1983)**
**(By Plaintiff ERIC MATILTON JR. as successor in interest against Defendants**
**COUNTY OF HUMBOLDT and DOES 21-40)**

155.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if stated fully herein.

156.    The Fourteenth Amendment of the U.S. Constitution and the parallel provision in Article 1, Section 7 of the California Constitution prohibit officials from employing policies, practices and customs that are subjectively unreasonable because they expose pretrial detainees to a substantial risk of serious harm.

157.    Via the actions described herein of Defendants HAWK and AGRICOLA, who as employees or agents of Defendant COUNTY OF HUMBOLDT, were acting under color of state law, Decedent was subjected to a substantial risk of serious harm and injury from

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 23

inadequate mental health care at the HCCF—all violative of his rights under the Fourteenth Amendment of the U.S. Constitution and the parallel provision in Article 1, Section 7 of the California Constitution.

158.    As recognized by the Civil Grand Jury, the administration of mental health care at the HCCF has long been deficient.

159.    Deficient policies, practices and customs pertaining to mental health care at the HCCF include, but are not limited to:

a.    Policies and practices permitting inadequate staffing leading to care decisions being made by staff not qualified to make care decisions;

b.    Policies and practices permitting inadequate staffing leading to substandard care decisions and the deprivation of needed care;

c.    Policies and practices permitting inadequate supervision of staff not individually qualified to provide care;

d.    Policies and practices permitting staff who are unlicensed or un/underqualified to provide mental health care or gatekeep access to such care.

160.    The policies, systemic practices and customs of Defendants COUNTY OF HUMBOLDT and DOES 21-40 described herein were the moving force of Decedent's injuries.

161.    Defendant HAWK, at all relevant times, was an Associate Marriage and Family Therapist and not a qualified healthcare provider able to make care decisions independently.

**FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 24**

162.    At all relevant times, Defendant HAWK was not meaningfully supervised, nor were all of her decisions related Decedent reviewed by a qualified healthcare provider.

163.    Despite her lack of qualifications, allowing Defendant HAWK to act without supervision or oversight was consistent with the customs, policies and practices of Defendants COUNTY OF HUMBOLDT and DOES 21-40, as Defendants COUNTY OF HUMBOLDT and DOES 21-40 knowingly permitted her to act without supervision or oversight.

164.    Defendant HAWK took no further action to care for Decedent despite Decedent reporting to her that he was experiencing auditory hallucinations and requesting medical aid, even though a reasonable person under the same or similar circumstances would have understood the high degree of risk involved.

165.    In so doing, Defendant Hawk denied Decedent, who was suffering from a serious and acute medical condition, with needed treatment.

166.    Defendant HAWK taking no further action despite actual or constructive knowledge that Decedent was in serious need of care, even when Decedent requested care was consistent with the policies and practices of Defendants COUNTY OF HUMBOLDT and DOES 21-40.

167.    Said conduct described herein was part of a larger pattern and practice as recognized by the Humboldt County Civil Grand Jury and described herein.

168.    Defendant AGRICOLA, seeing Decedent only once and taking no further action despite actual or constructive knowledge that Decedent was in serious need of care, was consistent with the customs, policies and practices of Defendants COUNTY OF HUMBOLDT and DOES 21-40.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 25

169.    Said conduct was part of a larger pattern and practice as recognized by the Humboldt County Civil Grand Jury and described herein.

170.    On information and belief, the inadequate staffing of the HCCF by Defendants COUNTY OF HUMBOLDT and DOES 21-40 contributed to the conduct of Defendants AGRICOLA and HAWK as described herein.

171.    Defendants COUNTY OF HUMBOLDT and DOES 21–40 acted with deliberate indifference in maintaining policies, practices, and customs that constitute an inadequate and dangerous system of mental health care within the HCCF.

172.    As alleged herein, Defendants COUNTY OF HUMBOLDT and DOES 21–40 was put on direct notice through multiple findings by the Humboldt County Civil Grand Jury that inmates with serious mental illness were at substantial risk of harm due to systemically inadequate mental health care. Despite these findings, COUNTY OF HUMBOLDT and DOES 21–40 failed or refused to take meaningful corrective action.

173.    Furthermore, Defendants COUNTY OF HUMBOLDT and DOES 21–40 were aware that employees and agents—including Defendants HAWK and AGRICOLA—were engaging in the types of conduct described herein and that such conduct reflected the broader unconstitutional practices and failures within the HCCF's mental health system. Nevertheless, Defendants COUNTY OF HUMBOLDT and DOES 21–40 condoned this conduct or were deliberately indifferent to the risk it posed, including the specific risk to Decedent..

174.    On information and belief, these policies and practices have and continue to be implemented Defendants COUNTY OF HUMBOLDT and DOES 21-40 and their agents or employees in their official capacities.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 26

**FOURTH CAUSE OF ACTION**
**Failure to Furnish Medical Care (Cal. Gov. Code § 845.6)**
**(By Plaintiffs C.M., K.M., and ERIC MATILTON JR., individually and as successor in interest, against Defendants AGRICOLA, HAWK and DOES 1-20)**

175. Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if stated fully herein.

176. As detained herein, Decedent was in serious medical need.

177. Defendants HAWK, AGRICOLA and DOES 1-20 knew of Decedent's medical history, including that Decedent had been previously diagnosed with post-traumatic stress disorder, major depressive disorder with psychotic features, unspecified schizophrenia spectrum and other psychotic disorder, and episodic mood disorder.

178. Defendants HAWK, AGRICOLA and DOES 1-20 knew Decedent experienced both suicidal ideations and auditory hallucinations ordering he self-harm and that Decedent had preciously actually attempted suicide.

179. Defendants HAWK, AGRICOLA and DOES 1-20 knew Decedent had been under the care of a psychiatrist and had been prescribed medication by that psychiatrist.

180. Defendants HAWK, AGRICOLA and DOES 1-20, who were employees or agents of Defendants COUNTY OF HUMBOLDT and DOES 21-40 knew or had reason to know of Decedent's need for immediate medical care. Indeed, Defendants HAWK, AGRICOLA and DOES 1-20, at all relevant times, had sufficient information to know Decedent was at such a significant risk of suicide that care should have been immediately furnished.

181. Despite actual or constructive knowledge that Decedent was not regularly taking Seroquel, Defendants HAWK, AGRICOLA and DOES 1-20 failed to reasonably summon care for Decedent even when it became obvious the course of treatment was not

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 27

working, and even though Defendants HAWK, AGRICOLA and DOES 1-20, at all relevant times, had sufficient information to know Decedent was at such a significant risk of suicide that care should have been immediately furnished.

182. Defendants HAWK, AGRICOLA and DOES 1-20 failed to reasonably summon care for Decedent despite Decedent reporting that he was experiencing auditory hallucinations and requesting medical aid, even though a reasonable person under the same or similar circumstances would have understood the high degree of risk involved and Defendants HAWK, AGRICOLA and DOES 1-20, at all relevant times, had sufficient information to know Decedent was at such a significant risk of suicide that care should have been immediately furnished.

183. Resulting from the acts and omissions of Defendants HAWK, AGRICOLA and DOES 1-20, Decedent suffered harm and Plaintiffs were injured.

**FIFTH CAUSE OF ACTION**
**Vicarious Liability for the Act or Omission of a Public Employee (Cal. Gov. Code §§ 815.2(a), 820(a))**
**(By Plaintiffs C.M., K.M., and ERIC MATILTON JR., individually and as successor in interest, against Defendants COUNTY OF HUMBOLDT, DOES 21-40)**

184. Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if stated fully herein.

185. Defendants HAWK, AGRICOLA and DOES 1-20 knew of Decedent's medical history, including that Decedent had been previously diagnosed with post-traumatic stress disorder, major depressive disorder with psychotic features, unspecified schizophrenia spectrum and other psychotic disorder, and episodic mood disorder

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 28

186.    Defendants HAWK, AGRICOLA and DOES 1-20 knew Decedent experienced both suicidal ideations and auditory hallucinations ordering he self-harm and that Decedent had preciously actually attempted suicide.

187.    Defendants HAWK, AGRICOLA and DOES 1-20 knew Decedent had been under the care of a psychiatrist and had been prescribed medication by that psychiatrist.

188.    Defendants HAWK, AGRICOLA and DOES 1-20, who were employees or agents of Defendants COUNTY OF HUMBOLDT and DOES 21-40 knew or had reason to know of Decedent's need for immediate medical care.

189.    Despite actual or constructive knowledge that Decedent was not regularly taking Seroquel, Defendants HAWK, AGRICOLA and DOES 1-20 failed to reasonably summon care for Decedent even when it became obvious the course of treatment was not working.

190.    Defendants HAWK, AGRICOLA and DOES 1-20 failed to reasonably summon care for Decedent despite Decedent reporting that he was experiencing auditory hallucinations and requesting medical aid, even though a reasonable person under the same or similar circumstances would have understood the high degree of risk involved.

191.    Resulting from the acts and omissions of Defendants HAWK, AGRICOLA and DOES 1-20, Decedent suffered harm and Plaintiffs were injured.

192.    The acts and omissions of Defendants HAWK, AGRICOLA and DOES 1-20, as alleged herein were done in the course and scope of their employment with Defendants COUNTY OF HUMBOLDT and DOES 21-40, rendering Defendants COUNTY OF HUMBOLDT and DOES 21-40 vicariously liable.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 29

**SIXTH CAUSE OF ACTION**
**Dependent Adult Neglect (Welf. Inst. Code § 15610.57)**
**(By Plaintiffs C.M., K.M., and ERIC MATILTON JR., individually and as successor in interest, against Defendants COUNTY OF HUMBOLDT HAWK, AGRICOLA and DOES 1-40)**

193.   Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if stated fully herein.

194.   At all relevant times, Decedent had mental limitations that restricted his ability to either carry out normal activities or protect his rights. Decedent had been previously diagnosed with post-traumatic stress disorder, major depressive disorder with psychotic features, unspecified schizophrenia spectrum and other psychotic disorder, and episodic mood disorder —all of which limited his ability to carry out normal activities and protect his rights.

195.   Decedent had been brought into the HCCF after being observed speaking delusionally and acting erratically.

196.   At all relevant times while at HCCF, due to his mental illness, Decedent's impulse control was poor and his judgement was poor in his ability to participate in treatment decisions.

197.   For example, Decedent's mental illness caused him to refuse to take medications prescribed to him.

198.   Furthermore, Decedent was experiencing auditory hallucinations—which also limited his ability to carry out normal activities and protect his rights.

199.   Additionally, by virtue of his incarceration, Decedent was entirely dependent on Defendants for all aspects of his care, and Defendants were in a position to deprive Decedent of medical care.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 30

200. The aforementioned rendered Decedent a dependent adult as per California Welfare and Institutions Code § 15610.27.

201. Defendants COUNTY OF HUMBOLDT HAWK, AGRICOLA and DOES 1-40 had a substantial caretaking relationship with Decedent in that they exercised exclusive control over every aspect of care Decedent received or did not receive.

202. Defendants COUNTY OF HUMBOLDT HAWK, AGRICOLA and DOES 1-40 were responsible for proving daily care to Decedent, which included monitoring Decedent's compliance with medication and ordered treatment, monitoring whether prescribed treatment was effective and monitoring whether Decedent was a harm to himself.

203. At best, as is alleged herein, needed care was provided by Defendants COUNTY OF HUMBOLDT HAWK, AGRICOLA and DOES 1-40 sporadically. At worst, needed care—including care explicitly ordered to be provided—was not.

204. Defendants COUNTY OF HUMBOLDT HAWK, AGRICOLA and DOES 1-40 failed to provide medical care for Decedent's mental health needs and failed to protect Decedent from health and safety hazards.

205. Despite actual or constructive knowledge that Decedent was not regularly taking Seroquel, and their ongoing, continuous responsibility to monitor Decedent, COUNTY OF HUMBOLDT HAWK, AGRICOLA and DOES 1-40 failed to reasonably care for Decedent even when it became obvious the course of treatment was not working.

206. In so doing, Defendants COUNTY OF HUMBOLDT HAWK, AGRICOLA and DOES 1-40 failed to provide for Decedent's mental health needs and failed to protect Decedent from health and safety hazards—all constituting neglect as per California Welfare and Institutions Code § 15610.57.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 31

207. Defendants COUNTY OF HUMBOLDT HAWK, AGRICOLA and DOES 1-40 failed to reasonably summon care for Decedent despite Decedent reporting that he was experiencing auditory hallucinations and requesting medical aid, even though a reasonable person under the same or similar circumstances would have understood the high degree of risk involved.

208. In so doing, Defendants COUNTY OF HUMBOLDT HAWK, AGRICOLA and DOES 1-40 acted recklessly and failed to provide for Decedent's mental health needs and failed to protect Decedent from health and safety hazards—all constituting neglect as per California Welfare and Institutions Code § 15610.57.

209. By Defendants COUNTY OF HUMBOLDT, HAWK, AGRICOLA and DOES 1-40 failures, Decedent was harmed and Plaintiffs sustained injury.

210. The conduct of Defendants COUNTY OF HUMBOLDT, HAWK, AGRICOLA and DOES 1-40 was a substantial factor in causing harm to Decedent and injury to Plaintiffs.

211. In acting as described herein, Defendants COUNTY OF HUMBOLDT, HAWK, AGRICOLA and DOES 1-40 acted with conscious disregard of the probability that injury to Decedent would occur.

## SEVENTH CAUSE OF ACTION
### Medical Negligence
**(By Plaintiffs C.M., K.M., and ERIC MATILTON JR., individually and as successor in interest, against Defendant AGRICOLA and DOES 1-20)**

212. Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if stated fully herein.

213. At all relevant times, Defendant AGRICOLA was a medical doctor.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 32

214. Defendants AGRICOLA and DOES 1-20 knew of Decedent's medical history, including that Decedent had been previously diagnosed with post-traumatic stress disorder, major depressive disorder with psychotic features, unspecified schizophrenia spectrum and other psychotic disorder, and episodic mood disorder

215. Defendants AGRICOLA and DOES 1-20 knew Decedent experienced both suicidal ideations and auditory hallucinations and that Decedent had preciously actually attempted suicide.

216. Defendants AGRICOLA and DOES 1-20 knew Decedent had been under the care of a psychiatrist and that Decedent had been prescribed medication by that psychiatrist.

217. With knowledge of Decedent's profound mental illness, Defendants AGRICOLA and DOES 1-20 limited his treatment of Decedent to entering into a "contract for safety" with Decedent and prescribing medication, namely Seroquel.

218. This course of treatment was medically unacceptable under the circumstances and fell below the standard of care.

219. Moreover, even after embarking upon a medically unacceptable course of treatment, and despite actual or constructive knowledge that Decedent was not regularly taking Seroquel, Defendants AGRICOLA and DOES 1-20 intentionally took no further action and provided Decedent with no further care even when it became obvious the course of treatment was not working.

220. Defendants AGRICOLA and DOES 1-20 took no further action to care for Decedent despite Decedent reporting auditory hallucinations and requesting medical aid, even though a reasonable doctor under the same or similar circumstances would have understood that failing to provide further treatment was below the standard of care.

**FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 33**

221. In so doing, the conduct of Defendants AGRICOLA and DOES 1-20 fell below the standard of care and breeched the duty of care owed to Decedent.

222. The conduct of Defendants AGRICOLA and DOES 1-20 directly led to Decedent sustaining serious harm.

223. In acting as described herein, Defendants AGRICOLA and DOES 1-20's conduct was a substantial factor in causing harm to Decedent and injury to Plaintiffs.

**EIGHTH CAUSE OF ACTION**
**Medical Negligence**
**(By Plaintiffs C.M., K.M., and ERIC MATILTON JR., individually and as successor in interest, against Defendant HAWK and DOES 1-20)**

224. Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if stated fully herein.

225. At all relevant times, Defendant HAWK was an associate marriage and family therapist.

226. Defendants HAWK and DOES 1-20 knew of Decedent's medical history, including that Decedent had been previously diagnosed with post-traumatic stress disorder, major depressive disorder with psychotic features, unspecified schizophrenia spectrum and other psychotic disorder, and episodic mood disorder.

227. Defendants HAWK and DOES 1-20 knew Decedent experienced both suicidal ideations and auditory hallucinations and that Decedent had preciously actually attempted suicide.

228. Defendants HAWK and DOES 1-20 knew Decedent had been under the care of a psychiatrist and had been prescribed medication by that psychiatrist.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 34

229. Defendants HAWK and DOES 1-20 knew Decedent had entered into a "contract for safety" and had been prescribed medication, namely Seroquel.

230. Defendants HAWK and DOES 1-20 had actual or constructive knowledge that Decedent was not regularly taking Seroquel.

231. Defendants HAWK and DOES 1-20 intentionally took no further action and provided Decedent with no further care even when it became obvious the course of treatment was not working.

232. Defendants HAWK and DOES 1-20 took no further action to care for Decedent despite Decedent directly reporting auditory hallucinations and requesting medical aid, even though a reasonable mental health provider under the same or similar circumstances would have understood that failing to provide further treatment was below the standard of care.

233. In so doing, the conduct of Defendants HAWK and DOES 1-20 fell below the standard of care and breeched the duty of care owed to Decedent.

234. The conduct of Defendants HAWK and DOES 1-20 directly led to Decedent sustaining serious harm.

235. In acting as described herein, Defendants HAWK and DOES 1-20's conduct was a substantial factor in causing harm to Decedent and injury to Plaintiffs.

**NINTH CAUSE OF ACTION**
**Violation of Fourteenth Amendment Right to Familial Association and Companionship (42 U.S.C. § 1983)**
**(By Plaintiffs ERIC MATILTON, JR., C.M., and K.M., individually, against Defendants AGRICOLA and DOES 1-20)**

236. Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if stated fully herein.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 35

237.     At all relevant times, Decedent was the father of Plaintiffs ERIC MATILTON, JR., C.M., and K.M., and each Plaintiff had a constitutionally protected liberty interest in their relationship with their father under the Fourteenth Amendment.

238.     The Fourteenth Amendment of the U.S. Constitution and the parallel provision in Article 1, Section 7 of the California Constitution prohibit officials from employing policies and practices that are subjectively unreasonable because they expose pretrial detainees to a substantial risk of serious harm.

239.     Defendants AGRICOLA and DOES 1-20 knew of Decedent's medical history, including that Decedent had been previously diagnosed with post-traumatic stress disorder, major depressive disorder with psychotic features, unspecified schizophrenia spectrum and other psychotic disorder, and episodic mood disorder.

240.     Defendants AGRICOLA and DOES 1-20 knew Decedent experienced both suicidal ideations and auditory hallucinations and that Decedent had preciously actually attempted suicide.

241.     Defendants AGRICOLA and DOES 1-20 knew Decedent had been under the care of a psychiatrist and that Decedent had been prescribed medication by that psychiatrist.

242.     With knowledge of Decedent's profound mental illness, Defendants AGRICOLA and DOES 1-20 limited his treatment of Decedent to entering into a "contract for safety" with Decedent and prescribing medication, namely Seroquel.

243.     This course of treatment was medically unacceptable under the circumstances.

244.     Moreover, even after embarking upon a medically unacceptable course of treatment, and despite actual or constructive knowledge that Decedent was not regularly taking Seroquel, Defendants AGRICOLA and DOES 1-20 intentionally took no further

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 36

action and provided Decedent with no further care even when it became obvious the course of treatment was not working.

245. Defendants AGRICOLA and DOES 1-20 took no further action to care for Decedent despite Decedent reporting auditory hallucinations and requesting medical aid, even though a reasonable person under the same or similar circumstances would have understood the high degree of risk involved.

246. In so doing, Defendants AGRICOLA and DOES 1-20 denied Decedent, who was suffering from a serious and acute medical condition, with needed treatment.

247. In ignoring the information available to him regarding Decedent's serious and acute medical condition, Defendants AGRICOLA and DOES 1-20 stood idly by and failed to respond with reasonable diligence. Indeed, in so doing, Defendants AGRICOLA and DOES 1-20 acted with deliberate indifference.

248. In acting as described herein, Defendants AGRICOLA and DOES 1-20 violated Decedent's Fourteenth Amendment Right to be provided adequate mental health care.

249. In acting as described herein, Defendants AGRICOLA and DOES 1-20 put Decedent at a substantial risk of serious harm.

250. In acting as described herein, Defendants AGRICOLA and DOES 1-20 were acting in their official duties as employees or agents of the COUNTY OF HUMBOLDT.

251. In acting as described herein, AGRICOLA and DOES 1-20's conduct was a substantial factor in causing harm to Decedent and injury to Plaintiffs.

252. Defendant AGRICOLA and DOES 1-20's conduct deprived Plaintiffs of their fundamental right to a continued familial relationship with their father.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 37

253. As a direct and proximate result of Defendant AGRICOLA and DOES 1-20's conduct, Plaintiffs suffered the loss of their father's society, companionship, and emotional support, and have endured emotional distress.

**TENTH CAUSE OF ACTION**
**Violation of Fourteenth Amendment Right to Familial Association and Companionship (42 U.S.C. § 1983)**
**(By Plaintiffs ERIC MATILTON, JR., C.M., and K.M., individually, against Defendants HAWK and DOES 1-20)**

254. Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if stated fully herein.

255. At all relevant times, Decedent was the father of Plaintiffs ERIC MATILTON, JR., C.M., and K.M., and each Plaintiff had a constitutionally protected liberty interest in their relationship with their father under the Fourteenth Amendment.

256. The Fourteenth Amendment of the U.S. Constitution and the parallel provision in Article 1, Section 7 of the California Constitution prohibit officials from employing policies and practices that are subjectively unreasonable because they expose pretrial detainees to a substantial risk of serious harm.

257. Defendants HAWK and DOES 1-20 knew of Decedent's medical history, including that Decedent had been previously diagnosed with post-traumatic stress disorder, major depressive disorder with psychotic features, unspecified schizophrenia spectrum and other psychotic disorder, and episodic mood disorder.

258. HAWK and DOES 1-20 knew Decedent experienced both suicidal ideations and auditory hallucinations and that Decedent had preciously actually attempted suicide.

259. HAWK and DOES 1-20 knew Decedent had been under the care of a psychiatrist and had been prescribed medication by that psychiatrist.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 38

260.    Despite actual or constructive knowledge that Decedent was not regularly taking Seroquel, HAWK and DOES 1-20 intentionally took no further action and provided Decedent with no further care even when it became obvious the course of treatment was not working.

261.    HAWK and DOES 1-20 took no further action to care for Decedent despite Decedent reporting to her that he was experiencing auditory hallucinations and was requesting medical aid, even though a reasonable person under the same or similar circumstances would have understood the high degree of risk involved associated with denying care.

262.    In so doing, HAWK and DOES 1-20 denied Decedent, who was suffering from a serious and acute medical condition, with needed treatment.

263.    In ignoring the information available to her regarding Decedent's serious and acute medical condition, HAWK and DOES 1-20 stood idly by and failed to respond with reasonable diligence.  Indeed, in so doing, Defendants HAWK and DOES 1-20 acted with deliberate indifference.

264.    In acting as described herein, HAWK and DOES 1-20 violated Decedent's Fourteenth Amendment Right to be provided adequate mental health care.

265.    In acting as described herein, HAWK and DOES 1-20 put Decedent at a substantial risk of serious harm.

266.    In acting as described herein, HAWK and DOES 1-20 were acting in their official duties as employees or agents of the COUNTY OF HUMBOLDT.

267.    In acting as described herein, HAWK and DOES 1-20's conduct was a substantial factor in causing harm to Decedent and injury to Plaintiffs.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 39

268.    Defendant HAWK's conduct deprived Plaintiffs of their fundamental right to a continued familial relationship with their father.

269.    As a direct and proximate result of Defendant HAWK's conduct, Plaintiffs suffered the loss of their father's society, companionship, and emotional support, and have endured emotional distress.

## ELEVENTH CAUSE OF ACTION
**Violation of Fourteenth Amendment Right to Familial Association and Companionship (42 U.S.C. § 1983)**
**(By Plaintiffs ERIC MATILTON, JR., C.M., and K.M., individually, against Defendants COUNTY OF HUMBOLDT and DOES 21-40)**

270.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if stated fully herein.

271.    At all relevant times, Decedent was the father of Plaintiffs ERIC MATILTON, JR., C.M., and K.M., and each Plaintiff had a constitutionally protected liberty interest in their relationship with their father under the Fourteenth Amendment.

272.    The Fourteenth Amendment of the U.S. Constitution and the parallel provision in Article 1, Section 7 of the California Constitution prohibit officials from employing policies, practices and customs that are subjectively unreasonable because they expose pretrial detainees to a substantial risk of serious harm.

273.    Via the actions described herein of Defendants HAWK and AGRICOLA, who as employees or agents of Defendant COUNTY OF HUMBOLDT, were acting under color of state law, Decedent was subjected to a substantial risk of serious harm and injury from inadequate mental health care at the HCCF—all violative of his rights under the Fourteenth Amendment of the U.S. Constitution and the parallel provision in Article 1, Section 7 of the California Constitution.

**FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 40**

274.    As recognized by the Civil Grand Jury, the administration of mental health care at the HCCF has long been deficient.

275.    Deficient policies, practices and customs pertaining to mental health care at the HCCF include, but are not limited to:

  a.  Policies and practices permitting inadequate staffing leading to care decisions being made by staff not qualified to make care decisions;

  b.  Policies and practices permitting inadequate staffing leading to substandard care decisions and the deprivation of needed care;

  c.  Policies and practices permitting inadequate supervision of staff not individually qualified to provide care;

  d.  Policies and practices permitting staff who are unlicensed or un/underqualified to provide mental health care or gatekeep access to such care.

276.    The policies, systemic practices and customs of Defendants COUNTY OF HUMBOLDT and DOES 21-40 described herein were the moving force of Decedent's injuries.

277.    Defendant HAWK, at all relevant times, was an Associate Marriage and Family Therapist and not a qualified healthcare provider able to make care decisions independently.

278.    At all relevant times, Defendant HAWK was not meaningfully supervised, nor were all of her decisions related Decedent reviewed by a qualified healthcare provider.

279.    Despite her lack of qualifications, allowing Defendant HAWK to act without supervision or oversight was consistent with the customs, policies and practices of

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 41

Defendants COUNTY OF HUMBOLDT and DOES 21-40, as Defendants COUNTY OF HUMBOLDT and DOES 21-40 knowingly permitted her to act without supervision or oversight.

280.    Defendant HAWK took no further action to care for Decedent despite Decedent reporting to her that he was experiencing auditory hallucinations and requesting medical aid, even though a reasonable person under the same or similar circumstances would have understood the high degree of risk involved.

281.    In so doing, Defendant Hawk denied Decedent, who was suffering from a serious and acute medical condition, with needed treatment.

282.    Defendant HAWK taking no further action despite actual or constructive knowledge that Decedent was in serious need of care, even when Decedent requested care was consistent with the policies and practices of Defendants COUNTY OF HUMBOLDT and DOES 21-40.

283.    Said conduct described herein was part of a larger pattern and practice as recognized by the Humboldt County Civil Grand Jury and described herein.

284.    Defendant AGRICOLA, seeing Decedent only once and taking no further action despite actual or constructive knowledge that Decedent was in serious need of care, was consistent with the customs, policies and practices of Defendants COUNTY OF HUMBOLDT and DOES 21-40.

285.    Said conduct was part of a larger pattern and practice as recognized by the Humboldt County Civil Grand Jury and described herein.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 42

286.    On information and belief, the inadequate staffing of the HCCF by Defendants COUNTY OF HUMBOLDT and DOES 21-40 contributed to the conduct of Defendants AGRICOLA and HAWK as described herein.

287.    Defendants COUNTY OF HUMBOLDT and DOES 21–40 acted with deliberate indifference in maintaining policies, practices, and customs that constitute an inadequate and dangerous system of mental health care within the HCCF.

288.    As alleged herein, Defendants COUNTY OF HUMBOLDT and DOES 21–40 was put on direct notice through multiple findings by the Humboldt County Civil Grand Jury that inmates with serious mental illness were at substantial risk of harm due to systemically inadequate mental health care. Despite these findings, COUNTY OF HUMBOLDT and DOES 21–40 failed or refused to take meaningful corrective action.

289.    Furthermore, Defendants COUNTY OF HUMBOLDT and DOES 21–40 were aware that employees and agents—including Defendants HAWK and AGRICOLA—were engaging in the types of conduct described herein and that such conduct reflected the broader unconstitutional practices and failures within the HCCF's mental health system. Nevertheless, Defendants COUNTY OF HUMBOLDT and DOES 21–40 condoned this conduct or were deliberately indifferent to the risk it posed, including the specific risk to Decedent.

290.    On information and belief, these policies and practices have and continue to be implemented Defendants COUNTY OF HUMBOLDT and DOES 21-40 and their agents or employees in their official capacities.

291.    These policies and failures resulted in the deprivation of constitutionally adequate care and protection for Decedent during his incarceration and were the moving force behind his death.

292.    As a result of Defendant COUNTY OF HUMBOLDT's policies, practices, and customs, Plaintiffs have been deprived of their father's companionship, emotional support, and society, in violation of their rights under the Fourteenth Amendment.

293.    As a direct and proximate result of Defendant COUNTY OF HUMBOLDT's conduct, Plaintiffs suffered damages including emotional pain, suffering, and loss of familial relationship.

### TWELFTH CAUSE OF ACTION
**Injunctive Relief**
**(By Plaintiffs against Defendants COUNTY OF HUMBOLDT and DOES 21-40)**

294.    Plaintiffs seek injunctive relief to remedy ongoing, systemic deficiencies at the HCCF which pose a substantial risk of irreparable harm to current and future detainees similarly situated to Decedent.

295.    As detailed herein, the COUNTY OF HUMBOLDT has repeatedly failed to provide Constitutionally adequate mental health care, resulting in persistent and dangerous conditions, as extensively documented by multiple Humboldt County Civil Grand Jury reports.

296.    The ongoing inadequacies in mental health care at the HCCF constitute an immediate threat to detainees' Constitutional rights, particularly their Fourteenth Amendment right to adequate medical and mental health treatment.

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 44

297.    Plaintiffs, therefore, request injunctive relief including, but not limited to, increased qualified mental health staffing, implementation of mandatory mental health evaluation and monitoring protocols, adequate training and supervision for mental health personnel, and establishment of oversight mechanisms ensuring compliance.

298.    Plaintiffs further seek a declaratory judgment that the conditions, acts, omission, policies and practices described herein were in violation of the rights of Decedent under the Fourteenth Amendment to the United States Constitution and the California Constitution

299.    This injunctive relief is necessary and appropriate to prevent ongoing and future harm to detainees arising from Defendants' continued unconstitutional practices

## **REQUEST FOR RELIEF**

 Wherefore, Plaintiff seeks judgment as follows:

300.    A declaratory judgment that the conditions, acts, omission, policies and practices described herein were in violation of the rights of Decedent under the Fourteenth Amendment to the United States Constitution and the California Constitution.

301.    An order requiring Defendant COUNTY OF HUMBOLDT to provide minimally adequate mental health care to persons incarcerated at the HCCF.

302.    General and compensatory damages for Plaintiffs, all to be determined according to proof;

303.    Punitive damages and exemplary damages for Plaintiffs as permitted by law according to proof;

304.    An award of attorneys' fees as permitted by law;

305.    Costs of suit;

FIRST AMENDED COMPLAINT FOR DAMAGES & DECLARATORY & INJUNCTIVE RELIEF   PAGE 45

306.    Pre- and post-judgement interest as permitted by law;

307.    Such other and further relief as the Court may deem just and proper.


DATED:  JUNE 24, 2025          **LAW OFFICE OF
                                BENJAMIN MAINZER, A.P.C.**



By: _____/S/_____
     BENJAMIN H. MAINZER
     Attorneys for Plaintiff



## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims.


DATED:  JUNE 24, 2025          **LAW OFFICE OF
                                BENJAMIN MAINZER, A.P.C.**



By: _____/S/_____
     BENJAMIN H. MAINZER
     Attorneys for Plaintiff

# Exhibit 1

**LAW OFFICE OF**
**BENJAMIN MAINZER, A.P.C.**
Benjamin Mainzer (CSB 257748)
305 K Street
Eureka, CA 95501
(707) 234-5171
bmainzer@mainzerlaw.com

Attorney for PLAINTIFFS

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC MATILTON, JR., individually and as successor in interest to ERIC MATILTON, SR. deceased; C.M. a minor by and through his guardian ad litem Carrie Ames; and K.M., a minor, by and through his guardian ad litem, Carrie Ames | CASE NO. **1:25-cv-1168-RMI**<br><br>**DECLARATION OF ERIC MATILTON JR.** |
| Plaintiff, | |
| v. | |
| COUNTY OF HUMBOLDT, CHRISTIAN AGRICOLA, KELSEY HAWK; and DOES 1 through 40 inclusive, | |
| Defendants. | |

I, Eric Matilton Jr., hereby declare as follows:

1. The Decedent's name is Eric, Matilton Sr. He was my father.

2. Decedent died on December 2, 2023, in Humboldt County California.

3. 3. No proceeding is now pending in California for administration of the Decedent's estate.

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF          PAGE 1

4. I am the Decedent's successor in interest (as defined in Section 377.11 of the California Code of Civil Procedure) and succeed to the Decedent's interests in this action.

5. No other person has a superior right to commence the action or be substituted for the Decedent in the pending action.

6. A certified copy of Decedent's death certificate is attached as Exhibit 1.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed this 24th day of June, 2025, at Hoopa, California.

By: _Eric Matilton_ _____

Eric Matilton

# Exhibit 1 to Declaration of Eric Matilton Jr.



# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF HUMBOLDT
## Eureka, California 95501

| 3052023265641 | CERTIFICATE OF DEATH | 3202312001279 |
|---|---|---|
| STATE FILE NUMBER | STATE OF CALIFORNIA<br>USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS<br>VS-11 (REV 3/06) | LOCAL REGISTRATION NUMBER |

**DECEDENTS PERSONAL DATA**

| 1. NAME OF DECEDENT– FIRST (Given) | 2. MIDDLE | 3. LAST (Family) |
|---|---|---|
| ERIC | MICHAEL | MATILTON |

AKA, ALSO KNOWN AS – Include full AKA (FIRST, MIDDLE, LAST)

| 4. DATE OF BIRTH mm/dd/ccyy | 5. AGE Yrs. | IF UNDER ONE YEAR Months / Days | IF UNDER 24 HOURS Hours / Minutes | 6. SEX |
|---|---|---|---|---|
| 03/21/1985 | 38 | | | M |

| 9. BIRTH STATE/FOREIGN COUNTRY | 10. SOCIAL SECURITY NUMBER | 11. EVER IN U.S. ARMED FORCES? | 12. MARITAL STATUS/SRDP (at Time of Death) | 7. DATE OF DEATH mm/dd/ccyy | 8. HOUR (24 Hours) |
|---|---|---|---|---|---|
| CA | ▓▓▓▓ | YES [X] NO UNK | NEVER MARRIED | 12/02/2023 | 1610 |

| 13. EDUCATION – Highest Level/Degree | 14/15. WAS DECEDENT HISPANIC/LATINO(A)/SPANISH? | 16. DECEDENT'S RACE – Up to 3 races may be listed |
|---|---|---|
| HS GRADUATE | YES  [X] NO | NATIVE AMERICAN |

| 17. USUAL OCCUPATION – Type of work for most of life. DO NOT USE RETIRED | 18. KIND OF BUSINESS OR INDUSTRY | 19. YEARS IN OCCUPATION |
|---|---|---|
| FISHING | TRIBAL FISHERS | 10 |

**USUAL RESIDENCE**

| 21. CITY | 22. COUNTY/PROVINCE | 23. ZIP CODE | 24. YEARS IN COUNTY | 25. STATE/FOREIGN COUNTRY |
|---|---|---|---|---|
| HOOPA | HUMBOLDT | 95546 | 38 | CA |

**INFORMANT**

| 26. INFORMANT'S NAME, RELATIONSHIP | 27. INFORMANT'S MAILING ADDRESS |
|---|---|
| CLYDE ARNOLD MATILTON JR, FATHER | PO BOX 951, HOOPA, CA 95546 |

**SPOUSE/SRDP AND PARENT INFORMATION**

| 28. NAME OF SURVIVING SPOUSE/SRDP–FIRST | 29. MIDDLE | 30. LAST (BIRTH NAME) |
|---|---|---|
| - | - | - |

| 31. NAME OF FATHER/PARENT–FIRST | 32. MIDDLE | 33. LAST | 34. BIRTH STATE |
|---|---|---|---|
| CLYDE | ARNOLD | MATILTON, JR | CA |

| 35. NAME OF MOTHER/PARENT–FIRST | 36. MIDDLE | 37. LAST (BIRTH NAME) | 38. BIRTH STATE |
|---|---|---|---|
| JEANINE | FAYE | MARSHALL | UNK |

**FUNERAL DIRECTOR/LOCAL REGISTRAR**

| 39. DISPOSITION DATE mm/dd/ccyy | 40. PLACE OF FINAL DISPOSITION |
|---|---|
| 12/08/2023 | RESIDENCE OF CARRIE AMES |

| 41. TYPE OF DISPOSITION(S) | 42. SIGNATURE OF EMBALMER | 43. LICENSE NUMBER |
|---|---|---|
| CREMATE/RESIDENCE | ▶ NOT EMBALMED | - |

| 44. NAME OF FUNERAL ESTABLISHMENT | 45. LICENSE NUMBER | 46. SIGNATURE OF LOCAL REGISTRAR | 47. DATE mm/dd/ccyy |
|---|---|---|---|
| PAUL'S CHAPEL | FD689 | ▶ CANDY STOCKTON, MD | 12/06/2023 |

**PLACE OF DEATH**

| 101. PLACE OF DEATH | 102. IF HOSPITAL, SPECIFY ONE | 103. IF OTHER THAN HOSPITAL, SPECIFY ONE |
|---|---|---|
| PROVIDENCE ST. JOSEPH HOSPITAL | P  [X] ER/OP  DOA | Hospice  Nursing Home/LTC  Decedent's Home  Other |

| 104. COUNTY | 105. FACILITY ADDRESS OR LOCATION WHERE FOUND | 106. CITY |
|---|---|---|
| HUMBOLDT | 2700 DOLBEER ST | EUREKA |

**CAUSE OF DEATH**

| 107. CAUSE OF DEATH | | Time Interval Between Onset and Death | 108. DEATH REPORTED TO CORONER? |
|---|---|---|---|
| IMMEDIATE CAUSE (A) HANGING | | (A) DAYS | [X] YES  NO<br>202305302 |
| (B) | | (B) | 109. BIOPSY PERFORMED? YES [X] NO |
| (C) | | (C) | 110. AUTOPSY PERFORMED? [X] YES  NO |
| (D) | | (D) | 111. USED IN DETERMINING CAUSE? [X] YES  NO |

| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 |
|---|
| - |

| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? | 113A. DECEDENT PREGNANT IN LAST YEAR? |
|---|---|
| NO | YES [X] NO  UNK |

**PHYSICIAN'S CERTIFICATION**

| 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. | 115. SIGNATURE AND TITLE OF CERTIFIER | 116. LICENSE NUMBER | 117. DATE mm/dd/ccyy |
|---|---|---|---|
| Decedent Attended Since (A) mm/dd/ccyy  Decedent Last Seen Alive (B) mm/dd/ccyy | ▶ | | |

116. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE

**CORONER'S USE ONLY**

| 118. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED.<br>MANNER OF DEATH: Natural  Accident  Homicide  [X] Suicide  Pending Investigation  Could not be determined | 120. INJURED AT WORK?<br>YES [X] NO  UNK | 121. INJURY DATE mm/dd/ccyy<br>11/18/2023 | 122. HOUR (24 Hours)<br>1530 EST |
|---|---|---|---|

| 123. PLACE OF INJURY (e.g. home, construction site, wooded area, etc.) |
|---|
| OTHER: HUMBOLDT COUNTY CORRECTIONAL FACILITY |

| 124. DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) |
|---|
| DECEDENT HUNG SELF |

| 125. LOCATION OF INJURY (Street and number, or location, and city, and zip) |
|---|
| SINGLE CELL UNIT<br>826 4TH ST, EUREKA, CA 95501 |

| 126. SIGNATURE OF CORONER / DEPUTY CORONER | 127. DATE mm/dd/ccyy | 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER |
|---|---|---|
| ▶ JAMIE BARNEY | 12/04/2023 | JAMIE BARNEY, DEP CORONER |

**STATE REGISTRAR**

| A | B | C | D | E | | FAX AUTH. | CENSUS TRACT |
|---|---|---|---|---|---|---|---|

## CERTIFIED COPY OF VITAL RECORDS
### STATE OF CALIFORNIA, COUNTY OF HUMBOLDT

This is a true and exact reproduction of the document officially registered and placed on file in the office of the Humboldt County Recorder.

* C C 0 2 9 6 3 9 7 *

DATE ISSUED **MAY 21 2024**



Juan P. Cervantes, Recorder
HUMBOLDT COUNTY, CALIFORNIA

This copy is not valid unless prepared on an engraved border, displaying the date, seal and signature of the County Recorder.

FRNCO (Rev. 12/23)

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE



# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF HUMBOLDT
## Eureka, California 95501

**AFFIDAVIT TO AMEND A RECORD**
NO ERASURES, WHITEOUTS, PHOTOCOPIES,
OR ALTERATIONS

3052023265641
STATE FILE NUMBER

3202312001279
LOCAL REGISTRATION NUMBER

1.1

☐ BIRTH    ☒ DEATH    ☐ FETAL DEATH

TYPE OR PRINT CLEARLY IN BLACK INK ONLY -- THIS AMENDMENT BECOMES AN ACTUAL PART OF THE OFFICIAL RECORD

### PART I    INFORMATION TO LOCATE RECORD

INFORMATION AS IT APPEARS ON ORIGINAL RECORD

| 1A. NAME—FIRST | 1B. MIDDLE | 1C. LAST |
|---|---|---|
| ERIC | MICHAEL | MATILTON |

| 2. SEX | 3. DATE OF EVENT—MM/DD/CCYY | 4. CITY OF EVENT | 5. COUNTY OF EVENT |
|---|---|---|---|
| M | 12/02/2023 | EUREKA | HUMBOLDT |

| 6. FULL NAME OF FATHER/PARENT AS STATED ON ORIGINAL RECORD | 7. FULL NAME OF MOTHER/PARENT AS STATED ON ORIGINAL RECORD |
|---|---|
| CLYDE ARNOLD MATILTON JR | JEANINE FAYE MARSHALL |

### PART II    STATEMENT OF CORRECTIONS TO BIRTH, DEATH, OR FETAL DEATH RECORD

LIST ONE ITEM PER LINE

| 8. ITEM NUMBER TO BE CORRECTED | 9. INCORRECT INFORMATION THAT APPEARS ON ORIGINAL RECORD | 10. CORRECTED INFORMATION AS IT SHOULD APPEAR |
|---|---|---|
| 42 | NOT EMBALMED | SANDRA L KUTZKEY |
| 43 | - | EMB8584 |

REASON FOR CORRECTION

11. INDICATE EMBALMING

AFFIDAVITS AND SIGNATURES

We, the undersigned, hereby certify under penalty of perjury that we have personal knowledge of the above facts and that the information given above is true and correct.

| 12A. SIGNATURE OF FIRST PERSON | 12B. PRINTED NAME | 12C. TITLE/RELATIONSHIP TO PERSON IN PART I |
|---|---|---|
| ▶ PEGGY T NUSTAD | PEGGY T NUSTAD | FUNERAL HOME STAFF LEVEL |

TWO PERSONS MUST SIGN THIS FORM TO CORRECT A BIRTH, DEATH, OR FETAL DEATH RECORD

| 12D. ADDRESS (STREET and NUMBER, CITY, STATE, ZIP) | 12E. DATE SIGNED—MM/DD/CCYY |
|---|---|
| 1835 E STREET P O BOX 66, EUREKA, CA 95502 | 12/13/2023 |

| 13A. SIGNATURE OF SECOND PERSON | 13B. PRINTED NAME | 13C. TITLE/RELATIONSHIP TO PERSON IN PART I |
|---|---|---|
| ▶ ARIANNA L GRINAGER | ARIANNA L GRINAGER | FUNERAL HOME STAFF LEVEL |

| 13D. ADDRESS (STREET and NUMBER, CITY, STATE, ZIP) | 13E. DATE SIGNED—MM/DD/CCYY |
|---|---|
| 1835 E STREET P O BOX 66, EUREKA, CA 95502 | 12/13/2023 |

STATE/LOCAL REGISTRAR USE ONLY

| 14. OFFICE OF VITAL RECORDS OR LOCAL REGISTRAR | 15. DATE ACCEPTED FOR REGISTRATION |
|---|---|
| ▶ CDPH-VR | 12/13/2023 |

STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC HEALTH, OFFICE OF VITAL RECORDS

FORM VS 24e (REV. 1/08)

1 1

**CERTIFIED COPY OF VITAL RECORDS**
STATE OF CALIFORNIA, COUNTY OF HUMBOLDT

This is a true and exact reproduction of the document officially registered and placed on file in the office of the Humboldt County Recorder.

DATE ISSUED  MAY 21 2024

\* C C 0 2 9 6 3 9 8 \*



Juan P. Cervantes, Recorder
HUMBOLDT COUNTY, CALIFORNIA

This copy is not valid unless prepared on an engraved border, displaying the date, seal and signature of the County Recorder.
MINCO (Rev) 12/22

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

Exhibit B

## PROFESSIONAL SERVICES AGREEMENT
## BY AND BETWEEN
## COUNTY OF HUMBOLDT
## AND
## NIGHTINGALE NURSES, LLC
## FOR FISCAL YEAR 2023-2024

This Agreement, entered into this **16** day of **May**, 2023, by and between the County of Humboldt, a political subdivision of the State of California, hereinafter referred to as "COUNTY," and Nightingale Nurses, LLC, a Florida limited liability company, hereinafter referred to as "CONTRACTOR," is made upon the following considerations:

WHEREAS, COUNTY, by and through its Department of Health and Human Services – Behavioral Health ("DHHS – Behavioral Health"), desires to retain a qualified professional organization to provide supplemental nursing personnel to fill certain positions at various DHHS – Behavioral Health facilities; and

WHEREAS, such work involves the performance of professional, expert and technical services of a temporary and occasional character; and

WHEREAS, COUNTY has no employees available to perform such services and is unable to hire employees for the performance thereof for the temporary period; and

WHEREAS, CONTRACTOR represents that it is adequately trained, skilled, experienced and qualified to perform the supplemental staffing services required by COUNTY; and

NOW THEREFORE, the parties hereto mutually agree as follows:

1. DESCRIPTION OF SERVICES:

   CONTRACTOR hereby agrees to provide the services described in Exhibit A – Scope of Services, which is attached hereto and incorporated herein by reference as if set forth in full. In providing such services, CONTRACTOR agrees to fully cooperate with the DHHS – Behavioral Health Director, or a designee thereof, hereinafter referred to as "Director."

2. TERM:

   This Agreement shall begin on July 1, 2023 and shall remain in full force and effect until July 30, 2024, unless extended by a valid amendment hereto or sooner terminated as set forth herein.

3. TERMINATION:

   A. Termination for Cause. COUNTY may, in its sole discretion, immediately terminate this Agreement, if CONTRACTOR fails to adequately perform the services required hereunder, fails to comply with the terms or conditions set forth herein, or violates any local, state or federal law, regulation or standard applicable to its performance hereunder.

   B. Termination without Cause. COUNTY may terminate this Agreement without cause upon thirty (30) days advance written notice which states the effective date of the termination.

   C. Termination due to Insufficient Funding. COUNTY's obligations under this Agreement are contingent upon the availability of local, state and/or federal funds. In the event such funding is reduced or eliminated, COUNTY shall, at its sole discretion, determine whether this Agreement

shall be terminated. COUNTY shall provide CONTRACTOR seven (7) days advance written notice of its intent to terminate this Agreement due to insufficient funding.

D.  Compensation upon Termination. In the event this Agreement is terminated, CONTRACTOR shall be entitled to compensation for uncompensated services provided pursuant to the terms and conditions set forth herein through and including the effective date of termination. However, this provision shall not limit or reduce any damages owed to COUNTY due to a breach of this Agreement by CONTRACTOR.

4.  COMPENSATION:

A.  Maximum Amount Payable. The maximum amount payable by COUNTY for any and all services provided, and costs and expenses incurred, pursuant to the terms and conditions of this Agreement is Two Million Five Hundred Twenty Thousand Dollars ($2,520,000.00). CONTRACTOR hereby agrees to perform any and all services required by this Agreement for an amount not to exceed such maximum dollar amount. However, if local, state or federal funding or allowance rates are reduced or eliminated, COUNTY may, by amendment, reduce the maximum amount payable hereunder or terminate this Agreement as set forth herein.

B.  Schedule of Rates. The specific rates and costs applicable to this Agreement are set forth in Exhibit B – Schedule of Rates, which is attached hereto and incorporated herein by reference as if set forth in full.

C.  Additional Services. Any additional services not otherwise set forth herein, shall not be provided by CONTRACTOR, or compensated by COUNTY, without COUNTY's prior written authorization. Any and all unauthorized costs and expenses incurred above the maximum payable amount set forth herein shall be the responsibility of CONTRACTOR. CONTRACTOR shall notify COUNTY in writing, at least six (6) weeks prior to the date upon which CONTRACTOR estimates that the maximum payable amount will be reached.

D.  Effect of Nonpayment. In the event COUNTY cannot, or will not, pay for services provided by CONTRACTOR pursuant to the terms and conditions of this Agreement, CONTRACTOR shall hold harmless the State of California and Medi-Cal Beneficiaries.

5.  PAYMENT:

CONTRACTOR shall submit to COUNTY monthly invoices substantiating the costs and expenses incurred pursuant to the terms and conditions of this Agreement no later than thirty (30) days after the end of each month in which services are provided hereunder. CONTRACTOR shall submit a final invoice for payment within thirty (30) days following the expiration or termination of this Agreement. Invoices shall be prepared using a format that is substantially similar to the format set forth in Exhibit C – Sample Invoice Form, which is attached hereto and incorporated herein by reference as if set forth in full. Payment for any and all costs and expenses incurred pursuant to the terms and conditions of this Agreement shall be made within thirty (30) days after the receipt of approved invoices. Any and all invoices submitted pursuant to the terms and conditions of this Agreement shall be sent to COUNTY electronically at the following address:

COUNTY:    Humboldt County DHHS – Behavioral Health
Attention: Financial Services
MHBFinancialServices@co.humboldt.ca.us

/ / / /

Nightingale Nurses, LLC FY 23/24                                                 Page 2 of 44

6.  NOTICES:

Any and all notices required to be given pursuant to the terms and conditions of this Agreement shall be in writing and either served personally or sent by certified mail, return receipt requested, to the respective addresses set forth below. Notice shall be effective upon actual receipt or refusal as shown on the receipt obtained pursuant to the foregoing.

COUNTY:        Humboldt County DHHS – Behavioral Health
               Attention: Emi Botzler-Rodgers, Behavioral Health Director
               720 Wood Street
               Eureka, California 95501

CONTRACTOR:    Nightingale Nurses, LLC
               Attention: Bob Marello, President
               6401 Congress Avenue, Suite 250
               Boca Raton, Florida 33487

7.  REPORTS:

CONTRACTOR hereby agrees to provide COUNTY with any and all reports that may be required by any local, state and/or federal agencies for compliance with this Agreement. CONTRACTOR shall submit one (1) hard copy and one (1) electronic copy of any and all reports required pursuant to the terms and conditions of this Agreement in a format that complies with the Americans with Disabilities Act and any other applicable local, state and federal accessibility laws, regulations and standards. Any and all reports required pursuant to the terms and conditions of this Agreement shall be submitted in accordance with any and all applicable timeframes using the format required by the State of California as appropriate.

8.  RECORD PREPARATION, RETENTION AND INSPECTION:

A.  Preparation of Performance Records. CONTRACTOR shall prepare and maintain, in accordance with all applicable local, state and federal laws, regulations and standards, any and all records, documents and other evidence relating to the services provided pursuant to the terms and conditions of this Agreement, including, without limitation, documents regarding CONTRACTOR's accounting procedures and practices, necessary to properly reflect all direct and indirect costs of any nature claimed to have been incurred in the performance of the services provided hereunder, including, but not limited to, any and all matching costs and expenses. The foregoing constitutes "performance records" for the purpose of this provision.

B.  Preparation of Clinical Records. CONTRACTOR shall timely prepare and maintain, in accordance with any and all applicable local, state and federal laws, regulations and standards, an accurate, complete and legible "Clinical Record" for each client who receives services pursuant to the terms and conditions of this Agreement. Clinical Records prepared and maintained pursuant to the terms and conditions of this Agreement shall contain sufficient detail to permit and facilitate effective internal professional review, external medical audit processes and adequate follow-up treatment. For purposes of this provision, "Clinical Records" shall include, without limitation, any and all physical and electronic books, records, documents and other evidence of medical treatment originated or prepared as part of CONTRACTOR's performance of the services provided pursuant to the terms and conditions of this Agreement, including, but not limited to, any and all treatment records, medical charts, prescription files and other documentation pertaining to the services provided hereunder.

C.  <u>Preparation of Clinical Documentation</u>.  CONTRACTOR shall timely prepare and maintain, in accordance with any and all applicable local, state and federal laws, regulations and standards, any and all "Clinical Documentation," necessary to disclose how CONTRACTOR discharged its duties hereunder.  Clinical Documentation shall identify all of the following: the quantity and quality of the services provided pursuant to the terms and conditions of this Agreement; the names of, and all other necessary identifying information pertaining to, clients who received such services; the manner in which CONTRACTOR administered the provision of such services; and the cost of, and the manner and amount of payment made for, such services.  For purposes of this provision, "Clinical Documentation" shall include, without limitation, any and all physical and electronic books, records, documents and other evidence of medical treatment originated or prepared as part of CONTRACTOR's performance of the services provided pursuant to the terms and conditions of this Agreement, including, but not limited to, working papers, performance reports, financial records and other documentation pertaining to the services provided hereunder.

D.  <u>Record Preservation</u>.  CONTRACTOR shall preserve, in accordance with any and all applicable local, state and federal laws, regulations and standards, any and all records and documentation prepared and maintained pursuant to the terms and conditions of this Agreement for a period of ten (10) years after final payment hereunder, and for such longer period, if any, as required by applicable statute or this Agreement.

   1.  If this Agreement is completely or partially terminated, any and all records and/or documentation relating to the terminated services shall be preserved and made available for a period of ten (10) years from the date of any resulting final settlement.

   2.  If any litigation, claim, negotiation, audit or other action involving any records and/or documentation prepared and maintained pursuant to the terms and conditions of this Agreement is initiated before the expiration of the above-referenced ten (10) year period, such records and/or documentation shall be retained until completion of the action and resolution of any and all issues arising therefrom, or until the end of the ten (10) year period, whichever is later.

E.  <u>Record Inspection</u>.  CONTRACTOR shall make, in accordance with any and all applicable local, state and federal laws, regulations and standards, any and all records and documentation prepared and maintained pursuant to the terms and conditions of this Agreement immediately available, during normal business hours, for inspection, audit and reproduction by COUNTY, the California Department of Health Care Services ("DHCS"), the California Department of General Services, the Bureau of State Audits, or their designated representatives, including, without limitation, the Comptroller General of the United States, and any other duly authorized local, state or federal agencies for a period of ten (10) years after final payment hereunder, and for such longer period, if any, as required by applicable statute or this Agreement.  CONTRACTOR shall also allow interviews of any employees who might reasonably have information related to any records and/or documentation prepared pursuant to the terms and conditions of this Agreement by COUNTY and any other duly authorized local, state or federal agencies during the above-referenced ten (10) year period.

F.  <u>Record Storage and Reproduction</u>.  Following the receipt of final payment hereunder, CONTRACTOR may, at its discretion, reduce any and all records and/or documentation prepared and maintained pursuant to the terms and conditions of this Agreement to microfilm, computer disk, CD ROM, DVD or other data storage medium.  Upon request by a designated representative of COUNTY, DHCS or any other duly authorized local, state or federal agency to inspect, audit or obtain copies of said records and/or documentation, CONTRACTOR shall make

available any and all applicable devices, hardware and/or software necessary to view, copy and/or print such records and/or documentation.

G. Effect of Non-Compliance. CONTRACTOR's failure to comply with the requirements set forth herein may result in the imposition of any and all applicable penalties pertaining to obstruction of governmental investigations.

9. AUDIT AND EXAMINATION OF PERFORMANCE AND CLINICAL RECORDS:

In accordance with any and all applicable local state and federal laws, regulations and standards, including, without limitation, California Government Code Section 8546.7, any all performance records, documentation, reports and other evidence relating to the services provided pursuant to the terms and conditions of this Agreement, and any subcontracts related hereto, shall be subject to the examination and audit by COUNTY, DHCS, the California Department of General Services, the Bureau of State Audits, or their designated representatives, including, but not limited to, the Comptroller General of the United States and any other duly authorized local, state or federal agencies. CONTRACTOR agrees to allow COUNTY, DHCS and any other duly authorized local, state or federal agencies access to such performance records, documentation, reports and other evidence, during normal business hours, for a period of ten (10) years after final payment hereunder, and for such longer period, if any, as required by applicable statute or any provision of this Agreement.

10. PROGRAM INSPECTION, MONITORING AND SUPERVISION:

A. Local, State and Federal Inspection Rights. CONTRACTOR shall allow COUNTY, DHCS, the United States Department of Health and Human Services, the Comptroller General of the United States and any other duly authorized local, state and federal agencies, or their designated representatives, to inspect or otherwise evaluate the quality, appropriateness and timeliness of services provided pursuant to the terms and conditions of this Agreement, and to inspect, evaluate and audit any and all records, documents and facilities maintained by CONTRACTOR, and its subcontractors hereunder, pertaining to such services, at any time during normal business hours, for a period of at least ten (10) years from the close of the DHCS fiscal year in which this Agreement came into effect. For purposes of this provision, "records" and "documents" include, without limitation, any and all physical and electronic records originated or prepared pursuant to CONTRACTOR's performance hereunder, including, but not limited to, working papers, reports, financial records and books of account, client records, prescription files, subcontracts and any other documentation pertaining to the services provided pursuant to the terms and conditions of this Agreement. Upon request, at any time during the above-referenced ten (10) year period, CONTRACTOR shall furnish any such record, or copy thereof, to COUNTY, DHCS, the United States Department of Health and Human Services, the Comptroller General of the United States and any other duly authorized local, state and federal agencies, or their designated representatives. COUNTY, and all other duly authorized local, state and federal agencies, shall maintain the confidentiality of such records and documents in accordance with any and all applicable local, state and federal laws, regulations and standards.

B. Local, State and Federal Monitoring. CONTRACTOR hereby agrees that COUNTY and any other duly authorized local, state or federal agencies, including, without limitation, DHCS and the United States Department of Health and Human Services, shall have the right to monitor any and all activities related hereto, including the right to review and monitor CONTRACTOR's records, policies, procedures and overall business operations, at any time, in order to ensure compliance with the terms and conditions of this Agreement. CONTRACTOR shall cooperate with a corrective action plan, if deficiencies in CONTRACTOR's records, policies or procedures are identified by COUNTY or any other duly authorized local, state or federal agencies.

However, COUNTY is not responsible, and shall not be held accountable, for overseeing or evaluating the adequacy of CONTRACTOR's performance hereunder.

C.    Utilization Review.  DHHS – Behavioral Health may designate appropriate staff to perform a utilization and/or professional standards review of all clients receiving services pursuant to the terms and conditions of this Agreement for which COUNTY is expected to make reimbursement.

11.    CONFIDENTIAL INFORMATION:

A.    Legal Compliance.  CONTRACTOR hereby agrees to protect any and all confidential records and client confidentiality in conformance with any and all applicable local, state and federal laws, regulations and standards, including, without limitation: California Welfare and Institutions Code Sections 827, 5328, 10850 and 14100.2; California Health and Safety Code Sections 1280.15 and 1280.18; the California Information Practices Act of 1977; the California Confidentiality of Medical Information Act ("CMIA"); the United States Health Information Technology and Clinical Health Act ("HITECH Act"); the United States Health Information Portability and Accountability Act of 1996 ("HIPAA") and any current and future implementing regulations promulgated thereunder, all as may be amended from time to time.

B.    State Contractual Requirements.  CONTRACTOR hereby agrees to comply with any and all applicable confidentiality requirements contained in the Mental Health Managed Care Agreement (State Standard Agreement No. 22-20103) and the Mental Health Performance Agreement (State Standard Agreement No. 21-10082) that COUNTY has with DHCS, which are incorporated herein by reference and made a part hereof as if set forth in full.

C.    HIPAA Covered Entity Requirements. Each party hereby represents itself to be a "covered entity," as that term is defined by HIPAA, and agrees to use and disclose any and all confidential information concerning persons receiving services pursuant to this Agreement in accordance with any and all applicable laws, regulations and standards.  COUNTY and CONTRACTOR acknowledge that the exchange of such confidential information shall only be for the purposes of treatment, payment and health care operations.

D.    Assistance in Litigation or Administrative Proceedings. CONTRACTOR shall make itself, and any agents, officers, directors, employees or subcontractors assisting CONTRACTOR in the performance of its obligations hereunder, available to DHCS, at CONTRACTOR's expense, to testify as witnesses or otherwise, in the event of any litigation or administrative proceedings being commenced against DHCS, or its agents, officers, directors or employees, based upon claimed violations of HIPAA, or any regulations promulgated thereunder, which involve inactions or actions by the parties hereto, except where either party is a named adverse party.

E.    Continuing Compliance with Confidentiality Requirements.  Each party hereby acknowledges that local, state and federal laws, regulations, standards and contractual requirements pertaining to confidentiality, electronic data security and privacy are rapidly evolving and that amendment of this Agreement may be required to ensure compliance with such developments.  Each party agrees to enter into negotiations concerning an amendment to this Agreement embodying written assurances consistent with the requirements of HIPAA, the HITECH Act, the CMIA and any other applicable local, state and federal laws, regulations, standards or contractual requirements.

12.    PRIVACY AND DATA SECURITY REQUIREMENTS:

A.    Legal Compliance. CONTRACTOR hereby agrees to comply with any and all applicable local, state and federal privacy and data security requirements, including, without limitation: the

Federal Privacy Regulations contained in Parts 160 and 164 of Title 45 of the Code of Federal Regulations ("C.F.R."); the Federal Security Standards contained in 45 C.F.R. Parts 160, 162 and 164; the Federal Standards for Electronic Transactions contained in 45 C.F.R. Parts 160 and 162; 42 C.F.R. Sections 431.300, *et seq.*; and 45 C.F.R. Section 205.50, all as may be amended from time to time.

B.   State Contractual Requirements.  CONTRACTOR hereby agrees to comply with any and all applicable privacy and data security requirements contained in the Mental Health Managed Care Agreement (State Standard Agreement No. 22-20103) and the Mental Health Performance Agreement (State Standard Agreement No. 21-10082) that COUNTY has with DHCS, which are incorporated herein by reference and made a part hereof as if set forth in full.

C.   Disclosure of Confidential Information.  By executing this Agreement, CONTRACTOR, for itself, and its assignees and successors in interest, agrees as follows:

1.   Disclosure of Identifying Information.  CONTRACTOR shall protect from unauthorized disclosure the names and other "Identifying Information," including "Personal Information" and "Personally Identifiable Information," concerning persons whose Identifying Information becomes available to CONTRACTOR as a result of the services provided hereunder, except for statistical information not identifying any such person.

   a.   Personal Information.  As used herein, the term "Personal Information" ("PI") shall include, without limitation, any and all information that identifies or describes an individual, including, but not limited to, his or her physical description, home address, home telephone number, education, financial matters, medical or employment history and statements made by, or attributed to, the individual.

   b.   Personally Identifiable Information.  As used herein, the term "Personally Identifiable Information" ("PII") shall include, without limitation, any and all information which can be used to distinguish or trace an individual's identity, such as their name, social security number, driver license number, identification card number, financial account number or other identifying number, symbol or particular, including, but not limited to, finger prints, voice prints and photographs.

2.   Unauthorized Disclosures of Identifying Information.  CONTRACTOR shall not disclose, except as otherwise specifically permitted by this Agreement or authorized by the client, any such Identifying Information to anyone other than COUNTY or DHCS without prior written authorization from COUNTY or the DHCS Program Contract Manager, unless disclosure is required by applicable local, state or federal law.

3.   Use of Identifying Information.  CONTRACTOR shall not use Identifying Information for any purpose other than carrying out its obligations under this Agreement.

4.   Notification of Requests for Identifying Information.  CONTRACTOR shall promptly transmit to COUNTY all requests for disclosure of such Identifying Information not emanating from a person whose Identifying Information becomes available to CONTRACTOR as a result of the services provided hereunder.

5.   Use and Disclosure of Protected Health Information.  CONTRACTOR shall not use or disclose "Protected Health Information" in any manner that would constitute a breach of this Agreement or a violation of any applicable local, state or federal laws, regulations or standards.

a. Protected Health Information. As used herein, the term "Protected Health Information" ("PHI") shall include, without limitation, any and all individually identifiable health information that is transmitted by, or maintained in, electronic media or any other medium, as defined by the HIPAA Standards for Privacy of Individually Identifiable Health Information and the Federal Security Standards contained in 45 C.F.R. Parts 160 and 164, all as may be amended from time to time.

6. Minimum Use and Disclosure of Protected Health Information. CONTRACTOR shall use or disclose only the minimum amount of PHI necessary to accomplish the intended purpose of this Agreement.

7. Legal Standards Pertaining to Protected Health Information. CONTRACTOR shall only use, store, disclose or access PHI in compliance with this Agreement and all applicable local, state and federal laws, regulations and standards.

8. Downloading Protected Health Information. CONTRACTOR shall not download PHI to any personal device, including, without limitation, flash drives, cell phones or tablets without COUNTY's prior written approval.

9. Maintenance and Preservation of Disclosure Records. CONTRACTOR hereby agrees to timely prepare accurate and complete performance records relating to the use and disclosure of PHI transmitted pursuant to this Agreement, and to maintain and preserve said records for at least ten (10) years from the date of expiration or termination of this Agreement, except that if any litigation, claim, negotiation, audit or other action is pending, the records shall be retained until completion and resolution of all issues arising therefrom.

10. Accounting Requirements. CONTRACTOR shall comply with the accounting requirements set forth in 45 C.F.R. Section 164.528, and any associated regulations or informal guidance issued by the United States Department of Health and Human Services – Office of Civil Rights, all as may be amended from time to time.

D. Security Incidents and Suspected Breaches of Confidential Information. If CONTRACTOR has reason to believe that PHI, PI or PII transmitted hereunder may have been accessed, disclosed or acquired in breach of this Agreement, CONTRACTOR shall immediately take all actions necessary to preserve forensic evidence and to identify, mitigate and remediate the cause of the suspected breach. Such actions shall include, without limitation, the following:

1. Reporting Breaches of Confidential Information. CONTRACTOR shall notify COUNTY immediately, by telephone and e-mail or fax, upon the discovery of a breach of PHI, PI or PII in electronic media or any other medium, if the PHI, PI or PII was, or is reasonably believed to have been, accessed or acquired by an unauthorized person.

2. Reporting Suspected Security Incidents. CONTRACTOR shall notify COUNTY, by telephone and e-mail or fax, within twenty-four (24) hours after discovering any other suspected security incident, intrusion, loss, use or disclosure of PHI, PI or PII in violation of this Agreement or any applicable local, state or federal laws, regulations or standards.

a. Discovery of Breaches and Security Incidents. For purposes of this Agreement, a breach of, or security incident involving, PHI, PI or PII shall be treated as discovered by CONTRACTOR as of the first (1st) day on which such breach is known, or by exercising reasonable diligence would have been known, to CONTRACTOR, or any employee or agent thereof, other than the person committing the suspected breach.

3. <u>Reporting Suspected Breaches and Security Incidents to Affected Individuals</u>.  To the extent deemed warranted, CONTRACTOR shall provide notice to any and all individuals affected by the suspected breach of, or security incident involving, PHI, PI or PII. CONTRACTOR shall pay the full costs associated with notifying such individuals, which may include, without limitation, the costs to retain an outside firm to undertake the notification effort.  In addition, CONTRACTOR shall consult with COUNTY regarding the steps required to notify impacted individuals and any other persons, media outlets or governmental agencies, and must supply COUNTY with the following information:

    a. <u>Description of Suspected Breach or Security Incident</u>.  A brief description of the circumstances surrounding the suspected breach of, or security incident involving, PHI, PI or PII, including, without limitation, the date of occurrence and discovery thereof, if known.

    b. <u>Description of the Information Involved</u>.  A description of the types of unsecured PHI, PI or PII that were involved in the suspected breach or security incident, including, without limitation, the full name, social security number, date of birth, home address, account number or disability code of all affected third parties.

    c. <u>Description of Remedial Actions</u>.  A brief description of the actions being taken by CONTRACTOR to remediate the breach of, or security incident involving, PHI, PI or PII, mitigate losses and protect against any further breaches or security incidents.

4. <u>Investigation of Suspected Breaches and Security Incidents</u>.  CONTRACTOR shall immediately investigate any and all suspected breaches of, or security incidents involving, PHI, PI or PII.  Within seventy-two (72) hours after the discovery of such suspected breach or security incident, CONTRACTOR shall submit an updated "Privacy Incident Report" containing the applicable information to the extent known at that time.

5. <u>Remediation of Breaches and Security Incidents</u>.  Upon discovery of a breach of, or security incident involving, PHI, PI or PII, CONTRACTOR shall:

    a. <u>Corrective Action</u>.  Take prompt corrective action to mitigate any risks or damages regarding the breach or security incident and to protect the operating environment.

    b. <u>Legal Compliance</u>.  Take any action pertaining to such breach or security incident required by any and all applicable local, state and federal laws and regulations.

6. <u>Cooperation with COUNTY's Remediation Efforts</u>.  Upon discovery of a breach of, or security incident involving, PHI, PI or PII, CONTRACTOR shall give highest priority to immediately mitigating and remediating the breach or security incident, and shall devote such resources as may be required to accomplish that goal.  In addition, CONTRACTOR shall cooperate with COUNTY's mitigation and remediation efforts, including, without limitation, providing any and all information necessary to enable COUNTY to fully understand the nature and scope of the breach or security incident, including, but not limited to, identification of each individual whose unsecured PHI may have been improperly accessed, acquired or disclosed.  In the event that CONTRACTOR's assistance is required to reinstall software, such assistance shall be provided, at CONTRACTOR's expense, in accordance with COUNTY's policies and standards.

7. <u>Remediation Report</u>.  CONTRACTOR shall provide to COUNTY a written report of the investigation of a breach of, or security incident involving, PHI, PI or PII within ten (10)

business days of the discovery of such breach or security incident. The report shall include, without limitation, the information specified above, as well as a full, detailed corrective action plan, including information on measures that were taken to remediate and/or contain the breach or security incident.

E.    Safeguarding Confidential Information. CONTRACTOR shall implement physical, technical and administrative safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of all PHI, PI and PII related to the services provided hereunder, including, without limitation, electronic PHI, PI and PII that CONTRACTOR creates, receives, maintains, uses or transmits on behalf of COUNTY. CONTRACTOR shall develop and maintain a written information privacy and security program that includes physical, technical and administrative safeguards appropriate to the size and complexity of CONTRACTOR's operations and the nature and scope of its activities, including, at a minimum, all of the following:

1.    Personnel Controls. By executing this Agreement, CONTRACTOR, for itself, and its assignees and successors in interest, agrees as follows:

a.    Employee Training. Any and all employees who assist in the performance of CONTRACTOR's duties and obligations hereunder, or access or disclose PHI, PI or PII, must complete, at a minimum, annual confidentiality, data security and privacy training at their own expense. Each employee who receives confidentiality, data security and privacy training pursuant to the terms and conditions of this Agreement must sign a certification indicating the employee's name and the date on which the training was completed. Such certifications must be retained for a period of ten (10) years following the expiration or termination of this Agreement.

b.    Employee Discipline. Appropriate sanctions must be applied against any and all employees who fail to comply with any of the confidentiality, data security or privacy requirements contained herein, including, without limitation, termination of employment where appropriate.

c.    Confidentiality Statement. Any and all employees who will be accessing PHI, PI or PII must sign a confidentiality statement that includes, at a minimum, General Use, Security and Privacy Safeguards, Unacceptable Use and Enforcement Policies, prior to gaining access to any such PHI, PI or PII and on an annual basis thereafter. CONTRACTOR shall retain each employee's written confidentiality statement for a period of ten (10) years following the expiration or termination of this Agreement.

d.    Background Check. A background screening of each employee who will be accessing PHI, PI or PII must be conducted before such employee is allowed to obtain any PHI, PI or PII. The screening should be commensurate with the risk and magnitude of harm that each employee could cause, with more thorough screening being done for those employees who are authorized to bypass significant technical and operational security controls. CONTRACTOR shall retain each employee's background check documentation for a period of ten (10) years following the expiration or termination of this Agreement.

2.    Technical Security Controls. By executing this Agreement, CONTRACTOR, for itself, and its assignees and successors in interest, agrees as follows:

a.    Workstation and Laptop Encryption. Any and all workstations and laptops that store PHI, PI or PII either directly, indirectly or temporarily must be encrypted using a

FIPS 140-2 certified algorithm which is 128bit or higher, such as Advanced Encryption Standard ("AES"). The encryption solution must be full disk unless approved by the DHCS – Information Security Office.

b. Server Security. Any and all servers containing unencrypted PHI, PI or PII must have sufficient administrative, physical and technical controls in place to protect such data, based upon a risk assessment or system security review.

c. Minimum Necessary. Only the minimum amount of PHI, PI or PII required to perform necessary business functions may be copied, downloaded or exported.

d. Removable Media Devices. Any and all electronic files that contain PHI, PI or PII must be encrypted when stored on any removable media or portable device, including, without limitation, USB drives, CD, DVD, and backup tapes. Encryption must be a FIPS 140-2 certified algorithm which is 128bit or higher, such as AES.

e. Antivirus Software. Any and all workstations, laptops and systems that process and/or store PHI, PI or PII must install and actively use a comprehensive anti-virus software solution with automatic updates scheduled at least daily.

f. Patch Management. Any and all workstations, laptops and systems that process and/or store PHI, PI or PII must have critical security patches applied, with system reboot capabilities, if necessary. There must be a documented patch management process which determines installation timeframes based on risk assessment and vendor recommendations. At a maximum, all applicable patches must be installed within thirty (30) days after vendor release. Applications and systems that cannot be patched within the required timeframe due to significant operational reasons must have compensatory controls implemented to minimize risk until the patches can be installed. Any and all applications and systems that cannot be patched must have compensatory controls implemented to minimize risk, where possible.

g. User Identification and Password Controls. Any and all users of any system providing access to PHI, PI or PII must be issued a unique user name and password. Usernames must be promptly disabled, deleted or have the password associated therewith changed within twenty-four (24) hours after the transfer or termination of an employee with knowledge of the password. Passwords must be a non-dictionary word that has at least eight (8) characters, and must not be shared or stored in readable format on any computer. Passwords must be changed at least every ninety (90) days, preferably every sixty (60) days. Passwords must be immediately changed if revealed or compromised. Passwords must be composed of characters from at least three (3) of the following four (4) groups from the standard keyboard:

- Upper case letters (A-Z);
- Lower case letters (a-z);
- Arabic numerals (0-9);
- Non-alphanumeric characters (punctuation symbols).

i. Warning Banners. Any and all systems providing access to PHI, PI or PII must display a warning banner which states that data contained therein is confidential and that system use is restricted to authorized users for business purposes and will be logged. Users must be directed to log off if they disagree with such requirements.

h. <u>System Timeout</u>. Any and all systems providing access to PHI, PI or PII must have an automatic timeout feature which requires re-authentication of the user session after no more than twenty (20) minutes of inactivity.

j. <u>System Logging</u>. Any and all systems providing access to PHI, PI or PII must maintain an automated audit trail that can be used to identify any user or process which alters PHI, PI or PII. The audit trail must be date and time stamped, log both successful and failed accesses, be read only and restricted to authorized users. If PHI, PI or PII is stored in a database, logging functionality must be enabled. Audit trail data must be archived for at least ten (10) years after occurrence.

k. <u>Access Controls</u>. Any and all systems providing access to PHI, PI or PII must use role-based user authentication controls that enforce the principle of least privilege.

l. <u>Transmission Encryption</u>. Any and all transmissions of PHI, PI or PII outside the secure internal network must be encrypted using a FIPS 140-2 certified algorithm which is 128bit or higher, such as AES. Encryption can be end to end at the network level, or the data files containing PHI can be encrypted. This requirement applies to any type of PHI, PI or PII in motion such as website access and e-mail.

m. <u>Intrusion Detection</u>. Any and all systems involved in accessing, holding, transporting or protecting PHI, PI or PII that are accessible via the internet must be protected by a comprehensive intrusion detection and prevention solution.

n. <u>Data Destruction</u>. When no longer needed, all PHI, PI or PII must be wiped using the Gutmann or United States Department of Defense 5220.22-M (7 Pass) standard or by degaussing. Media may also be physically destroyed in accordance with National Institute of Standards and Technology Special Publication 800-88. The use of any other data destruction methods shall require prior written permission of the DHCS – Information Security Office.

3. <u>Audit Controls</u>. By executing this Agreement, CONTRACTOR, for itself, and its assignees and successors in interest, agrees as follows:

a. <u>System Security Review</u>. CONTRACTOR must ensure audit control mechanisms which record and examine system activity are in place. Any and all systems processing and/or storing PHI, PI or PII must have at least an annual system risk assessment or security review, including, without limitation, vulnerability scanning, which provides assurance that administrative, physical and technical controls are functioning effectively and providing adequate levels of protection.

b. <u>Log Reviews</u>. Any and all systems processing and/or storing PHI, PI or PII must have a routine procedure in place to review system logs for unauthorized access.

c. <u>Change Control</u>. Any and all systems processing and/or storing PHI, PI or PII must have a documented change control procedure that ensures separation of duties and protects the confidentiality, integrity and availability of data.

4. <u>Business Continuity and Disaster Recovery Controls</u>. By executing this Agreement, CONTRACTOR, for itself, and its assignees and successors in interest, agrees as follows:

/ / / /

a. Emergency Mode Operation Plan. CONTRACTOR must establish a documented plan to enable continuation of critical business processes and protection of the security of PHI, PI or PII held in an electronic format in the event of an emergency. For purposes of this provision, "emergency" means any circumstance or situation that causes normal computer operations to become unavailable for performing the work required under this Agreement for more than twenty-four (24) hours.

b. Data Backup Plan. CONTRACTOR must have documented procedures to backup PHI, PI or PII which allows retrievable exact copies of PHI, PI or PII to be maintained. Such procedures must include a regular schedule for making backups, storing backups offsite, an inventory of backup media and an estimate of the amount of time needed to restore lost PHI, PI or PII. At a minimum, the schedule must include weekly data backup and monthly offsite storage.

5. Paper Document Controls. By executing this Agreement, CONTRACTOR, for itself, and its assignees and successors in interest, agrees as follows:

a. Supervision of Data. PHI, PI or PII in paper form shall not be left unattended at any time, unless it is locked in a file cabinet, file room, desk or office. Unattended means that information is not being observed by an employee authorized to access the information. PHI, PI or PII in paper form shall not be left unattended at any time in vehicles or airplanes and shall not be checked in baggage on commercial airplanes.

b. Escorting Visitors. Visitors to areas where PHI, PI or PII is contained shall be escorted and PHI, PI or PII shall be kept out of sight while visitors are in the area.

c. Confidential Destruction. PHI, PI or PII must be disposed of through confidential means, including, without limitation, cross-cut shredding and pulverizing.

d. Removal of Data. Only the minimum necessary amount of PHI, PI or PII may be removed from the premises of CONTRACTOR except with express written permission from COUNTY. PHI, PI or PII shall not be considered "removed from the premises," if it is only being transported from one (1) of CONTRACTOR's locations to another of CONTRACTOR's locations.

e. Faxing. Faxes containing PHI, PI or PII shall not be left unattended and fax machines shall be in secure areas. Faxes shall contain a confidentiality statement notifying persons receiving faxes in error to destroy them. Fax numbers shall be verified with the intended recipient before sending the fax.

f. Mailings. Mailings containing PHI, PI or PII shall be sealed and secured from damage or inappropriate viewing to the extent possible. Mailings which include five hundred (500) or more individually identifiable records in a single package shall be sent using a tracked mailing method which includes verification of delivery and receipt, unless prior written permission to use another method is obtained.

13. HOURS OF OPERATION:

CONTRACTOR shall offer to Humboldt County Medi-Cal Beneficiaries hours of operation that are equal to the hours of operation offered to commercial enrollees. If CONTRACTOR serves only Medi-Cal Beneficiaries, CONTRACTOR shall offer hours of operation that are comparable to the hours made available for Medi-Cal services that are not covered by COUNTY or other Mental Health Plans.

14. DETERMINATION OF ABILITY TO PAY:

If so instructed by Director, CONTRACTOR shall determine client's share of the cost associated with the services provided pursuant to the terms and conditions of this Agreement using the State of California's Uniform Method of Determining the Ability to Pay, and notify COUNTY of its determination. Such determinations shall be made any time there is a demonstrable change in client's financial status, but no less than annually. CONTRACTOR hereby agrees that a client's inability to pay shall not be a bar to CONTRACTOR's services.

15. PATIENTS' RIGHTS:

A. Legal Compliance. Each party hereto shall comply with any and all applicable local, state and federal laws, regulations and standards relating to patients' rights, including, without limitation, California Welfare and Institutions Code Section 5325, Sections 862 through 868 of Title 9 of the California Code of Regulations ("C.C.R.") and 42 C.F.R. Section 438.100.

B. Specific Rights. During the performance of this Agreement, each party hereto shall comply with any and all applicable local, state and federal policies and procedures pertaining to patients' rights, and shall ensure that its staff and subcontractors take those rights into account when providing services hereunder, including, without limitation, the right to:

1. Receive information in accordance with 42 C.F.R. Section 438.10.

2. Be treated with respect and with due consideration for his or her dignity and privacy.

3. Receive information on available treatment options and alternatives, presented in a manner appropriate to his or her condition and ability to understand.

4. Participate in decisions regarding his or her health care, including, without limitation, the right to refuse treatment.

5. Be free from any form of restraint or seclusion used as a means of coercion, discipline, convenience or retaliation.

6. Request and receive a copy of his or her medical records, and to request that they be amended or corrected, as specified in 45 C.F.R. Sections 164.524 and 164.526.

7. Be furnished services in accordance with 42 C.F.R. Sections 438.206 through 438.210.

8. Freely exercise his or her rights without adversely affecting the way in which he or she is treated by CONTRACTOR.

C. Effect of Provision. Nothing herein shall be construed to replace or conflict with the duties of patients' rights advocates set forth in California Welfare and Institutions Code Section 5520.

16. PSYCHIATRIC HEALTH FACILITY:

In connection with the execution of this Agreement, CONTRACTOR and its staff, employees and subcontractors will be providing services in COUNTY's Psychiatric Health Facility, Sempervirens. Prior to commencing work, CONTRACTOR will provide COUNTY with proof of a negative screen for Tuberculosis ("TB") and Purified Protein Derivative ("PPD") or X-rays along with a statement of negative TB and PPD Waiver from a qualified medical professional.

17.  REQUIRED DISCLOSURES:

A.  Notification of Change in Ownership and Control. CONTRACTOR shall notify COUNTY of any change in ownership or control of its business within thirty-five (35) days after the occurrence thereof, and provide COUNTY with any and all information relating thereto upon request. The disclosures to be provided hereunder shall include, without limitation:

1.  The name and address of any individual or corporation with an ownership or control interest in CONTRACTOR's business. The address for corporate entities shall include, as applicable, a primary business address, each business location, and a P.O. Box address;

2.  Date of birth and social security number, in the case of an individual;

3.  Tax identification number, in the case of a corporation with an ownership or control interest in CONTRACTOR's business or in the business of any subcontractor in which CONTRACTOR has a five percent (5%) or more interest;

4.  Whether the individual or corporation with an ownership or control interest in CONTRACTOR's business is related to another person with an ownership or control interest in the same or any other COUNTY contractor as a spouse, parent, child or sibling;

5.  Whether the individual or corporation with an ownership or control interest in the business of any subcontractor in which CONTRACTOR has a five percent (5%) or more interest is related to another person with ownership or control interest in CONTRACTOR's business as a spouse, parent, child or sibling;

6.  The name of any other disclosing entity in which CONTRACTOR has an ownership or control interest; and

7.  The name, address, date of birth and social security number of any managing employee of CONTRACTOR.

B.  Disclosures Related to Business Transactions. In accordance with 42 C.F.R. Sections 455.101 through 455.106, CONTRACTOR shall submit the following disclosures regarding certain business transactions within thirty-five (35) days after receiving COUNTY's request for such information:

1.  The ownership of any subcontractor with whom CONTRACTOR has had business transactions totaling more than Twenty-Five Thousand Dollars ($25,000.00) within twelve (12) months prior to the date of the request; and

2.  Any significant business transactions between CONTRACTOR and any wholly owned supplier, or any subcontractor, within five (5) years prior to the date of the request.

C.  Disclosures Related to Persons Convicted of Crimes. Upon request by COUNTY, CONTRACTOR shall submit the following disclosures regarding its owners, persons with controlling interest, agents and managing employees' criminal convictions related to federal health care programs pursuant to 42 C.F.R. Section 455.106(a)(1)-(2):

1.  The identity of any managing employee of CONTRACTOR who has been convicted of a crime related to federal health care programs; and

2. The identity of any agent of CONTRACTOR who has been convicted of a crime related to federal health care programs. For purposes of this provision, the term "agent" has the meaning set forth in 42 C.F.R. Section 455.101.

18. SUSPENSION AND DEBARMENT:

A. Legal Compliance. CONTRACTOR hereby agrees to comply with any and all applicable local, state and federal suspension and debarment laws, regulations and standards, including, without limitation, 7 C.F.R. Part 3017, 45 C.F.R. Part 76, 40 C.F.R. Part 32 and 34 C.F.R. Part 85.

B. Certification of Eligibility. By executing this Agreement, CONTRACTOR certifies, to the best of its knowledge and belief, that it and its principals, assignees and successors in interest:

1. Are not presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded by any federal department or agency.

2. Have not, within a three (3) year period preceding the effective date of this Agreement, been convicted of, or had a civil judgment rendered against it, for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain or performing a public transaction or contract at the local, state or federal level; violation of local, state or federal antitrust statutes; or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records or receiving stolen property.

3. Are not presently indicted for, or otherwise criminally or civilly charged by a local, state or federal governmental entity with, commission of any of the offenses referenced herein.

4. Have not, within a three (3) year period preceding the effective date of this Agreement, had one (1) or more public transactions with a local, state or federal entity terminated for cause or default.

5. Shall not knowingly enter into any lower tier covered transaction with a person who is proposed for debarment under 48 C.F.R. Part 9, debarred, suspended, declared ineligible or voluntarily excluded from participation in such transaction, unless specifically authorized to do so by DHCS.

C. Construction of Provision. The terms used herein shall have the meanings set forth in the definitions and coverage sections of the rules implementing Federal Executive Order 12549.

D. Effect of Non-Compliance. Failure to meet any of the requirements set forth herein shall constitute a material breach of this Agreement, upon which COUNTY may, in addition to any other available remedies, immediately suspend any and all payments due hereunder or terminate this Agreement as provided herein.

E. Incorporation of Provisions. CONTRACTOR hereby agrees to include the provisions contained herein, without substantial modification, in all lower tier covered transactions as well as all solicitations for lower tier covered transactions.

19. FEDERAL HEALTH CARE PROGRAM EXCLUSION:

A. Certification of Eligibility. By executing this Agreement, CONTRACTOR certifies that neither it nor any of its staff members are restricted or excluded from providing services under any health care program funded by the federal government, either directly or indirectly, in whole or in part,

and that CONTRACTOR will notify COUNTY in writing, within thirty (30) days from receipt of a fully executed copy of this Agreement, of any event that would require the mandatory exclusion of CONTRACTOR, or one (1) or more of its staff members, from participation in a federally funded health care program and/or any exclusionary action taken by any agency of the federal government which directly or indirectly bars CONTRACTOR, or one (1) or more of its staff members, from participation in a federally funded health care program, whether such bar is in whole or in part.

B. <u>Employment of Ineligible or Excluded Individuals or Entities</u>. CONTRACTOR shall not employ or contract with providers, or other individuals or entities, excluded from participation in federally funded health care programs, as defined in Section 1128B(F) of the Social Security Act, under either Section 1128, 1128A, 1156 or 1842(j)(2) of the Social Security Act. Federal funding is not available for amounts expended for providers excluded by Medicare, Medicaid or the California Children's Insurance Program, except for emergency services.

C. <u>Eligibility Screening</u>. CONTRACTOR shall screen, on a monthly basis, all staff employed or retained to provide services related to this Agreement to ensure that they are not designated as ineligible or excluded from participation in federally funded health care programs. Screening shall be conducted against the California "Medi-Cal Suspended and Ineligible List," the United States Health and Human Services – Office of Inspector General "List of Excluded Individuals and Entities" and any other list pursuant to 42 C.F.R. Section 438.214(d). CONTRACTOR shall screen prospective staff prior to hire or engagement.

D. <u>Eligibility Notification</u>. CONTRACTOR shall provide COUNTY with written attestations that CONTRACTOR and its staff are eligible to participate in federally funded health care programs on a monthly basis.

E. <u>Disclosure Requirements</u>. CONTRACTOR shall immediately disclose to COUNTY any debarment, exclusion or other event that causes CONTRACTOR, or any member of its staff to be ineligible for, or excluded from, participation in federally funded health care programs. If CONTRACTOR discovers that a staff member has become ineligible for, or excluded from, participation in any federally funded health care program, CONTRACTOR shall remove such individual from responsibility for, or involvement with, business or health care operations related to this Agreement.

F. <u>Defense and Indemnification</u>. CONTRACTOR shall hold harmless, defend and indemnify COUNTY against any and all loss or damage arising from any exclusion of CONTRACTOR, or any of its staff members, from participation in federally funded health care programs.

G. <u>Effect of Non-Compliance</u>. Failure to meet any of the requirements set forth herein shall constitute a material breach of this Agreement, upon which COUNTY may, in addition to any other available remedies, immediately suspend any and all payments due hereunder or terminate this Agreement as provided herein.

20. <u>INTELLECTUAL PROPERTY RIGHTS</u>:

CONTRACTOR hereby agrees to comply with any and all applicable intellectual property rights provisions contained in the Mental Health Managed Care Agreement (State Standard Agreement No. 22-20103) that COUNTY has with DHCS, which are incorporated herein by reference and made a part hereof as if set forth in full.

A. <u>Ownership</u>. By executing this Agreement, CONTRACTOR, for itself, and its assignees and successors in interest, agrees as follows:

1. Except where DHCS has agreed in a signed writing to accept a license, DHCS shall be and remain, without additional compensation, the sole owner of any and all rights, title and interest in all "Intellectual Property," from the moment of creation, whether or not jointly conceived, that are made, conceived, derived from or reduced to practice by CONTRACTOR or DHCS as a direct or indirect result of this Agreement.

   a. For purposes of this Agreement, "Intellectual Property" means any and all recognized and protectable rights and interests, including, without limitation, patents, whether issued or not, copyrights, trademarks, service marks, applications for any of the foregoing, inventions, trade secrets, trade dress, logos, insignia, color combinations, slogans, moral rights, right of publicity, author's rights, contract and licensing rights, works, mask works, industrial design rights, rights of priority, design flows, methodologies, devices, business processes, developments, innovations, know how, good will and all other legal rights protecting intangible proprietary information as may exist now and/or come into existence hereafter, and all renewals and extensions, regardless of whether those rights arise under the laws of any state, the United States or any other country or jurisdiction.

      i. For purposes of the definition of "Intellectual Property," "works" means all literary works, writings and printed matter, including the medium by which they are recorded or reproduced, photographs, art work, pictorial and graphic representations and works of a similar nature, film, motion pictures, digital images, animation cells and other audiovisual works, including positives and negatives thereof, sound recordings, tapes, educational materials, interactive videos and any other materials or products created, produced, conceptualized and fixed in a tangible medium of expression. It includes preliminary and final products and any materials and information developed for the purposes of producing those final products. The term "works" does not include articles submitted to peer review, reference journals or independent research projects.

2. In the performance of this Agreement, CONTRACTOR will exercise and utilize certain of its Intellectual Property in existence prior to the effective date of this Agreement. In addition, CONTRACTOR may access and utilize certain of DHCS' Intellectual Property in existence prior to the effective date of this Agreement. Except as otherwise set forth herein, CONTRACTOR shall not use any of DHCS' Intellectual Property now existing or hereafter existing for any purpose without DHCS' prior written permission. Except as otherwise set forth herein, neither CONTRACTOR nor DHCS shall give any ownership interest in, or rights to, its Intellectual Property to the other party. If during the term of this Agreement, CONTRACTOR accesses any third-party Intellectual Property that is licensed to DHCS, CONTRACTOR hereby agrees to abide by any and all license and confidentiality restrictions applicable to DHCS in the third-party's license agreement.

3. CONTRACTOR hereby agrees to cooperate with DHCS in establishing or maintaining DHCS' exclusive rights in the Intellectual Property, and in assuring DHCS' sole rights against third parties with respect to the Intellectual Property. If CONTRACTOR enters into any agreements or subcontracts with other parties in order to perform its duties and obligations hereunder, CONTRACTOR shall require the terms of such agreements or subcontracts to include all of the Intellectual Property provisions set forth herein. Such terms must include, without limitation, the subcontractor assigning and agreeing to assign to DHCS all rights, title and interest in Intellectual Property made, conceived, derived from or reduced to practice by the subcontractor, CONTRACTOR or DHCS as a direct or indirect result of this Agreement or any subcontract related hereto.

4.   CONTRACTOR further agrees to assist and cooperate with DHCS in all reasonable respects, execute all documents, give testimony, subject to reasonable availability, and take all further acts reasonably necessary to acquire, transfer, maintain and enforce DHCS' Intellectual Property rights and interests.

B.   Retained Rights and License Rights.  By executing this Agreement, CONTRACTOR, for itself, and its assignees and successors in interest, agrees as follows:

1.   Except for Intellectual Property made, conceived, derived from or reduced to practice by CONTRACTOR or DHCS as a direct or indirect result of this Agreement, CONTRACTOR shall retain title to all of its Intellectual Property to the extent such Intellectual Property is in existence prior to the effective date of this Agreement.  CONTRACTOR hereby grants to DHCS, without additional compensation, a permanent, non-exclusive, royalty free, paid-up, worldwide, irrevocable, perpetual, non-terminable license to use, reproduce, manufacture, sell, offer to sell, import, export, modify, publicly and privately display or perform, distribute and dispose CONTRACTOR's Intellectual Property resulting from this Agreement, unless CONTRACTOR assigns all rights, title and interest in the Intellectual Property as set forth herein.

2.   Nothing in this provision shall restrict, limit or otherwise prevent CONTRACTOR from using any ideas, concepts, know-how, methodology or techniques related to the performance of its duties and obligations hereunder, provided that CONTRACTOR's use does not infringe the patent, copyright, trademark, license or other Intellectual Property rights of DHCS or any third-party, or result in a breach of this Agreement or violation of any local, state or federal laws, regulations or standards relating to confidentiality.

C.   Copyright.  By executing this Agreement, CONTRACTOR, for itself, and its assignees and successors in interest, agrees as follows:

1.   CONTRACTOR hereby agrees that for purposes of copyright law, all works, as defined herein, of authorship made by or on behalf of CONTRACTOR in connection with the performance of its duties and obligations hereunder shall be deemed "works made for hire." CONTRACTOR further agrees that the work of each person utilized by CONTRACTOR in connection with the performance of this Agreement will be a "work made for hire," whether that person is an employee of CONTRACTOR or has entered into an agreement with CONTRACTOR to perform the work.  CONTRACTOR shall enter into a written agreement with any such person which provides that: all work performed for CONTRACTOR shall be deemed a "work made for hire" under the Copyright Act; and such person shall assign all right, title and interest to DHCS to any work product made, conceived, derived from or reduced to practice by CONTRACTOR or DHCS as a direct or indirect result of this Agreement.

2.   Any and all materials, including, without limitation, visual works or text, reproduced or distributed pursuant to the terms and conditions of this Agreement that include Intellectual Property made, conceived, derived from or reduced to practice by CONTRACTOR or DHCS as a direct or indirect result of this Agreement, shall include DHCS' notice of copyright, which shall read in three (3) millimeter or larger typeface: "© [*Enter Current Year e.g., 2010, etc.*], California Department of Health Care Services.  This material may not be reproduced or disseminated without prior written permission from the California Department of Health Care Services."  This notice should be placed prominently on the materials and set apart from other matter on the page where it appears.  Audio productions shall contain a similar audio notice of copyright.

D.  <u>Patent Rights</u>.  With respect to inventions made by CONTRACTOR in the performance of its duties and obligations hereunder, which did not result from research and development specifically included in Exhibit A – Scope of Services, CONTRACTOR hereby grants to DHCS a license for any and all devices or materials incorporating, or made through the use of, such inventions.  If such inventions result from research and development work specifically included within Exhibit A – Scope of Services, CONTRACTOR hereby agrees to assign to DHCS, without additional compensation, all its right, title and interest in and to such inventions and to assist DHCS in securing United States and foreign patents with respect thereto.

E.  <u>Third-Party Intellectual Property</u>.  Except as provided herein, CONTRACTOR hereby agrees that the performance of its obligations and duties hereunder shall not be dependent upon or include any Intellectual Property of CONTRACTOR or third-party without first: obtaining DHCS' prior written approval; and granting to or obtaining for DHCS, without additional compensation, a license, as described herein, for any of CONTRACTOR's or third-party's Intellectual Property in existence prior to the effective date of this Agreement.  If such a license upon these terms is unattainable, and DHCS determines that Intellectual Property should be included in, or is required for CONTRACTOR's performance of, this Agreement, CONTRACTOR shall obtain a license under terms acceptable to DHCS.

F.  <u>Warranties</u>.  By executing this Agreement, CONTRACTOR, for itself, and its assignees and successors in interest, represents, warrants and agrees as follows:

1.  It is free to enter into and fully perform this Agreement.

2.  It has secured, and will secure, any and all rights and licenses necessary for the performance of its duties and obligations hereunder.

3.  Neither CONTRACTOR's performance of this Agreement, nor the exercise by either party of the rights granted in this Agreement, nor any use, reproduction, manufacture, sale, offer to sell, import, export, modification, public and private display or performance, distribution and disposition of the Intellectual Property made, conceived, derived from or reduced to practice by CONTRACTOR or DHCS as a direct or indirect result of this Agreement, will infringe upon or violate any Intellectual Property right, non-disclosure obligation or other proprietary right or interest of any third-party or entity now existing under the laws of, or hereafter existing or issued by, any state, the United States or any foreign country.  There is currently no actual or threatened claim by any such third-party based on an alleged violation of any such right by CONTRACTOR.

4.  Neither CONTRACTOR's performance of its duties and obligations hereunder, nor any part thereof, will violate the privacy rights of, or constitute a libel or slander against, any person or entity.

5.  It has secured, and will secure, any and all rights and licenses necessary for the use of Intellectual Property, including, without limitation, consents, waivers or releases from all authors of music or performances, talent, including radio, television and motion picture talent, and owners of any interest in sites, property or props that may be used or shown.

6.  It has appropriate systems and controls in place to ensure that state funds will not be used in the performance of this Agreement for the acquisition, operation or maintenance of computer software in violation of copyright laws.

/ / / /

7.  It has not granted, and shall not grant to, any person or entity any right that might derogate, encumber or interfere with any of the rights granted to DHCS hereunder.

8.  It has no knowledge of any outstanding claims, licenses or other charges, liens or encumbrances of any kind or nature that could affect in any way CONTRACTOR's performance of its duties and obligations hereunder.

9.  DHCS makes no warranty that the Intellectual Property resulting from this Agreement will not infringe upon any existing or subsequent patent, trademark, copyright or the like.

G.  Intellectual Property Indemnity. By executing this Agreement, CONTRACTOR, for itself, and its assignees and successors in interest, agrees as follows:

1.  CONTRACTOR shall indemnify, defend and hold harmless DHCS, and its licensees, assignees, officers, directors, employees, agents, representatives, successors and users of its products ("Indemnitees"), from and against all claims, actions, damages, losses or liabilities, whether or not rightful, arising from any and all actions or claims by any third-party or expenses related thereto, including, without limitation, all legal expenses, court costs and attorney's fees incurred in investigating, preparing, serving as a witness in or defending against, any such claim, action or proceeding, whether commenced or threatened, to which any of the Indemnitees may be subject, regardless of whether or not CONTRACTOR is a party to any pending or threatened litigation, which arise out of or are related to: the incorrectness or breach of any of the representations, warranties, covenants or agreements of CONTRACTOR pertaining to Intellectual Property; or any Intellectual Property infringement, or other type of actual or alleged infringement claim, arising out of DHCS' use, reproduction, manufacture, sale, offer to sell, distribution, import, export, modification, public and private performance or display, license and disposition of the Intellectual Property made, conceived, derived from or reduced to practice by CONTRACTOR or DHCS as a direct or indirect result of this Agreement. CONTRACTOR's indemnity obligations hereunder shall apply irrespective of whether the infringement claim is based on a patent, trademark or copyright registration that issued after the effective date of this Agreement. DHCS reserves the right to participate in, at CONTRACTOR's expense, any such infringement action brought against DHCS.

2.  Should any Intellectual Property licensed by CONTRACTOR to DHCS under this Agreement become the subject of an Intellectual Property infringement claim, CONTRACTOR shall exercise its authority reasonably and in good faith to preserve DHCS' right to use the licensed Intellectual Property in accordance with the terms and conditions of this Agreement at no expense to DHCS. DHCS shall have the right to monitor and appear through its own counsel, at CONTRACTOR's expense, in any such claim or action. In the defense or settlement of the claim, CONTRACTOR may obtain the right for DHCS to continue using the licensed Intellectual Property; or replace or modify the licensed Intellectual Property so that the replaced or modified Intellectual Property becomes non-infringing provided that such replacement or modification is functionally equivalent to the original licensed Intellectual Property. If such remedies are not reasonably available, DHCS shall be entitled to a refund of all monies paid under this Agreement, without restriction or limitation of any other available rights and remedies.

3.  CONTRACTOR hereby agrees that damages alone would be inadequate to compensate DHCS for CONTRACTOR's breach of the Intellectual Property provisions set forth herein. CONTRACTOR acknowledges DHCS would suffer irreparable harm in the event of such breach, and agrees DHCS shall be entitled to obtain equitable relief, including,

without limitation, an injunction, from a court of competent jurisdiction, without restriction or limitation of any other rights and remedies available at law or in equity.

H.   Federal Funding. In any agreement funded in whole or in part by the federal government, DHCS may acquire and maintain the Intellectual Property rights, title and ownership, which results directly or indirectly from this Agreement; except as provided in 37 C.F.R. Section 401.14; however, the federal government shall have a worldwide, non-exclusive, nontransferable, irrevocable, paid-up license to use, duplicate or dispose of such Intellectual Property in any manner for governmental purposes and to have and permit others to do so.

I.   Survival. The provisions set forth herein shall survive any termination or expiration of this Agreement or any project schedule associated therewith.

21.   NON-DISCRIMINATION COMPLIANCE:

A.   Compliance with Anti-Discrimination laws. CONTRACTOR hereby assures that it, and its subcontractors, shall comply with the provisions of Title VI and Title VII of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, as amended, the Age Discrimination Act of 1975, California Welfare and Institutions Code Section 10000, Division 21 of the California Department of Social Services Manual of Policies and Procedures, Federal Executive Order 11246, as amended, the Americans with Disabilities Act of 1990, the California Fair Employment and Housing Act and any other applicable local, state and federal laws, regulations and standards, all as may be amended from time to time. The applicable regulations of the California Fair Employment and Housing Commission implementing Government Code Section 12990, set forth in 2 C.C.R. Sections 8101, *et seq.*, are incorporated into this Agreement by reference and made a part hereof as if set forth in full.

B.   Provision of Professional Services. Consistent with the requirements of any and all applicable local, state and federal laws, regulations and standards, including, without limitation, 42 C.F.R. Section 438.3(d)(3)-(4), CONTRACTOR shall not engage in any unlawful discriminatory practices in the admission of clients, assignments of accommodations, treatment, evaluation, employment or personnel or any other respect on the basis of: race; religion or religious creed; color; age (over forty (40) years of age); sex, including, without limitation, gender identity and expression, pregnancy, childbirth and related medical conditions; sexual orientation, including, without limitation, heterosexuality, homosexuality and bisexuality; national origin; ancestry; marital status; medical condition, including, without limitation, cancer and genetic characteristics; mental or physical disability, including, without limitation, HIV status and AIDS; political affiliation; military service; denial of family care leave; or any other classifications protected by any and all applicable local, state or federal laws, regulations or standards, all as may be amended from time to time. CONTRACTOR shall not discriminate against clients on the basis of health status or need for health care services.

C.   Employment Practices. In connection with the services provided hereunder, CONTRACTOR, and its subcontractors, shall not unlawfully discriminate against any employee, or applicant for employment, because of: race; religion or religious creed; color; age (over forty (40) years of age); sex, including, without limitation, gender identity and expression, pregnancy, childbirth and related medical conditions; sexual orientation, including, without limitation, heterosexuality, homosexuality and bisexuality; national origin; ancestry; marital status; medical condition, including, without limitation, cancer and genetic characteristics; mental or physical disability, including HIV status and AIDS; political affiliation; military service; denial of family care leave; or any other classifications protected by any and all applicable local, state or federal laws, regulations or standards, all as may be amended from time to time. CONTRACTOR shall take

affirmative action to ensure that qualified applicants are employed, and that during employment, employees are treated without regard to the factors referenced above. Such actions shall include, without limitation: employment, promotion, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and career development opportunities and selection for training, including, but not limited to, apprenticeship. Nothing herein shall be construed to require employment of unqualified persons.

D.    Solicitations for Employment. Any and all solicitations or advancements for employees placed by, or on behalf of, CONTRACTOR shall state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, national origin, physical or mental disability, age or status as a disabled veteran or veteran of the Vietnam era.

E.    Notification to Current and Prospective Employees. CONTRACTOR shall post in conspicuous places, available to employees and applicants for employment, notices to be provided by the federal government or DHCS, setting forth the provisions of the Equal Opportunity Clause of Section 503 of the Rehabilitation Act of 1973 and the Affirmative Action Clause required by the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (Section 4212 of Title 38 United States Code ("U.S.C.")). Such notices shall state CONTRACTOR's obligation under the law to take affirmative action to employ and advance in employment qualified applicants without discrimination based on their race, color, religion, sex, national origin, physical or mental disability, age or status as a disabled veteran or veteran of the Vietnam era and the rights of applicants and employees.

F.    Notification to Labor Unions and/or Employee Representatives. CONTRACTOR shall send to each labor union or representative of employees with which it has a collective bargaining agreement, or other contract or understanding, a notice, to be provided by the federal government or the State of California, advising the labor union or employee representative of CONTRACTOR's commitments under the provisions herein, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

G.    Non-Discrimination in Federally Assisted Programs. CONTRACTOR shall comply with all the provisions of, and furnish all information and reports required by, Section 503 of the Rehabilitation Act of 1973, as amended, the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (38 U.S.C. Section 4212) and Federal Executive Order 11246, as amended by Federal Executive Order 11375 – "Amending Executive Order 11246 Relating to Equal Employment Opportunity," and as supplemented by 41 C.F.R. Part 60 – "Office of the Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor," and the rules, regulations and relevant orders of the Secretary of Labor pertaining to the prohibition of discrimination against qualified disabled persons in all federally assisted programs or activities, as detailed in the regulations signed by the Secretary of Health and Human Services, effective June 2, 1977, found in the Federal Register, Volume 42, No. 86, dated May 4, 1977.

H.    Access to Records Regarding Non-Discrimination Compliance. CONTRACTOR shall furnish any and all information and reports required by Federal Executive Order 11246, as amended, including by Federal Executive Order 11375 – "Amending Executive Order 11246 Relating to Equal Employment Opportunity," and as supplemented by 41 C.F.R. Part 60 – "Office of the Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor," the Rehabilitation Act of 1973, and by the rules, regulations and orders of the Secretary of Labor, and will permit access to its books, records and accounts by authorized representatives of the State of California and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations and orders.

I. Sanctions for Non-Compliance. In the event of CONTRACTOR's non-compliance with the requirements set forth herein, or with any federal rules, regulations or orders referenced herein, this Agreement may be cancelled, terminated or suspended in whole or in part and CONTRACTOR may be declared ineligible for further state and federal contracts in accordance with procedures authorized in Federal Executive Order 11246, as amended, and such other sanctions that may be imposed, and remedies invoked, as provided in Federal Executive Order 11246, as amended, including by Federal Executive Order 11375 – "Amending Executive Order 11246 Relating to Equal Employment Opportunity," and as supplemented by 41 C.F.R. Part 60 – "Office of the Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor," or by the rules, regulations or orders of the Secretary of Labor, or as otherwise provided by any applicable local, state and federal laws, regulations and standards.

J. Determination of Medical Necessity. Notwithstanding anything set forth herein to the contrary, CONTRACTOR may require a determination of medical necessity pursuant to 9 C.C.R. Sections 1820.205, 1830.205 or 1830.210, prior to providing covered services to a client.

K. Incorporation of Provisions. CONTRACTOR shall include the foregoing provisions in every subcontract related to the services provided pursuant to the terms and conditions of this Agreement, unless exempted by rules, regulations or orders of the Secretary of Labor issued pursuant to Federal Executive Order 11246, as amended, including by Federal Executive Order 11375 – "Amending Executive Order 11246 Relating to Equal Employment Opportunity," and as supplemented by 41 C.F.R. Part 60 – "Office of the Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor," Section 503 of the Rehabilitation Act of 1973 or the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (38 U.S.C. Section 4212), so that such provisions will be binding upon each subcontractor or vendor. CONTRACTOR shall take such action with respect to any subcontract related to the services provided hereunder, as the Director of the Office of Federal Contract Compliance Programs or DHCS may direct as a means of enforcing such provisions, including, without limitation, sanctions for non-compliance, provided, however, that in the event CONTRACTOR becomes involved in, or is threatened with litigation by a subcontractor or vendor as a result of such direction by DHCS, CONTRACTOR may request in writing to DHCS, who, in turn, may request the United States to enter into such litigation.

22. LOBBYING RESTRICTIONS:

A. Certification Regarding Lobbying Activities. CONTRACTOR shall file a certification, as set forth in Exhibit D – Certification Regarding Lobbying Activities, which is attached hereto and incorporated herein by reference as if set forth in full, that it has not made, and will not make, any payment prohibited by the provisions of 31 U.S.C. Section 1352.

B. Disclosure of Lobbying Activities. CONTRACTOR shall file a disclosure, as set forth in Exhibit E – Disclosure of Lobbying Activities, which is attached hereto and incorporated herein by reference as if set forth in full, if CONTRACTOR has made, or has agreed to make, any payment using non-appropriated funds, including, without limitation, profits from any covered federal action, in connection with a contract or any amendment of that contract, which would be prohibited by the provisions of 31 U.S.C. Section 1352, if paid for with appropriated funds.

C. Additional Disclosures. CONTRACTOR shall file a disclosure, as set forth in Exhibit E – Disclosure of Lobbying Activities, at the end of each quarter in which there is an occurrence of any event that requires disclosure, or materially affects the accuracy of the information contained in any certification or disclosure previously filed pursuant to the terms and conditions of this Agreement, including, without limitation, all of the following:

1. A cumulative increase of Twenty-Five Thousand Dollars ($25,000.00) or more in the amount paid or expected to be paid for influencing a covered federal action.

2. A change in the persons or entities influencing or attempting to influence a covered federal action.

3. A change in the officers, employees or members contacted for the purpose of influencing or attempting to influence a covered federal action.

D. Incorporation of Provisions. CONTRACTOR shall incorporate the provisions set forth herein, without substantial modification, into any subcontracts related to the services provided hereunder.

23. CLEAN AIR AND WATER POLLUTION COMPLIANCE:

A. Certification of Compliance. During the performance of this Agreement, CONTRACTOR, for itself, and its assignees and successors in interest, hereby agrees as follows:

1. To comply with any and all applicable standards, orders and requirements issued under Section 306 of the Clean Air Act (42 C.F.R. Section 1857(h)), Section 508 of the Clean Water Act (33 U.S.C. Section 1368), Executive Order 11738 and the Environmental Protection Agency regulations set forth in 40 C.F.R. Part 15.

1. To comply with any and all applicable standards, orders and requirements under the Clean Air Act (42 C.F.R. Sections 7401, *et seq.*), as amended, and the Water Pollution Control Act (33 U.S.C. Sections 1251, *et seq.*), as amended.

B. Incorporation of Provisions. CONTRACTOR shall include this provision in every subcontract related to the services provided hereunder, unless exempted by law.

24. SMOKE-FREE WORKPLACE CERTIFICATION:

A. Legal Requirements. The United States Pro-Children Act of 1994 ("PCA"), requires that smoking not be permitted in any portion of any indoor facility owned or leased by an entity and used routinely or regularly for the provision of health, day care, early childhood development, education or library services to children under eighteen (18) years of age, if the services are funded by federal programs, either directly or through local or state governments, or by federal grant, contract, loan or loan guarantee. The PCA also applies to children's services that are provided in indoor facilities that are constructed, operated or maintained with such federal funds. The PCA does not apply to children's services provided in private residences, portions of facilities used for inpatient substance use disorder treatment, service providers whose sole source of applicable federal funds is Medicare or Medicaid or facilities where Women, Infants and Children Program coupons are redeemed.

B. Certification of Compliance. By executing this Agreement, CONTRACTOR certifies that it will comply with the requirements of the PCA, and will not allow smoking within any indoor facility used for the provision of services for children as defined thereby.

C. Effect of Non-Compliance. Failure to comply with the PCA may result in the imposition of a civil monetary penalty of up to One Thousand Dollars ($1,000.00) for each violation and/or the imposition of an administrative compliance order on the responsible entity.

/ / / /

D.    Incorporation of Provisions.  CONTRACTOR further agrees that it will incorporate the provisions contained herein into any subcontracts related to the services provided hereunder.

25.    DRUG-FREE WORKPLACE CERTIFICATION:

By executing this Agreement, CONTRACTOR certifies that it will provide a drug-free workplace in accordance with the requirements of the Drug-Free Workplace Act of 1990 (California Government Code Sections 8350, *et seq.*), by doing all of the following:

A.    Drug-Free Policy Statement.  Publish, as required by California Government Code Section 8355(a)(1), a Drug-Free Policy Statement which notifies employees that the unlawful manufacture, distribution, dispensation, possession or use of a controlled substance is prohibited, and specifies the actions to be taken against employees for violations.

B.    Drug-Free Awareness Program.  Establish, as required by California Government Code Section 8355(a)(2), a Drug-Free Awareness Program which informs employees about:

1.    The dangers of drug abuse in the workplace;

2.    CONTRACTOR's policy of maintaining a drug-free workplace;

3.    Any available counseling, rehabilitation and employee assistance programs; and

4.    Penalties that may be imposed upon employees for drug abuse violations.

C.    Drug-Free Employment Agreement.  Ensure, as required by California Government Code Section 8355(a)(3), that every employee who provides services hereunder will:

1.    Receive a copy of CONTRACTOR's Drug-Free Policy Statement; and

2.    Agree to abide by CONTRACTOR's Drug-Free Policy as a condition of employment.

D.    Effect of Non-Compliance.  Failure to comply with the requirements set forth herein may result in termination of this Agreement and/or ineligibility for award of future contracts.

26.    NUCLEAR-FREE HUMBOLDT COUNTY ORDINANCE COMPLIANCE:

By executing this Agreement, CONTRACTOR certifies that it is not a Nuclear Weapons Contractor, in that CONTRACTOR is not knowingly or intentionally engaged in the research, development, production or testing of nuclear warheads, nuclear weapons systems or nuclear weapons components as defined by the Nuclear-Free Humboldt County Ordinance. CONTRACTOR hereby agrees to notify COUNTY immediately if it becomes a Nuclear Weapons Contractor as defined above.  COUNTY may immediately terminate this Agreement if it determines that the foregoing certification is false or if CONTRACTOR subsequently becomes a Nuclear Weapons Contractor.

27.    INDEMNIFICATION:

A.    Hold Harmless, Defense and Indemnification.  CONTRACTOR shall hold harmless, defend and indemnify COUNTY and its agents, officers, officials, employees and volunteers from and against any and all claims, demands, losses, damages and liabilities of any kind or nature, including, without limitation, attorney's fees and other costs of litigation, arising out of, or in connection with, CONTRACTOR's negligent performance of, or failure to comply with, any of

the duties and/or obligations contained herein, except such loss or damage which was caused by the sole negligence or willful misconduct of COUNTY.

B.    Effect of Insurance.  Acceptance of the insurance required by this Agreement shall not relieve CONTRACTOR from liability under this provision.  This provision shall apply to all claims for damages related to CONTRACTOR's performance hereunder, regardless of whether any insurance is applicable or not.  The insurance policy limits set forth herein shall not act as a limitation upon the amount of indemnification or defense to be provided hereunder.

28.    INSURANCE REQUIREMENTS:

This Agreement shall not be executed by COUNTY, and CONTRACTOR is not entitled to any rights hereunder, unless certificates of insurance, or other proof that the following provisions have been complied with, are filed with the Clerk of the Humboldt County Board of Supervisors.

A.    General Insurance Requirements.    Without limiting CONTRACTOR's indemnification obligations set forth herein, CONTRACTOR, and its subcontractors hereunder, shall take out and maintain, throughout the entire term of this Agreement, and any extensions thereof, the following policies of insurance, placed with insurers authorized to do business in the State of California with a current A.M. Bests rating of no less than A: VII or its equivalent against personal injury, death and property damage which may arise from, or in connection with, the activities of CONTRACTOR or its agents, officers, directors, employees, licensees, invitees, assignees or subcontractors:

1.    Comprehensive or Commercial General Liability Insurance at least as broad as Insurance Services Office Commercial General Liability Coverage (occurrence form CG 0001), in an amount of Two Million Dollars ($2,000,000.00) per occurrence for any one (1) incident, including, without limitation, personal injury, death and property damage.  If a general aggregate limit is used, such limit shall apply separately hereto or shall be twice the required occurrence limit.

2.    As stated in Exhibit A – Scope of Services, CONTRACTOR will not drive an automobile in the performance of the services provided pursuant to the terms and conditions of this Agreement.  If CONTRACTOR's responsibilities are changed in such a way that driving will be required during the performance of the services set forth herein, CONTRACTOR shall take out and maintain Automobile/Motor Liability Insurance with a limit of liability not less than One Million Dollars ($1,000,000.00) combined single limit coverage.  Such insurance shall include coverage of all owned, hired and non-owned vehicles, and be at least as broad as Insurance Service Offices Form Code 1 (any auto).

3.    Workers' Compensation Insurance, as required by the California Labor Code, with statutory limits, and Employers Liability Insurance with a limit of no less than One Million Dollars ($1,000,000.00) per accident for bodily injury or disease.    Said policy shall contain, or be endorsed to contain, a waiver of subrogation against COUNTY and its agents, officers, officials, employees and volunteers.

4.    Professional Liability Insurance – Error and Omission Coverage including coverage in an amount no less than Two Million Dollars ($2,000,000.00) for each occurrence (Four Million Dollars ($4,000,000.00) general aggregate).  Said insurance shall be maintained for the statutory period during which CONTRACTOR may be exposed to liability.  CONTRACTOR shall require that such coverage be incorporated into its professional services agreements with any other entities.

B.  Special Insurance Requirements. Said policies shall, unless otherwise specified herein, be endorsed with the following provisions:

1.  The Comprehensive or Commercial General Liability Policy shall provide that COUNTY, and its agents, officers, officials, employees and volunteers, are covered as additional insured for liability arising out of the operations performed by, or on behalf of, CONTRACTOR. The coverage shall contain no special limitations on the scope of protection afforded to COUNTY or its agents, officers, officials, employees and volunteers. Said policy shall also contain a provision stating that such coverage:

    a.  Includes contractual liability.

    b.  Does not contain exclusions as to property damage caused by explosion or collapse of structures or underground damage, commonly referred to as "XCU Hazards."

    c.  Is the primary insurance with regard to COUNTY.

    d.  Does not contain a pro-rata, excess only and/or escape clause.

    e.  Contains a cross liability, severability of interest or separation of insureds clause.

2.  The above-referenced policies shall not be canceled, non-renewed or materially reduced in coverage without thirty (30) days prior written notice being provided to COUNTY in accordance with the notice requirements set forth herein. It is further understood that CONTRACTOR shall not terminate such coverage until COUNTY receives adequate proof that equal or better insurance has been secured.

3.  The inclusion of more than one (1) insured shall not operate to impair the rights of one (1) insured against another insured, and the coverage afforded shall apply as though separate policies had been issued to each insured, but the inclusion of more than one (1) insured shall not operate to increase the limits of the insurer's liability.

4.  For claims related to this Agreement, CONTRACTOR's insurance is the primary coverage to COUNTY, and any insurance or self-insurance programs maintained thereby are excess to CONTRACTOR's insurance and will not be used to contribute therewith.

5.  Any failure to comply with the terms and conditions of this Agreement shall not affect the coverage provided to COUNTY or its agents, officers, officials, employees and volunteers.

6.  CONTRACTOR shall furnish COUNTY with certificates and original endorsements effecting the required coverage prior to execution of this Agreement. The endorsements shall be on forms approved by the Humboldt County Risk Manager. Any deductible or self-insured retention over One Hundred Thousand Dollars ($100,000.00) shall be disclosed to, and approved by, COUNTY. If CONTRACTOR does not keep all required policies in full force and effect, COUNTY may, in addition to any other available remedies, take out the necessary insurance and deduct the cost of said insurance from the monies owed to CONTRACTOR under this Agreement.

7.  COUNTY is to be notified immediately if twenty-five percent (25%) or more of any required insurance aggregate limit is encumbered, and CONTRACTOR shall be required to purchase additional coverage to meet the above-referenced aggregate limits.

C.   Insurance Notices. Any and all notices regarding the insurance required hereunder shall be sent to the addresses set forth below in accordance with the notice requirements contained herein.

          COUNTY:        County of Humboldt
                          Attention: Risk Management
                          825 Fifth Street, Room 131
                          Eureka, California 95501

          CONTRACTOR:   Nightingale Nurses, LLC
                          Attention: Bob Marello, President
                          6401 Congress Avenue, Suite 250
                          Boca Raton, Florida 33487

29.   RELATIONSHIP OF PARTIES:

It is understood that this Agreement is by and between two (2) independent entities and is not intended to, and shall not be construed to, create the relationship of agents, servant, employee, partnership, joint venture or any other similar association. Both parties further agree that CONTRACTOR shall not be entitled to any benefits to which COUNTY employees are entitled, including, without limitation, overtime, retirement, leave or workers' compensation benefits. CONTRACTOR shall be solely responsible for the acts and omissions of its agents, officers, employees, assignees and subcontractors.

30.   COMPLIANCE WITH APPLICABLE LAWS, REGULATIONS AND STANDARDS:

A.   General Legal Requirements. CONTRACTOR hereby agrees to comply with any and all local, state and federal laws, regulations, policies, procedures and standards applicable to the services provided pursuant to the terms and conditions of this Agreement, including, without limitation, any and all applicable laws, regulations and standards pertaining to the Medicaid program.

B.   Licensure Requirements. CONTRACTOR hereby agrees to comply with any and all local, state and federal licensure, certification and accreditation standards applicable to the services provided pursuant to the terms and conditions of this Agreement.

C.   Accessibility Requirements. CONTRACTOR hereby agrees to comply with any and all applicable accessibility requirements set forth in the Americans with Disabilities Act, Section 508 of the Rehabilitation Act of 1973, as amended, California Government Code Section 11135 and any current and future implementing regulations, policies, procedures and standards promulgated thereunder, including, without limitation, the federal accessibility standards set forth in 36 C.F.R. Section 1194.1, all as may be amended from time to time.

D.   Conflict of Interest Requirements. CONTRACTOR hereby agrees to comply with any and all applicable conflict of interest requirements set forth in the California Political Reform Act and any current and future implementing regulations, policies, procedures and standards promulgated thereunder, including, without limitation, COUNTY's Conflict of Interest Code, all as may be amended from time to time.

E.   Humboldt County Mental Health Managed Care Agreement. CONTRACTOR hereby agrees to comply with any and all applicable provisions of the Mental Health Managed Care Agreement (State Standard Agreement No. 22-20103) that COUNTY has with DHCS, which are incorporated herein by reference and made a part hereof as if set forth in full. In the event, of any conflict in the terms and conditions set forth in COUNTY's Mental Health Managed Care Agreement (State Standard Agreement No. 22-20103) and the terms and conditions set forth in

this Agreement, the terms and conditions set forth in COUNTY's Mental Health Managed Care Agreement (State Standard Agreement No. 22-20103) shall have priority. COUNTY's Mental Health Managed Care Agreement (State Standard Agreement No. 22-20103) can be obtained online at https://humboldtgov.org.

F.   Humboldt County Mental Health Performance Agreement. CONTRACTOR hereby agrees to comply with any and all applicable provisions of the Mental Health Performance Agreement (State Standard Agreement No. 21-10082) that COUNTY has with DHCS, which are incorporated herein by reference and made a part hereof as if set forth in full. In the event, of any conflict in the terms and conditions set forth in COUNTY's Mental Health Performance Agreement (State Standard Agreement No. 21-10082) and the terms and conditions set forth in this Agreement, the terms and conditions set forth in COUNTY's Mental Health Performance Agreement (State Standard Agreement No. 21-10082) shall have priority. COUNTY's Mental Health Performance Agreement can be obtained online at https://humboldtgov.org.

G.   Humboldt County Local System of Care. CONTRACTOR hereby agrees to comply with any and all applicable provisions of the Humboldt County Local System of Care, which is attached hereto as Exhibit F – Local System of Care and incorporated herein by reference as if set forth in full.

31.   PROVISIONS REQUIRED BY LAW:

This Agreement is subject to additional local, state and federal restrictions, limitations or conditions that may affect the terms, conditions or funding of this Agreement. This Agreement shall be read and enforced as though all legally required provisions are included herein, and if for any reason any such provision is not included, or incorrectly stated, the parties agree to amend the pertinent section to make such insertion or correction.

32.   REFERENCE TO LAWS, REGULATIONS AND STANDARDS:

In the event any law, regulation, policy, procedure, standard or contractual obligation referred to herein is amended during the term of this Agreement, the parties agree to comply with the amended provision as of the effective date of such amendment.

33.   PROTOCOLS:

Each party hereby agrees that the inclusion of additional protocols may be required to make this Agreement specific. All such protocols shall be negotiated, determined and agreed upon by both parties hereto.

34.   NOTIFICATION OF LITIGATION:

CONTRACTOR shall notify COUNTY of any claim for damages, lawsuit or other professional litigation filed against CONTRACTOR, which relates to the services provided pursuant to the terms and conditions of this Agreement, within forty-eight (48) hours after being informed of the commencement of such claim for damages, lawsuit or other professional litigation.

35.   SEVERABILITY:

If any provision of this Agreement, or any portion thereof, is found by any court of competent jurisdiction to be unenforceable or invalid for any reason, such provision shall be severable and shall not in any way impair the enforceability of any other provision of this Agreement.

36. ASSIGNMENT:

Neither party shall delegate its duties or assign its rights hereunder, either in whole or in part, without the other party's prior written consent. Any assignment by CONTRACTOR in violation of this provision shall be void, and shall be cause for immediate termination of this Agreement. This provision shall not be applicable to service agreements or other arrangements usually or customarily entered into by either party to obtain supplies, technical support or professional services.

37. AGREEMENT SHALL BIND SUCCESSORS:

All provisions of this Agreement shall be fully binding upon, and inure to the benefit of, the parties and to each of their heirs, executors, administrators, successors and permitted assigns.

38. WAIVER OF DEFAULT:

The waiver by either party of any breach of this Agreement shall not be deemed to be a waiver of any such breach in the future, or of the breach of any other requirement of this Agreement. In no event shall any payment by COUNTY constitute a waiver of any breach of this Agreement which may then exist on the part of CONTRACTOR. Nor shall such payment impair or prejudice any remedy available to COUNTY with respect to the breach or default. COUNTY shall have the right to demand repayment of, and CONTRACTOR shall promptly refund, any funds disbursed to CONTRACTOR, which COUNTY determines were not expended in accordance with the terms and conditions of this Agreement.

39. NON-LIABILITY OF COUNTY OFFICIALS AND EMPLOYEES:

No official or employee of COUNTY shall be personally liable for any default or liability under this Agreement.

40. AMENDMENT:

This Agreement may be amended at any time during the term hereof upon the mutual consent of both parties. No addition to, or alteration of, the terms of this Agreement shall be valid unless made in writing and signed by the parties hereto.

41. STANDARD OF PRACTICE:

CONTRACTOR warrants that it has the degree of learning and skill ordinarily possessed by reputable professionals practicing in similar localities in the same profession and under similar circumstances. CONTRACTOR's duty is to exercise such care, skill and diligence as professionals engaged in the same profession ordinarily exercise under like circumstances.

42. JURISDICTION AND VENUE:

This Agreement shall be construed under the laws of the State of California and COUNTY's contractual obligations under the Mental Health Managed Care Agreement (State Standard Agreement No. 22-20103) and the Mental Health Performance Agreement (State Standard Agreement No. 21-10082) that COUNTY has with DHCS. Any dispute arising hereunder, or relating hereto, shall be litigated in and venue shall lie in the County of Humboldt unless transferred by court order pursuant to California Code of Civil Procedure Sections 394 or 395.

////

43.   ADVERTISING AND MEDIA RELEASE:

Any and all informational material related to this Agreement shall receive approval from COUNTY prior to being used as advertising or released to the media, including, without limitation, television, radio, newspapers and internet. CONTRACTOR shall inform COUNTY of any and all requests for interviews by the media related to this Agreement before such interviews take place. COUNTY shall be entitled to have a representative present at any and all interviews concerning the subject matter of this Agreement. Any and all notices required by this provision shall be given to Director in accordance with the notice requirements set forth herein.

44.   SUBCONTRACTS:

CONTRACTOR shall obtain prior written approval from COUNTY before subcontracting any of the services to be provided pursuant to the terms and conditions of this Agreement.    Any and all subcontracts shall be subject to all applicable terms and conditions of this Agreement, including, without limitation, the licensing, certification, privacy, security and confidentiality requirements set forth herein. CONTRACTOR shall remain legally responsible for the performance of all terms and conditions of this Agreement, including, without limitation, any and all services provided by third-parties under subcontracts, whether approved by COUNTY or not.

45.   ATTORNEYS' FEES:

If either party shall commence any legal action, including, without limitation, an action for declaratory relief, against the other by reason of the alleged failure of the other to perform any of its obligations hereunder, the party prevailing in said action shall be entitled to recover court costs and reasonable attorneys' fees, including, but not limited to, the reasonable value of services rendered by the Humboldt County Counsel's Office, to be fixed by the court, and such recovery shall include court costs and attorneys' fees on appeal, if applicable. As used herein, the term "prevailing party" means the party who dismisses an action in exchange for payment of substantially all sums allegedly due, performance of provisions allegedly breached, or other considerations substantially equal to the relief sought by said party, as well as the party in whose favor final judgment is rendered.

46.   SURVIVAL OF PROVISIONS:

The duties and obligations of the parties set forth in Section 3(D) – Compensation upon Termination, Section 8 – Record Preparation, Retention and Inspection, Section 9 – Audit and Examination of Performance and Clinical Records, Section 10 – Program Inspection, Monitoring and Supervision, Section 11 – Confidential Information, Section 12 – Privacy and Data Security Requirements, Section 20 – Intellectual Property Rights and Section 27 – Indemnification shall survive the expiration or termination of this Agreement.

47.   CONFLICTING TERMS OR CONDITIONS:

In the event of any conflict in the terms or conditions set forth in any other agreements in place between the parties hereto and the terms and conditions set forth in this Agreement, the parties hereby agree the terms and conditions set forth in this Agreement shall have priority.

48.   INTERPRETATION:

This Agreement, as well as its individual provisions, shall be deemed to have been prepared equally by both of the parties hereto, and shall not be construed or interpreted more favorably for one (1) party on the basis that the other party prepared it.

49.  INDEPENDENT CONSTRUCTION:

The titles of the sections and subsections set forth herein are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

50.  FORCE MAJEURE:

Neither party hereto shall be liable or responsible for delays or failures in performance resulting from events beyond the reasonable control, and without the fault or negligence, of such party. Such events shall include, without limitation, acts of God, strikes, lockouts, riots, acts of war, epidemics, pandemics, acts of government, fire, power failures, nuclear accidents, earthquakes, unusually severe weather, acts of terrorism or other disasters, whether or not similar to the foregoing.

51.  ENTIRE AGREEMENT:

This Agreement contains all of the terms and conditions agreed upon by the parties hereto and no other agreements, oral or otherwise, regarding the subject matter of this Agreement shall be deemed to exist or to bind either of the parties hereto. In addition, this Agreement shall supersede in their entirety any and all prior agreements, promises, representations, understandings and negotiations of the parties, whether oral or written, concerning the same subject matter. Any and all acts which may have already been consummated pursuant to the terms and conditions of this Agreement are hereby ratified.

52.  COUNTERPART EXECUTION:

This Agreement, and any amendments hereto, may be executed in one (1) or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one (1) and the same agreement. This Agreement, and any amendments hereto, may be signed by manual or electronic signatures in accordance with any and all applicable local, state and federal laws, regulations and standards, and such signatures shall constitute original signatures for all purposes. A signed copy of this Agreement, and any amendments hereto, transmitted by email or by other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement and any amendments hereto.

53.  AUTHORITY TO EXECUTE:

Each person executing this Agreement represents and warrants that he or she is duly authorized and has legal authority to execute and deliver this Agreement. Each party represents and warrants to the other that the execution and delivery of this Agreement and the performance of such party's obligations hereunder have been duly authorized.

[Signatures on Following Page]

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the first date written above.

TWO SIGNATURES ARE REQUIRED FOR LIMITED LIABILITY COMPANIES PURSUANT TO THE CALIFORNIA CORPORATIONS CODE:
    (1) CHAIRPERSON OF THE BOARD, PRESIDENT, OR VICE PRESIDENT; AND
    (2) SECRETARY, CHIEF FINANCIAL OFFICER OR TREASURER; OR
    (3) ANY OTHER PROPERTY AUTHORIZED OFFICIAL OR EMPLOYEE.

**NIGHTINGALE NURSES, LLC:**

By: _____

Name: Scott Poirier

Title: SVP of Operations

Date: 4/18/23

By: _Gustavo Rengifo_ Digitally signed by Gustavo Rengifo
Date: 2023.04.18 10:13:14 -04'00'

Date: 04/18/2023

Name: Gustavo Rengifo

Title: Operations Manager

**COUNTY OF HUMBOLDT:**

By: Botzler-Rodgers, Emi  Digitally signed by Botzler-Rodgers, Emi
Date: 2023.05.10 17:46:48 -07'00'

Date: _____

Emi Botzler-Rodgers, Behavioral Health Director
*(Pursuant to the authority granted by the Humboldt County Board of Supervisors on June 25, 2019 [Item C-36])*

**INSURANCE AND INDEMNIFICATION REQUIREMENTS APPROVED:**

By: Freeman, Krista  Digitally signed by Freeman, Krista
Date: 2023.05.16 16:06:15 -07'00'

Date: _____

Risk Management

**LIST OF EXHIBITS:**

Exhibit A – Scope of Services
Exhibit B – Schedule of Rates
Exhibit C – Sample Invoice Form
Exhibit D – Certification Regarding Lobbying Activities
Exhibit E – Disclosure of Lobbying Activities
Exhibit F – Local System of Care

**EXHIBIT A**
**SCOPE OF SERVICES**
Nightingale Nurses, LLC
For Fiscal Year 2023-2024

1.   PLACEMENT OF PSYCHIATRIC REGISTERED NURSES:

CONTRACTOR shall provide, on an as needed basis, qualified Psychiatric Registered Nurses ("Placements") for assignment to specific temporary positions upon request by COUNTY. Specific assignment terms will be outlined in a Facility Confirmation to be signed by both COUNTY and CONTRACTOR.

2.   STAFFING REQUIREMENTS:

A.   Employment Relationship. CONTRACTOR shall assure that an independent contractor agreement is executed between CONTRACTOR and all Placements, provided to COUNTY pursuant to the terms and conditions of this Agreement, which obligates such Placements to comply with the terms and conditions of this Agreement.

B.   Qualifications. Each Placement provided to COUNTY pursuant to the terms and conditions of this Agreement shall have the appropriate education, training, background, certifications and experience to provide high quality patient care consistent with the specific position requested by COUNTY, including, without limitation, two (2) years of experience in a similar setting.

C.   Placement Profiles. CONTRACTOR shall submit to COUNTY a completed Placement Profile for each potential Placement. Placement Profiles shall include, without limitation, the Placement's employment history, clinical skills checklist, curriculum vitae, two (2) professional references, licenses and certifications.

D.   Placement Interviews. CONTRACTOR shall arrange for an interview between COUNTY and potential Placements upon request by COUNTY.

E.   Replacement of Discharged Placements. CONTRACTOR shall make all reasonable efforts to replace any Placements who are discharged by COUNTY.

3.   CREDENTIAL REQUIREMENTS:

CONTRACTOR shall ensure that Placements meet the following requirements – evidence of which shall be provided to COUNTY upon request. CONTRACTOR shall provide and keep on file general background and credential information for each Placement.

A.   Criminal Background Investigation. CONTRACTOR represents and warrants that it has conducted, and Placement has successfully completed, a criminal background investigation within three (3) years prior to the first (1st) day of Placement's assignment, or as dictated by COUNTY. All Placements must have a LiveScan done in the State of California prior to starting their assignment with COUNTY.

B.   Drug and Health Screening. CONTRACTOR shall conduct, and Placements must successfully complete, a ten (10) panel drug screen upon COUNTY's request.

C.   Health Records. CONTRACTOR shall provide COUNTY with the following medical records for each Placement assigned to COUNTY:

1. Documentation that Placement is physically capable of performing the essential functions relative to the services to be provided by Placement pursuant to the terms and conditions of this Agreement.

2. Positive titers or documentation of immunization for Mumps, Measles and Rubella.

3. Positive titer or documentation of immunization for Varicella.

4. Titer indicating immunity, documentation of immunization or declination statement for Hepatitis B.

5. Documentation of influenza immunization within twelve (12) months of the first (1st) day of Placement's assignment.

D. Professional Credentials. CONTRACTOR shall provide COUNTY with the following documentation for each Placement assigned to COUNTY:

1. Copies of any and all applicable licenses, including, without limitation, a valid nursing license and/or certification issued by the State of California.

2. Copies of any and all certifications or registrations, including, without limitation, current Basic Cardiac Life Support for health care providers and any additional information as requested by COUNTY.

4. SERVICE RESTRICTIONS:

CONTRACTOR will not drive an automobile in the performance of the services required pursuant to the terms and conditions of this Agreement. If CONTRACTOR's responsibilities are changed in such a way that driving will be required during the performance of the services required hereunder, CONTRACTOR shall take out and maintain Automobile/Motor Liability Insurance with a limit of liability not less than One Million Dollars ($1,000,000.00) combined single limit coverage prior to the commencement of any driving. Such insurance shall include coverage of all owned, hired and non-owned vehicles, and be at least as broad as Insurance Service Offices Form Code 1 (any auto).

5. RIGHTS AND RESPONSIBILITIES OF COUNTY:

A. Provision of Information. COUNTY shall notify CONTRACTOR of the number and specialties of Placements required, the shifts for which the Placements are required, the respective start dates, the minimum level of competencies and specific qualifications required of the Placement to fulfill the assignment. COUNTY further agrees to provide CONTRACTOR with the addresses of any and all COUNTY facilities at which Placements will be assigned along with COUNTY's Tax Identification Number.

B. Acceptance of Placements. COUNTY shall be responsible for making the final decision on whether Placements have the required qualifications to fulfill COUNTY's clinical need. COUNTY shall review the credentials of, and other applicable information pertaining to, potential Placements prior to accepting Placements for Assignment. COUNTY reserves the right to conduct telephone and/or in-person interviews of potential Placements at COUNTY's expense. COUNTY shall provide written confirmation of acceptance of Placements provided pursuant to the terms and conditions of this Agreement.

////

C. <u>Provision of Necessary Supplies and Support Staff</u>. COUNTY shall provide Placements with work schedules, orientations, supplies, practice environments and support staff that it makes available to its employees.

D. <u>Approval of Timesheets</u>. COUNTY shall approve each Placement's timesheet by Monday, 11:00 a.m. Pacific Standard Time, for all work completed during the previous week.

E. <u>Discharge of Placements</u>. Unless otherwise agreed to in writing by the parties hereto, COUNTY may discharge Placements without penalty, if a Placement is unable to perform the essential functions of a job with reasonable accommodation, does not perform in accordance with COUNTY's policies, procedures and/or standards, or engages in misconduct while working at COUNTY's facility. COUNTY shall only be responsible for paying CONTRACTOR for the shifts actually worked by the Placement.

F. <u>Non-Solicitation of Employees</u>. During the term of this Agreement, and for one hundred eighty (180) days from a Placement's last date of active work with COUNTY, COUNTY agrees not to solicit Placements unless otherwise agreed to in writing by the parties. If COUNTY desires to hire any Placement, either directly or indirectly, during such period, COUNTY may hire the Placement for a fee equal to twenty-five percent (25%) of the first (1st) year of such Placement's salary. COUNTY may hire any Placement at a reduced charge of twenty percent (20%), if the Placement has completed a thirteen (13) week, full-time assignment with COUNTY. However, COUNTY may hire any Placement at no charge, if the Placement has completed two (2), thirteen (13) week, full-time assignments with COUNTY.

**EXHIBIT B**
**SCHEDULE OF RATES**
Nightingale Nurses, LLC
For Fiscal Year 2023-2024

1.   HOURLY RATES OF COMPENSATION:

Placements are billed per hour for time worked up to forty (40) hours from Sunday to Saturday ("Work Week").   All such hours shall be considered "regular hours" for purposes of this Agreement. CONTRACTOR shall be compensated for the services provided pursuant to the terms and conditions of this Agreement at the following maximum hourly rates of compensation:

| Position | Regular Rate | Incentive Rate | Critical Need Rate |
|---|---|---|---|
| Psychiatric Registered Nurse | $100.00 | $110.00 | $140.00 |
| Supervising Registered Nurse | $110.00 | N/A | N/A |
| Licensed Vocational Nurse | $82.00 | $92.00 | N/A |
| Licensed Psychiatric Technician | $82.00 | $92.00 | N/A |

2.   ON-CALL SERVICE RATES:

On call services are billed at the maximum hourly rate of Ten Dollars ($10.00) per hour, with a two (2) hour minimum.   When Placements are assigned by COUNTY to be "on-call," CONTRACTOR shall be entitled to be paid for the full amount of the time assigned whether or not such Placements are required to work.

3.   OVERTIME RATES:

COUNTY will be charged overtime rates of one and one-half (1.5) times the hourly rates set forth herein for any time worked over forty (40) hours in a Work Week. CONTRATOR shall be responsible for paying all other overtime required by any and all applicable local, state and federal laws, regulations and standards.

4.   CALL-BACK RATES:

If Placements are called back in to work while they are on-call, time worked during that shift shall be billed at one and one-half (1.5) times the hourly rates set forth herein.

5.   HOLIDAY RATES:

All hours worked during the following holidays shall be billed at one and one-half (1.5) times the hourly rates set forth herein:

- Juneteenth
- Independence Day
- Labor Day
- Veteran's Day
- Thanksgiving Day
- Day After Thanksgiving
- Christmas Day
- New Year's Day
- Martin Luther King Jr. Day
- Lincoln's Birthday
- President's Day
- Cesar Chavez Day
- Memorial Day

6. ALLOCATION AND DEDUCTION OF TRAVEL EXPENSES:

   A.  Travel Expenses.  The CONTRACTOR's hourly billing rates and COUNTY's payment of those hourly rates necessarily incorporate and contemplate that a portion of those rates is to reimburse CONTRACTOR for all lodging, meals and incidental expenses incurred by Placements ("travel expenses"). COUNTY acknowledges and agrees that a portion of its payment for the hourly billing rates shall reimburse CONTRACTOR for all travel expenses paid by CONTRACTOR to any of the Placements providing services to COUNTY hereunder. COUNTY may deduct such allocable portion of the payment as travel expenses subject to any applicable federal limitations.

   B.  Documentation of Travel Expenses.  CONTRACTOR shall provide COUNTY with information detailing all such per diem allowances paid for travel expenses on a report referenced and included as a part of each invoice. Each such report shall be deemed to be incorporated by reference into the applicable invoice and read as a part thereof. Such report shall contain the names of each Placement providing services to COUNTY who received per diem allowances during the period referenced on the invoice, as well as the aggregate amount of those allowances during the billing period. Copies of such expense reports shall be maintained by CONTRACTOR, and be available upon request, if needed to further substantiate COUNTY's tax deductions for travel expenses.

   C.  Per Diem Allowances.  CONTRACTOR is providing COUNTY with an aggregate hourly rate for billing purposes which is inclusive of both the amounts for healthcare services provided by Placements hereunder and reimbursements for per diem allowances paid by CONTRACTOR to Placements, at the current rate, with zero percent (0%) markup. The aforementioned hourly rate is being given solely at COUNTY's request to allow COUNTY to compare the total cost of CONTRACTOR's services to its competitors' and it shall in no way reflect treatment of how CONTRACTOR is paying wages to Placements.

7. BREAKS AND REST PERIODS:

   Under California Law, all Placements are entitled to a thirty (30) minute uninterrupted meal period for every five (5) hours worked. Placements' first (1st) meal period must be taken within the first (1st) five (5) hours after the start of the shift unless the shift is six (6) hours or less. Placements are entitled to a second (2nd) meal period for any shifts of ten (10) or more hours, unless it has been waived in writing according to law, however, a Placement may not waive his or her second (2nd) meal period if the Placement works more than twelve (12) hours. This waiver may be revoked upon one (1) day written notice to CONTRACTOR. For a shift between three and one-half (3.5) and six (6) hours, Placements are entitled to one (1) rest break; for a shift between six (6) and ten (10) hours, two (2) rest breaks; and for a shift between ten (10) and fourteen (14) hours, three (3) rest breaks, and so on. Placements are not entitled to a rest break if the shift is less than three and one-half (3.5) hours. COUNTY shall provide all Placements with all breaks and meal periods required pursuant to California law. COUNTY shall reimburse CONTRACTOR for any and all costs, including penalties, incurred by CONTRACTOR for failure to comply with this requirement.

# EXHIBIT C
## CERTIFICATION REGARDING LOBBYING ACTIVITIES
Nightingale Nurses, LLC
For Fiscal Year 2023-2024

*(Place on agency letter head)*

## INVOICE

**Contractor Name**
**Contract Reference**
**Contractor Street Address**
**City, State, Zip Code**

**Invoice Date**
**Invoice Period**
**Invoice Number**

**Contact Name**
**Contact Phone Number**

| Date of Service | Quantity | Description of Service | Rate | Total |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | **Total Invoiced Amount:** | |

## EXHIBIT D
## CERTIFICATION REGARDING LOBBYING ACTIVITIES
Nightingale Nurses, LLC
For Fiscal Year 2023-2024

The undersigned certifies, to the best of his or her knowledge and belief, that:

(1)  No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making, awarding or entering into of this Federal contract, Federal grant, or cooperative agreement, and the extension, continuation, renewal, amendment, or modification of this Federal contract, grant, or cooperative agreement.

(2)  If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency of the United States Government, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, or cooperative agreement, the undersigned shall complete and submit Standard Form LLL, "Disclosure of Lobbying Activities" in accordance with its instructions.

(3)  The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontractors, subgrants, and contracts under grants and cooperative agreements) of $100,000 or more, and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into.  Submission of this certification is a prerequisite for making or entering into this transaction imposed by Section 1352, Title 31, U.S.C., any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

| | |
|---|---|
| Nightingale Nurses, LLC | Gustavo Rengifo |
| Name of Contractor | Printed Name of Person Signing for Contractor |
| | *Gustavo Rengifo* Digitally signed by Gustavo Rengifo Date: 2023.04.25 08:57:01 -04'00' |
| Contract / Grant Number | Signature of Person Signing for Contractor |
| 04/25/2023 | Operations Manager |
| Date | Title |

**EXHIBIT E**
**DISCLOSURE OF LOBBYING ACTIVITIES**
Nightingale Nurses, LLC
For Fiscal Year 2023-2024

| 1. Type of Federal Action: | 2. Status of Federal Action: | 3. Report Type: |
|---|---|---|
| [ ]  a.  contract<br>      b.  grant<br>      c.  cooperative agreement<br>      d.  loan<br>      e.  loan guarantee<br>      f.  loan insurance | [ ]  a.  bid/offer/application<br>      b.  Initial award<br>      c.  post-award | [ ]  a.  initial filing<br>      b.  material change<br>For Material Change Only:<br>Year _____ quarter _____<br>date of last report _____. |

| 4. Name and Address of Reporting Entity:<br><br>☐ Prime        ☐ Subawardee<br>                     Tier ____, if known:<br><br><br>Congressional District, If known: | 5. If Reporting Entity in No. 4 is Subawardee, Enter Name and Address of Prime:<br><br><br><br>Congressional District, If known: |
|---|---|
| 6. Federal Department/Agency | 7. Federal Program Name/Description:<br><br>CDFA Number, if applicable: _____ |
| 8. Federal Action Number, if known: | 9. Award Amount, if known:<br><br>$ |
| 10.a. Name and Address of Lobbying Registrant<br>*(If individual, last name, first name, MI):* | b. Individuals Performing Services *(including address if different from 10a.*<br>*(Last name, First name, MI):* |

| 11. Information requested through this form is authorized by title 31 U.S.C. section 1352. This disclosure of lobbying activities is a material representation of fact upon which reliance was placed by the tier above when this transaction was made or entered into. This disclosure is required pursuant to 31 U.S.C. 1352. This information will be available for public inspection. Any person that fails to file the required disclosure shall be subject to a not more than $100,000 for each such failure. | Signature: _____<br>Print Name: _____<br>Title:<br>Telephone No.: _____ Date: _____ |
|---|---|
| **Federal Use Only** | Authorized for Local Reproduction<br>Standard Form-LLL (Rev. 7-97) |

**EXHIBIT F**
**LOCAL SYSTEM OF CARE**
Nightingale Nurses, LLC
For Fiscal Year 2023-2024

Child services are part of the local System of Care ("SOC"), therefore CONTRACTOR will operate within all applicable principles of the local SOC:

1. Providing effective, community-based services and supports for children and their families which coordinate with other systems to address their emotional, social, educational and physical needs, including, without limitation, traditional and nontraditional services as well as natural and informal supports.

2. Provide individualized services in accordance with the unique potentials and needs of each child and family, guided by a strengths-based planning process and an individualized service plan developed in true partnership with the child and family.

3. Ensure that services and supports include evidence-informed practices and/or interventions supported by practice-based evidence, as agreed upon with COUNTY, to ensure the effectiveness of services and to improve outcomes for children and their families. This includes selecting, training and implementing practices with fidelity and tracking of outcomes associated with intervention using standardized outcome measurement tools.

4. Deliver services and supports within the least restrictive and most normative environments that are clinically appropriate.

5. Ensure that families, other caregivers and youth are full partners in all aspects of the planning and delivery of their own services. CONTRACTOR is also encouraged to include family and youth voice in development and implementation of policies and procedures that govern care for children and youth in their organization.

6. Ensure that services are well coordinated with other child-serving agencies with which the child and/or family may be involved to assure integrated care management.

7. Practice care management at the service level to ensure that multiple services are delivered in a coordinated and therapeutic manner and that children and their families can move through the system of services in accordance with their changing needs.

8. Provide developmentally appropriate mental health services and supports that promote optimal social and emotional outcomes for young children and their families in their homes and community when the CONTRACTOR serves children zero (0) to five (5) years of age.

9. Provide developmentally appropriate services and supports to facilitate the transition of youth eighteen (18) to twenty-one (21) years of age to adulthood and to the transition age youth and adult service systems as needed.

10. Encourage participation in local mental health promotion, prevention and early identification and intervention opportunities.

11. Incorporate continuous accountability and quality improvement mechanisms to track, monitor and manage the quality, effectiveness and outcomes at the program level, practice level and child and family level.

12. Protect the rights of children and families and promote effective advocacy efforts.

13. Provide services and supports without regard to race, religion, national origin, gender, gender expression, sexual orientation, physical disability, socio-economic status, geography, language, immigration status or other characteristics, and ensure that services are sensitive and responsive to these differences.

**FIRST AMENDMENT**
**PROFESSIONAL SERVICES AGREEMENT**
**BY AND BETWEEN**
**COUNTY OF HUMBOLDT**
**AND**
**NIGHTINGALE NURSES, LLC**
**FOR FISCAL YEARS 2023-2024 THROUGH 2024-2025**

This First Amendment to the Professional Services Agreement dated May 10, 2023, by and between the County of Humboldt, a political subdivision of the State of California, hereinafter referred to as "COUNTY," and Nightingale Nurses, LLC, a Florida limited liability company, hereinafter referred to as "CONTRACTOR," is entered into this 29 day of March , 2024.

WHEREAS, COUNTY, by and through its Department of Health and Human Services – Behavioral Health ("DHHS – Behavioral Health"), desired to retain a qualified professional organization to provide supplemental nursing personnel to fill certain positions at various DHHS – Behavioral Health facilities; and

WHEREAS, on May 10, 2023, COUNTY and CONTRACTOR entered into a Professional Services Agreement regarding the provision of such supplemental staffing services; and

WHEREAS, COUNTY and CONTRACTOR now desire to amend certain provisions of the Professional Services Agreement in order to extend the term thereof, increase the maximum amount payable thereunder and modify the budgetary requirements set forth therein.

NOW THEREFORE, the parties mutually agree as follows:

1.    The first paragraph of the Professional Services Agreement is hereby amended to read as follows:

> This Agreement, entered into this tenth day of May 2023, by and between the County of Humboldt, a political subdivision of the State of California, hereinafter referred to as "COUNTY," and Nightingale Nurses, LLC, a Florida limited liability company, hereinafter referred to as "CONTRACTOR," is made upon the following considerations:

2.    Section 2 – Term of the Professional Services Agreement is hereby amended to read as follows:

2.    <u>TERM</u>:

> This Agreement shall begin on July 1, 2023 and shall remain in full force and effect until June 30, 2025, unless extended by a valid amendment hereto or sooner terminated as set forth herein.

3.    Section 4 – Compensation of the Professional Services Agreement is hereby amended to read as follows:

4.    <u>COMPENSATION</u>:

A.    <u>Maximum Amount Payable</u>. The maximum amount payable by COUNTY for any and all services provided, and costs and expenses incurred, pursuant to the terms and conditions of this Agreement is Five Million Forty Thousand Dollars ($5,040,000.00). In no event shall the maximum amount paid under this Agreement exceed Two Million Five Hundred Twenty Thousand Dollars

($2,520,000.00) per fiscal year for fiscal years 2023-2024 and 2024-2025. CONTRACTOR hereby agrees to perform any and all services required by this Agreement for an amount not to exceed such maximum dollar amount. However, if local, state or federal funding or allowance rates are reduced or eliminated, COUNTY may, by amendment, reduce the maximum amount payable hereunder or terminate this Agreement as set forth herein.

B.    Schedule of Rates.  The specific rates and costs applicable to this Agreement are set forth in Exhibit B – Schedule of Rates, which is attached hereto and incorporated herein by reference as if set forth in full.

C.    Additional Services.  Any additional services not otherwise set forth herein, shall not be provided by CONTRACTOR, or compensated by COUNTY, without COUNTY's prior written authorization.  Any and all unauthorized costs and expenses incurred above the maximum payable amount set forth herein shall be the responsibility of CONTRACTOR.  CONTRACTOR shall notify COUNTY in writing, at least six (6) weeks prior to the date upon which CONTRACTOR estimates that the maximum payable amount will be reached.

D.    Effect of Nonpayment.  In the event COUNTY cannot, or will not, pay for services provided by CONTRACTOR pursuant to the terms and conditions of this Agreement, CONTRACTOR shall hold harmless the State of California and Medi-Cal Beneficiaries.

4.    The Professional Services Agreement is hereby amended to delete Exhibit B – Schedule of Rates ("Exhibit B") and replace it in its entirety with the modified version of Exhibit B that is attached hereto and incorporated herein by reference as if set forth in full.  The modified version of Exhibit B attached hereto shall supersede any and all prior versions thereof as of the effective date of this First Amendment.

5.    Except as modified herein, the Professional Services Agreement dated May 10, 2023 shall remain in full force and effect.  In the event of a conflict between the provisions of this First Amendment and the original Professional Services Agreement, the provisions of this First Amendment shall govern.

[Signatures on Following Page]

IN WITNESS WHEREOF, the parties have entered into this First Amendment as of the first date written above.

TWO SIGNATURES ARE REQUIRED FOR LIMITED LIABILITY COMPANIES PURSUANT TO THE CALIFORNIA CORPORATIONS CODE:
(1) CHAIRPERSON OF THE BOARD, PRESIDENT, OR VICE PRESIDENT; AND
(2) SECRETARY, CHIEF FINANCIAL OFFICER OR TREASURER; OR
(3) ANY OTHER PROPERLY AUTHORIZED OFFICIAL OR EMPLOYEE.

## NIGHTINGALE NURSES, LLC:

By: _____                    Date: 03/12/2024

Name: Gustavo Rengifo

Title: Operations Manager

By: _____                    Date: 03/12/2024

Name: Erick Weiss

Title: Vice President of Operations

## COUNTY OF HUMBOLDT:

Botzler-
By: Rodgers, Emi    Digitally signed by Botzler-Rodgers, Emi Date: 2024.03.29 08:46:28 -07'00'        Date: _____

Emi Botzler-Rodgers, Behavioral Health Director
*(Pursuant to the authority granted by the Humboldt County Board of Supervisors on June 25, 2019 [Item C-36])*

## INSURANCE AND INDEMNIFICATION REQUIREMENTS APPROVED:

Oakley,    Digitally signed by Oakley, Jennifer
By: Jennifer    Date: 2024.05.23 12:45:16 -07'00'        Date: 05/23/2024

Risk Management

## LIST OF EXHIBITS:

Exhibit B – Schedule of Rates

**EXHIBIT B**
**SCHEDULE OF RATES**
Nightingale Nurses, LLC
For Fiscal Years 2023-2024 through 2024-2025

1.    HOURLY RATES OF COMPENSATION:

Placements are billed per hour for time worked up to forty (40) hours from Sunday to Saturday ("Work Week"). All such hours shall be considered "regular hours" for purposes of this Agreement. CONTRACTOR shall be compensated for the services provided pursuant to the terms and conditions of this Agreement at the following maximum hourly rates of compensation:

| Position | Regular Rate | Incentive Rate | Critical Need Rate |
|---|---|---|---|
| Psychiatric Registered Nurse | $100.00 | $105.00 | $140.00 |
| Supervising Registered Nurse | $110.00 | N/A | N/A |
| Licensed Vocational Nurse | $82.00 | $92.00 | N/A |
| Licensed Psychiatric Technician | $82.00 | $92.00 | N/A |

2.    ON-CALL SERVICE RATES:

On call services are billed at the maximum hourly rate of Ten Dollars ($10.00) per hour, with a two (2) hour minimum. When Placements are assigned by COUNTY to be "on-call," CONTRACTOR shall be entitled to be paid for the full amount of the time assigned whether or not such Placements are required to work.

3.    OVERTIME RATES:

COUNTY will be charged overtime rates of one and one-half (1.5) times the hourly rates set forth herein for any time worked over forty (40) hours in a Work Week. CONTRATOR shall be responsible for paying all other overtime required by any and all applicable local, state and federal laws, regulations and standards.

4.    CALL-BACK RATES:

If Placements are called back in to work while they are on-call, time worked during that shift shall be billed at one and one-half (1.5) times the hourly rates set forth herein.

5.    HOLIDAY RATES:

All hours worked during the following holidays shall be billed at one and one-half (1.5) times the hourly rates set forth herein:

- Juneteenth
- Independence Day
- Labor Day
- Veteran's Day
- Thanksgiving Day
- Day After Thanksgiving
- Christmas Day
- New Year's Day
- Martin Luther King Jr. Day
- Lincoln's Birthday
- President's Day
- Cesar Chavez Day
- Memorial Day

6.    ALLOCATION AND DEDUCTION OF TRAVEL EXPENSES:

A.    Travel Expenses. The CONTRACTOR's hourly billing rates and COUNTY's payment of those hourly rates necessarily incorporate and contemplate that a portion of those rates is to reimburse CONTRACTOR for all lodging, meals and incidental expenses incurred by Placements ("travel expenses"). COUNTY acknowledges and agrees that a portion of its payment for the hourly billing rates shall reimburse CONTRACTOR for all travel expenses paid by CONTRACTOR to any of the Placements providing services to COUNTY hereunder. COUNTY may deduct such allocable portion of the payment as travel expenses subject to any applicable federal limitations.

B.    Documentation of Travel Expenses. CONTRACTOR shall provide COUNTY with information detailing all such per diem allowances paid for travel expenses on a report referenced and included as a part of each invoice. Each such report shall be deemed to be incorporated by reference into the applicable invoice and read as a part thereof. Such report shall contain the names of each Placement providing services to COUNTY who received per diem allowances during the period referenced on the invoice, as well as the aggregate amount of those allowances during the billing period. Copies of such expense reports shall be maintained by CONTRACTOR, and be available upon request, if needed to further substantiate COUNTY's tax deductions for travel expenses.

C.    Per Diem Allowances. CONTRACTOR is providing COUNTY with an aggregate hourly rate for billing purposes which is inclusive of both the amounts for healthcare services provided by Placements hereunder and reimbursements for per diem allowances paid by CONTRACTOR to Placements, at the current rate, with zero percent (0%) markup. The aforementioned hourly rate is being given solely at COUNTY's request to allow COUNTY to compare the total cost of CONTRACTOR's services to its competitors' and it shall in no way reflect treatment of how CONTRACTOR is paying wages to Placements.

7.    BREAKS AND REST PERIODS:

Under California Law, all Placements are entitled to a thirty (30) minute uninterrupted meal period for every five (5) hours worked. Placements' first (1st) meal period must be taken within the first (1st) five (5) hours after the start of the shift unless the shift is six (6) hours or less. Placements are entitled to a second (2nd) meal period for any shifts of ten (10) or more hours, unless it has been waived in writing according to law, however, a Placement may not waive his or her second (2nd) meal period if the Placement works more than twelve (12) hours. This waiver may be revoked upon one (1) day written notice to CONTRACTOR. For a shift between three and one-half (3.5) and six (6) hours, Placements are entitled to one (1) rest break; for a shift between six (6) and ten (10) hours, two (2) rest breaks; and for a shift between ten (10) and fourteen (14) hours, three (3) rest breaks, and so on. Placements are not entitled to a rest break if the shift is less than three and one-half (3.5) hours. COUNTY shall provide all Placements with all breaks and meal periods required pursuant to California law. COUNTY shall reimburse CONTRACTOR for any and all costs, including penalties, incurred by CONTRACTOR for failure to comply with this requirement.

**SECOND AMENDMENT**
**PROFESSIONAL SERVICES AGREEMENT**
**BY AND BETWEEN**
**COUNTY OF HUMBOLDT**
**AND**
**NIGHTINGALE NURSES, LLC**
**FOR FISCAL YEARS 2023-2024 THROUGH 2024-2025**

This Second Amendment to the Professional Services Agreement dated May 10, 2023, as amended on March 29, 2024, by and between the County of Humboldt, a political subdivision of the State of California, hereinafter referred to as "COUNTY," and Nightingale Nurses, LLC, a Florida limited liability company, hereinafter referred to as "CONTRACTOR," is entered into this __5__ day of __September__, 2024.

WHEREAS, COUNTY, by and through its Department of Health and Human Services – Behavioral Health ("DHHS – Behavioral Health"), desired to retain a qualified professional organization to provide supplemental nursing personnel to fill certain positions at various DHHS – Behavioral Health facilities; and

WHEREAS, on May 10, 2023, COUNTY and CONTRACTOR entered into a Professional Services Agreement regarding the provision of such supplemental staffing services; and

WHEREAS, on March 29, 2024, COUNTY and CONTRACTOR agreed to amend the Professional Services Agreement in order to extend the term thereof, increase the maximum amount payable thereunder and modify the budgetary requirements set forth therein; and

WHEREAS, COUNTY and CONTRACTOR now desire to amend certain provisions of the Professional Services Agreement in order to increase the maximum amount payable thereunder.

NOW THEREFORE, the parties mutually agree as follows:

1.  Section 4 – Compensation of the Professional Services Agreement is hereby amended to read as follows:

    4.  <u>COMPENSATION</u>:

        A.  <u>Maximum Amount Payable</u>. The maximum amount payable by COUNTY for any and all services provided, and costs and expenses incurred, pursuant to the terms and conditions of this Agreement is Five Million One Hundred Forty Thousand Dollars ($5,140,000.00). In no event shall the maximum amount paid under this Agreement exceed Two Million Six Hundred Twenty Thousand Dollars ($2,620,000.00) for fiscal year 2023-2024 and Two Million Five Hundred Twenty Thousand Dollars ($2,520,000.00) for fiscal year 2024-2025. In the event that the maximum amount payable for a specified fiscal year is not reached, the remaining balance thereof will be added to the maximum amount payable for the following fiscal year. CONTRACTOR hereby agrees to perform any and all services required by this Agreement for an amount not to exceed such maximum dollar amount. However, if local, state or federal funding or allowance rates are reduced or eliminated, COUNTY may, by amendment, reduce the maximum amount payable hereunder or terminate this Agreement as set forth herein.

        B.  <u>Schedule of Rates</u>. The specific rates and costs applicable to this Agreement are set forth in Exhibit B – Schedule of Rates, which is attached hereto and incorporated herein by reference as if set forth in full.

C.  Additional Services. Any additional services not otherwise set forth herein, shall not be provided by CONTRACTOR, or compensated by COUNTY, without COUNTY's prior written authorization. Any and all unauthorized costs and expenses incurred above the maximum payable amount set forth herein shall be the responsibility of CONTRACTOR. CONTRACTOR shall notify COUNTY in writing, at least six (6) weeks prior to the date upon which CONTRACTOR estimates that the maximum payable amount will be reached.

D.  Effect of Nonpayment. In the event COUNTY cannot, or will not, pay for services provided by CONTRACTOR pursuant to the terms and conditions of this Agreement, CONTRACTOR shall hold harmless the State of California and Medi-Cal Beneficiaries.

2.  Except as modified herein, the Professional Services Agreement dated May 10, 2023, as amended on March 29, 2024, shall remain in full force and effect. In the event of a conflict between the provisions of this Second Amendment and the original Professional Services Agreement, or any prior amendments thereto, the provisions of this Second Amendment shall govern.

[Signatures on Following Page]

IN WITNESS WHEREOF, the parties have entered into this Second Amendment as of the first date written above.

TWO SIGNATURES ARE REQUIRED FOR LIMITED LIABILITY COMPANIES PURSUANT TO THE CALIFORNIA COPRORATIONS CODE:
    (1) CHAIRPERSON OF THE BOARD, PRESIDENT, OR VICE PRESIDENT; AND
    (2) SECRETARY, CHIEF FINANCIAL OFFICER OR TREASURER; OR
    (3) ANY OTHER PROPERLY AUTHORIZED OFFICIAL OR EMPLOYEE.

## NIGHTINGALE NURSES, LLC:

By: _____    Date: 08/19/2024

Name: Gustavo Rengifo

Title: Operations Manager

By: _____    Date: 08/19/2024

Name: Eric Wiest

Title: Vice President of Operations

## COUNTY OF HUMBOLDT:

By: Botzler-Rodgers, Emi
Digitally signed by Botzler-Rodgers, Emi
Date: 2024.09.05 16:57:14 -07'00'
    Date: _____

Emi Botzler-Rodgers, Behavioral Health Director
*(Pursuant to the authority granted by the*
*Humboldt County Board of Supervisors on*
*June 25, 2019 [Item C-36])*

## INSURANCE AND INDEMNIFICATION REQUIREMENTS APPROVED:

By: Oakley, Jennifer
Digitally signed by Oakley, Jennifer
Date: 2024.08.29 13:42:04 -07'00'
    Date: 08/29/2024

Risk Management